**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

-----------------------------------------------------------------X

JOHN DOE,                                                  Civ. No.

                    **Plaintiff,**

                                             **COMPLAINT**

      v.

DRAKE UNIVERSITY, DRAKE UNIVERSITY
BOARD OF TRUSTEES, EARL MARTIN,                            **JURY TRIAL**
KATHRYN OVERBERG, JERRY PARKER,                            **DEMANDED**
SENTWALI BAKARI, MARY HOWELL SIRNA,
TRICIA MCKINNEY, JERRY FOXHOVEN,

                    **Defendants.**
-----------------------------------------------------------------X

Plaintiff John Doe (hereinafter referred to as "Plaintiff" or "John Doe") by his undersigned counsel and as and for his Complaint, respectfully alleges as follows:

### The Nature of this Action

1.      This case arises out of the actions taken and procedures employed by Defendants Drake University ("Drake" or the "University"), Drake University Board of Trustees ("Defendant Board of Trustees"), Earl "Marty" Martin ("Defendant Martin"), Kathryn Overberg  ("Defendant Overberg"), Jerry Parker ("Defendant Parker"), Sentwali Bakari ("Defendant Bakari"), Mary Howell Sirna ("Defendant Sirna"), Tricia McKinney ("Defendant McKinney"), and Jerry Foxhoven ("Defendant Foxhoven") (collectively, "Defendants") concerning allegations made against Plaintiff, a male student at Drake, at the time in his senior year, as a result of false allegations of nonconsensual sexual activity with fellow Drake student Jane Doe.

1

2.      Plaintiff John Doe[1] seeks relief against Drake following Drake's wrongful and unjustified imposition of sanctions based on a fellow Drake student's false and unproven allegations of sexual misconduct, as well as Drake's failure and refusal to investigate or report John Doe's own allegations of sexual misconduct. This injustice was the direct result of Drake's failure to (1) conduct an adequate investigation, (2) provide Plaintiff with due process as defined by Drake's own policies, and (3) excessively focus on the concerns and interests of the female complainant and the convenience of the University to the total exclusion of the rights and interests of the male respondent John Doe.

3.      Drake's precipitous and unjustified actions violated its contract with John Doe, the applicable standard of care under Iowa law, and the requirements of Title IX of the Education Amendments of 1972.

4.      Drake's arbitrary and capricious findings and action have derailed John Doe's education, tarnished his reputation, and permanently damaged his future career and educational prospects.

**The Parties**

5.      Plaintiff is a natural person, of Hispanic descent, who was born in Costa Rica. Plaintiff is a citizen of the United States and resident and citizen of the state of Illinois.  During the events described herein, Plaintiff was a student at Drake University and resided in his fraternity house in Des Moines, Iowa.

---

[1]      Plaintiff files herewith a motion for leave to use pseudonyms.

2

6.      Upon information and belief, Drake University is a private, co-educational university that offers a number of undergraduate and graduate programs, as well as professional programs, located in Des Moines, Iowa.

7.      Upon information and belief, the Drake University Board of Trustees is the governing body of Drake University. It is composed of approximately 33 voting members, and approximately 29 of the voting members are Drake alumni. "Full authority on matters pertaining to Drake University rests with the University's Board of Trustees."[2]

8.      Upon information and belief, Earl "Marty" Martin is a resident of the State of Iowa and was the President of Drake University at all relevant times herein. He has been employed by Drake since July 1, 2015.

9.      Upon information and belief, Kathryn Overberg is a resident of the State of Iowa and was Drake's Title IX Coordinator/Equity and Inclusion Policy Specialist since October 2015 and at all relevant times herein.

10.     Upon information and belief, Mary Howell Sirna is a resident of the State of Iowa and was the Interim Title IX Coordinator, Interim Equal Opportunity Director, and Administrative Adviser for Iowa State University Police during all relevant times herein. She was selected by Drake University to serve as Investigator for the matter concerning John Doe and Jane Doe only.

11.     Upon information and belief, Tricia McKinney is a resident of the State of Iowa and was Assistant Director of Campus Public Safety at Drake University during all relevant times herein.

---

[2] www.drake.edu/media/departmentsoffices/catalogfiles/archive/pdfugrad0607/15-BOT-UniversityGov.pdf

12.     Upon information and belief, Sentwali Bakari is a resident of the State of Iowa and was Dean of Students of the University at all relevant times herein.

13.     Upon information and belief, Jerry Parker is a resident of the State of Iowa and was Associate Dean of Students and Acting Dean of Students of the University at all relevant times herein. He has been an employee of Drake since December 2014.

14.     Upon information and belief, Jerry Foxhoven is a resident of the State of Iowa and was Professor of Law, Executive Director of the Drake Legal Clinic, and Hearing Officer of the University at all relevant times herein.

15.     Plaintiff and Defendants Drake University, Drake University Board of Trustees, Martin, Overberg, Parker, Bakari, Sirna, McKinney, and Foxhoven are sometimes hereinafter collectively referred to as the "Parties."

## Jurisdiction and Venue

16.     This Court has diversity, federal question, and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. § 1367 because: (i) John Doe is a citizen of the state if Illinois and Drake University and the other individual Defendants are citizens of Iowa and the amount in controversy exceeds $75,000.00, exclusive of costs and interest; (ii) the claims herein arise under federal law; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

17.     This Court has personal jurisdiction over Drake University on the grounds that Drake University is conducting business within the State of Iowa and personal

jurisdiction over all the other Defendants who are residents of or whose actions are the subject of this action took place in the Southern District of Iowa.

18.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

19.     On April 11, 2011, the United States Department of Education's ("DOE") Office of Civil Rights ("OCR") sent a "Dear Colleague" letter to colleges and universities with instructions on how to comply with Title IX when investigating and resolving complaints of sexual misconduct. ("2011 Dear Colleague Letter") (*available at* http://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html last visited 8/21/16).  This letter echoes the mandates of President Obama's Administration that colleges like Drake equate "victim/complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.  For instance, the 2011 Dear Colleague Letter:

a)  states: "1 in 5  women are victims of completed or attempted sexual assault while in college . . . [a]dditionally, the likelihood that a  woman with intellectual disabilities will be sexually assaulted is estimated to be significantly higher than the general population.  The Department is deeply concerned about this problem . . . ." 2011 Dear Colleague Letter, p. 2;

b)  warns that "the majority of campus sexual assaults occur when  women are incapacitated, primarily by alcohol." *Id.*;

c)  suggests educational institutions seek grants from the U.S. Department of Justice's Office on Violence against Women, which require institutions "develop victim service programs and campus policies that ensure victim safety, [and] offender accountability . . . ." *Id*. p. 19; and

d)  warns education institutions that they must "never" view the "victim at fault for sexual violence" if she has been using "alcohol or drugs."  In fact, OCR asks "schools to consider" providing students who violate alcohol or drug policies with amnesty if they allege they were sexually assaulted while consuming alcohol or drugs.  *Id.* p. 15.

20.     In order to provide females preferential treatment, the 2011 Dear Colleague Letter also imposed numerous mandates to make it more difficult for males accused of sexual misconduct to defend themselves. For example, the  2011  Dear Colleague  Letter  required schools adopt the lowest burden of proof—"more likely than not"—in cases involving sexual misconduct, including assault. Several colleges had been using "clear and convincing" evidence and some, like Stanford, applied the criminal standard, "beyond a reasonable doubt." The 2011 Dear Colleague Letter also mandated schools "minimize the burden on the complainant."  2011 Dear Colleague Letter, pp. 15-16.

21.     Similarly, on April 29, 2014, OCR published a document signed by OCR's Assistant Secretary of Education Catherine E. Lhamon ("Sec. Lhamon") titled "Questions and Answers  on  Title  IX  and  Sexual  Violence."  ("OCR's  2014  Q&A")   *available  at*  http://www2.ed.gov/about/offices/list/ocr/docs/qa-201404-title-ix.pdf   (last visited 8/21/16).  OCR's 2014 Q&A continued OCR's quest to hamper students' ability to defend themselves by reducing or eliminating the ability to expose credibility flaws in the allegations made against them.  For example, OCR's 2014 Q&A states schools:

a)  "[M]ust not require a complainant to be present" at sexual misconduct disciplinary hearings."  OCR's 2014 Q&A, p. 30;
b)  May decide to eliminate all opportunities for "cross-examination." *Id.* p. 31; and

6

c) Must avoid "revictimization" by minimizing the number of times a victim is interviewed so "complainants are not unnecessarily required to give multiple statements about a traumatic event." *Id.* pp. 30, 38.

22.     Neither OCR's 2014 Q&A nor the 2011 Dear Colleague Letter were subject to notice-and-comment rulemaking, and therefore their validity as binding law is at best questionable. As a result, Senator James Lankford wrote to the DOE on January 7, 2016 to express his concerns that the DOE's Dear Colleague letters are not interpretive, but are unlawfully altering the regulatory and legal landscape of Title IX and the U.S. Constitution. https://www.thefire.org/sen-james-lankford-letter-to-the-education-department/ (last visited 9/12/16). Following Senator Lankford's letter, Representative Earl Ehrhart from Georgia filed a lawsuit against the DOE on April 21, 2016 in the United States District Court for the Northern District of Georgia alleging that the DOE's implementation of the 2011 Dear Colleague letter was unconstitutional and unlawful. *See* http://www.saveservices.org/wp-content/uploads/Ehrhart-v.-DOE-2016.pdf (last visited 9/12/16).

23.     Similar allegations were made against DOE in two federal lawsuits. The first is *Neal v. Colorado State Univ.-Pueblo, et al.*, Case No. 1:16-cv-00873, which was filed on April 19, 2016, in the United States District Court for the District of Colorado. The second is *John Doe v. Lhamon et al.*, which was filed in United States District Court for the District of Columbia. https://d28htnjz2elwuj.cloudfront.net/wp-content/uploads/2016/06/16141411/doe-v-lhamon-complaint.pdf (last visited 9/12/16). The Lhamon Complaint contains the following information about how OCR is pressuring

colleges around the country to make it more difficult for male students accused of sexual

misconduct to defend themselves:

a)   "Princeton University . . . continued to use a 'clear and persuasive evidence' standard after publication of the [2011 Dear Colleague Letter. As a result] OCR informed Princeton in a letter dated November 5, 2014, that its policy 'did not provide for an adequate, reliable and impartial investigation' . . . . In a 'Resolution Agreement' accompanying that letter, OCR required Princeton to adopt 'the proper standard of review of allegations of sexual misconduct (preponderance of the evidence).'"

b)   " . . . in a letter dated December 30, 2014, OCR informed Harvard Law school (HLS) that the sexual misconduct policy it continued to use after publication of the [2011 Dear Colleague Letter] '*improperly* used a "clear and convincing" evidence standard of proof in its Title IX grievance procedures, *in violation of Title IX*.' The letter confirmed elsewhere that '[t]his higher standard of proof was inconsistent with preponderance of the evidence standard required by Title IX for investigating allegations of sexual harassment or violence' . . . by January 15, 2015, procedures 'that comply with the applicable Title IX regulations and OCR policy,' which procedures must include, among other things, '[a]n explicit statement that the preponderance of evidence standard will be used for investigating allegations of sexual harassment or violence.'" (emphasis in original).

c)   "In a letter dated October 31, 2013, OCR notified the State University of New York (SUNY) System that '[t]he grievance procedures used by' Buffalo State 'do not specify whether the arbitrator should use the preponderance of evidence standard in investigating allegations of sexual harassment' and further that Morrisville State College 'fail[ed] to . . . use the preponderance of the evidence standards to investigate allegations of sexual harassment.' It ordered the SUNY System to '[r]evise the SUNY System grievance procedures to ensure that these comply with the *requirements* of Title IX; including using the preponderance of evidence standard to investigate allegation of sexual harassment." (emphasis in original).

d)   "OCR has ordered at least two schools to adopt grievance procedures that explicitly forbid parties from directly cross-examining each other in sexual misconduct disciplinary proceedings despite the fact that the [2011 Dear Colleague Letter] states that personal cross-examination is only 'strongly discourage[d].'"

e)   "In a Resolution Agreement with Rockford University signed on April 24, 2015, OCR required Rockford University to present to OCR for review a

draft Title IX policy that stated, among other things, that 'the parties may not personally question or cross-examine each other during the hearing.'"

f) "... in a resolution agreement with Southern Virginia University entered on or around December 23, 2014, OCR required Southern Virginia University to draft, by March 31, 2015, Title IX grievance procedures that stated, 'If cross- examination of parties is permitted . . . the parties will not be permitted to personally question or cross-examine each other.'" *Id.* pp. 13-15, ¶¶ 47-52.

24. In February 2014, Sec. Lhamon told college officials attending a conference at the University of Virginia that schools need to make "radical" change. According to the Chronicle of Higher Education, college presidents suggested afterward that there were "crisp marching orders from Washington." *See* Libby Sander, *Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases*, The Chronicle of Higher Education, (Feb. 11, 2014), *available at* http://chronicle.com/article/Colleges-Are-Reminded-of/144703/ (last visited 9/12/16).

25. Consistent with this message from Sec. Lhamon, in October 2013, Drake became ensnared in an investigation by DOE's OCR because of its handling of sexual assault and harassment complaints. *See* Nick Anderson, *55 Colleges Under Title IX Probe for Handling of Sexual Violence and Harassment Claims*, Wash. Post (May 1, 2014), *available at* https://www.washingtonpost.com/local/education/federal-government-releases-list-of-55-colleges-universities-under-title-ix-investigations-over-handling-of-sexual-violence/2014/05/01/e0a74810-d13b-11e3-937f-d3026234b51c_story.html (last visited 9/12/16).

26. At all times relevant to this Complaint, Drake's investigations by DOE's OCR were ongoing. Unfortunately, Drake is only one of many institutions subject to

these types of OCR investigations.  *See, e.g.*, Nick Anderson, *Tally of Federal Probes of Colleges on Sexual Violence Grows 50 Percent Since May*, Wash. Post, Oct. 19 2014, *available at*  https://www.washingtonpost.com/local/education/tally-of-federal-probes-of-colleges-on-sexual-violence-grows-50-percent-since-may/2014/10/19/b253f02e-54aa-11e4-809b-8cc0a295c773_story.html (last visited 9/12/16); Title IX, The Chronicle of Higher Education, *available at* http://projects.chronicle.com/titleix/cases (containing database of information related DOE's Title IX investigations of colleges and universities since 2011) (last visited 9/12/16).

27.  OCR's investigations primarily involve females alleging the universities they attend condone sexual harassment and/or sexual violence by males. These complaints by female students have triggered OCR investigations of academic institutions that include, but are not limited to: (i) the University of Virginia; (ii) Southern Methodist University; (iii) Yale University; (iv) George Washington University; (v) Tufts University; and (vi) the University of Montana in Missoula. *See generally*  Letter from Alice B. Wender, OCR Regional Office Director, to Dr. Teresa A. Sullivan, University of Virginia President, Sept. 21, 2015, *available at* http://www2.ed.gov/documents/press-releases/university-virginia-letter.pdf  (last visited 9/12/16) (containing OCR's letter to the University of Virginia regarding OCR's Title IX investigation); Letter from Taylor D. August, OCR Regional Director, to Dr. R. Gerald Turner, Southern Methodist University President, Dec. 11, 2014, *available at* http://www2.ed.gov/documents/press-releases/southern-methodist-university-letter.pdf (last visited 9/12/16) (containing  OCR's  letter  to  Southern Methodist University

regarding OCR's Title IX investigation) (last visited 9/12/16); Letter from Thomas J. Hibino, OCR Regional Director, to Dorothy K. Robinson, Yale University Vice President and General Counsel, June 15, 2012, *available at* http://www2.ed.gov/about/offices/list/ocr/docs/investigations/01112027-a.html (last visited 9/12/16) (containing OCR's letter to Yale University regarding OCR's Title IX investigation); Letter from Olabisi L. Okubadejo, OCR Team Leader, to Dr. Steven Knapp, George Washington University President, Aug. 31, 2011, *available at* http://www2.ed.gov/about/offices/list/ocr/docs/investigations/11112079-a.pdf (last visited 9/12/16) (containing OCR's letter to George Washington University regarding OCR's Title IX investigation); Letter from Thomas J. Hibino, OCR Regional Director, to Anthony P. Monaco, Tufts University President, Apr. 28, 2014, *available at* http://www2.ed.gov/about/offices/list/ocr/docs/investigations/01102089-a.html (last visited 9/12/16) (containing OCR's letter to Tufts University regarding OCR's Title IX investigation).

28. Many academics and organizations have raised alarms that DOE/OCR's worthwhile goal of protecting female college students from sexual misconduct has evolved into an unlawful example of federal governmental overreach that violates the rights of male students who never engaged in misconduct. *See, e.g.*, Eugene Volokh, *Open Letter From Sixteen Members of Penn Law School Faculty*, Wash. Post (Feb. 17, 2014), *available at* http://www.washingtonpost.com/news/volokh-conspiracy/wp/2015/02/19/open-letter-from-16-penn-law-school-professors-about-title-ix-and-sexual-assault-complaints/ (last visited 8/23/16) ("Although we appreciate the

efforts of Penn and other universities to implement fair procedures, particularly in light of the financial sanctions threatened by OCR, we believe that OCR's approach exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness."); Emily D. Safko, *Are Campus Sexual Assault Tribunals Fair?: The Need For Judicial Review and Additional Due Process Protections In Light of New Case Law*, 84 Fordham L. Rev. 2289 (2016); Barclay Sutton Hendrix, *A Feather on One Side, A Brick on the Other: Tilting the Scale Against Males Accused of Sexual Assault In Campus Disciplinary Proceedings*, 47 Ga. L. Rev. 591 (2013); Stephen Henrick, *A Hostile Environment for Student Defendants*: *Title IX and Sexual Assault on College Campuses*, 40 N. Ky. L. Rev. 49 (2013); *Rethink Harvard's Sexual Harassment Policy*, Letter to Editor, Boston Globe (Oct. 15, 2015), *available at* 2015, http://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html  (last visited 8/21/16); Janet Halley, *Trading the Megaphone for the Gavel in Title IX Enforcement*, 128 Harv. L. Rev. F.  103, 103-17, (2015); Samantha Harris, *Campus Judiciaries on Trial: An Update from the Courts*, Heritage Foundation (Oct. 6. 2015), *available at* http://www.heritage.org/research/reports/2015/10/campus-judiciaries-on-trial-an-update-from-the-courts (last visited 9/12/16); Janet Napolitano, *"Only Yes Means Yes": An Essay on University Policies Regarding Sexual Violence and Sexual Assault*, 33 Yale L. & Pol'y Rev. 387 (2015); Robin Wilson, *Presumed Guilty*, Chronicle of Higher Education (Sept. 1, 2014), *available at* http://chronicle.com/article/Presumed-Guilty/148529/?cid=a&utm_medUCm=en (last visited 9/12/16) ("Under current

interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."); Jacob Gershman, *Dershowitz and Other Professors Decry 'Pervasive and Severe Infringement' of Student Rights* (May 18, 2016), *available at* http://blogs.wsj.com/law/2016/05/18/dershowitz-and-other-professors-decry-pervasive-and-severe-infringement-of-student-rights/ (last visited 9/12/16).

29.   As detailed in many of the publications cited above, OCR's investigations put millions of dollars in federal student aid at risk. This is because DOE/OCR can impose civil penalties and/or suspend institutions from participating in federal student financial aid programs if DOE/OCR finds a university, such as Drake, did not do enough to discipline males alleged to have engaged in sexual misconduct with female students. Sec. Lhamon confirmed this risk of losing federal funds at a national conference at Dartmouth in the summer of 2014 when she said, "I will go to enforcement, and I am prepared to withhold federal funds." *See* Tovia Smith, *How Campus Sexual Assaults Came to Command New Attention*, NPR (Aug. 12, 2014), *available at* http://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command-new-attention (last visited 9/12/16).

30.   In June 2014, Sec. Lhamon told a Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . . ." Full

testimony available at http://www.help.senate.gov/hearings/sexual-assault-on-campus-

working-to-ensure- student-safety (last visited 11/29/16).  In addition, Sec. Lhamon noted

> "If OCR cannot secure voluntary compliance from the recipient, OCR
> may initiate an administrative action to terminate and/or refuse to grant
> federal funds or refer the case to the DOJ to file a lawsuit against the
> school. To revoke federal funds—the ultimate penalty—is a powerful
> tool because institutions receive billions of dollars a year from the
> federal government for student financial aid, academic resources and
> many other functions of higher education. OCR has not had to impose
> this severe penalty on any institution recently because our enforcement
> has consistently resulted in institutions agreeing to take the steps
> necessary to come into compliance and ensure that students can learn in
> safe, nondiscriminatory environments."

http://www.help.senate.gov/hearings/sexual-assault-on-campus-working-to-

ensure-student-safety (last visited 11/29/16).

31.  For Drake, the withdrawal of federal funding would be catastrophic in part

because, upon information and belief, for the year ending June 30, 2014, Drake had

received $1,058,675 in federal funding and $8,988,122 in government grants and

contracts, in addition to the federal student loan money they receive. *See* Drake

University Audit Report, FY 2014, *available at* http://www.drake.edu/media/

departmentsoffices/businessandfinance/busfin/documents/Final%20FY14%20Drake%20

Audit%20Report%20(SHORT%20FORM).pdf (last visited 9/12/16).

32.  As detailed in some of the publications cited above, OCR investigations put

immediate and tremendous pressure upon universities, such as Drake, to: (a) aggressively

prosecute males accused of sexual misconduct; (b) severely discipline male students

alleged to have engaged in sexual misconduct regardless of their innocence; and (c)

14

equate "victim/complainants" in sexual misconduct proceedings as being females who must receive preferential treatment.

33.   Upon information and belief, OCR pressured Drake to apply the preponderance of the evidence standard, which would have the result of making it easier to: (a) find accused male students responsible in sexual misconduct cases, even if it meant depriving these accused male students of their Constitutional rights; and (b) equate "complainants" in sexual misconduct proceedings as being females who must receive preferential  treatment  in  part because of pressure from the federal government.

34.   The use of the preponderance of the evidence standard has also been challenged in a paper submitted by the American Association of University Professors in March 2016. (*Exhibit* 2 containing AAUP paper).

35.   Therefore, upon information and belief, pressure from governmental agencies such as OCR/DOE and/or internal forces at Drake caused Drake to apply its Title IX policies in an unlawful and gender-biased manner against John Doe. Evidence of Drake's gender bias includes, but is not limited to, the fact that Drake is prosecuting Jane Doe's October 2015 Title IX complaint against John Doe, while rejecting: (a) John Doe's October 2015 Title IX complaint against Jane Doe; and (b) John Doe's complaint regarding the bad faith, unsupported, and false nature of Jane Doe's October 2015 Title IX complaint.

36.   Additionally, upon information and belief, Drake adopted gender-biased policies and procedures for addressing complaints of sexual assault in order to avoid

negative publicity that the University did not adequately handle sexual assault investigations.

37. Furthermore, based on the information detailed in this Complaint and upon information and belief, Drake's discriminatory treatment of John Doe occurred in part because of Drake's archaic assumptions that female students do not sexually assault or harass their fellow male students because females are less sexually promiscuous than males. Evidence supporting this belief includes, but is not limited to, Drake prosecuting Jane Doe's October 2015 Title IX complaint against John Doe, while rejecting: (a) John Doe's October 2015 Title IX complaint against Jane Doe; and (b) John Doe's complaint regarding the bad faith, unsupported, and false nature of Jane Doe's October 2015 Title IX complaint.

38. In engaging in the conduct detailed in the preceding paragraph and below, Drake is failing to comply with OCR's guidance regarding the credibility of the parties and the presence of corroborating evidence. *See generally*, *OCR's Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties* ("OCR's Sexual Harassment Guide") (January 2001), *available at* https://www2.ed.gov/offices/OCR/ archives/pdf/ shguide.pdf (last visited 9/12/16).

For example, OCR's Sexual Harassment Guide recommends evaluating the "relative credibility" of evidence by looking at the level of detail and consistency of each person's account . . . in an attempt to determine who is telling the truth. Another way to assess credibility is to see if corroborative evidence is lacking where it should logically exist." *OCR's Sexual Harassment Guide*, p. 9.

16

39.   Upon information and belief, Drake engaged in the gender-biased behavior and/or Title IX retaliation detailed in this Complaint, in part because of fear of President Obama's treatment to females such as Jane Doe.   Evidence supporting this belief includes The White House's April 2014 report entitled "Not Alone," which threatens the elimination of federal funds by stating: "[i]f OCR finds a Title IX violation, the school risks losing federal funds." Not Alone:  The First Report of the White House Task Force  to  Protect  Students  from  Sexual  Assault  (April  2014),  *available  at* www.whitehouse.gov/sites/default/files/docs/report_0.pdf (last visited 9/12/16).

40.   The White House also noted that:   "The Justice Department (DOJ) . . . shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools receiving DOJ financial assistance.  If schools are found to violate Title IX and a voluntary resolution cannot be reached, DOJ can . . . seek to terminate DOJ funds."  *Id.*

41.   President Obama's federal funding threats dovetail with his Administration's "It's On Us" campaign that states: "[a]n estimated one in five women has been sexually assaulted during her college years. . . ." Tanya Somanader, *President Obama Launches the "It's On Us" Campaign to End Sexual Assault on Campus*, The White House Blog (Sept. 19, 2014),  *available  at*  https://www.whitehouse.gov/blog/2014/09/19/president-obama-launches-its-us-campaign-end-sexual-assault-campus  (last  visited  9/12/16); *Fact Sheet:  Not Alone—Protecting Students from Sexual Assault* (Apr. 29, 2014), *available at*        https://www.whitehouse.gov/the-press-office/2014/04/29/fact-sheet-not-alone-protecting-students-sexual-assault (last visited 9/12/16).

42.   Upon information and belief, in response to pressure from the DOE/OCR, Drake joined the "It's On Us" Campaign on or before September 2014. https://www.whitehouse.gov/sites/default/files/docs/college_list_updated_final.pdf   (last visited 9/12/16).

43.   However, the Obama Administration's allegations that 20% of America's female college students are being sexually assaulted by their male counterparts is false. For example, over 90% of the colleges and universities in the United States reported *none* of their students were raped in 2014. *91 Percent of Colleges Reported Zero Incidents of Rape in 2014*, AAUW (Nov. 23, 2015), *available at* http://www.aauw.org/article/clery-act-data-analysis/ (last visited 11/29/16).

44.   Although Drake will likely allege Drake's enforcement of sexual misconduct policies and the White House's "It's On Us" campaign are gender neutral, both are irreparably tainted by gender bias against male students.

45.   In addition, Vice President Joe Biden has made it clear that the purpose of the "It's On Us" campaign is to protect female students from male students. *See, e.g.*, https://www.osu.edu/buckeyesact/vpbidenvideo.html   (last   visited   9/12/16).   Vice President Biden also made it clear that President Obama's Administration and the DOE used Title IX investigations and potential loss of federal funding to encourage university presidents to join the campaign. *Id.*  In addition, Vice President Biden encourages "guys" to take the "It's On Us" pledge to combat the fact that one in five college women are the victim of sexual assault while attending college. *Id.*

46.   Emily Yoffe's 2014 article in *Slate* refutes sexual assault statistics relied on by President Obama and/or Drake.  *Emily Yoffe*, *The College Rape Overcorrection*, Slate (Dec. 7, 2014), *available at* http://www.slate.com/articles/double_x/ doublex/2014/12/college_rape_campus_sexual_assault_is_a_serious_problem_but_the_e fforts.html  (last visited 9/12/16). Ms. Yoffe asked Christopher Krebs—the lead author of the study cited by President Obama—whether his study represented the experience of the approximately twelve million female students in America.  *Id.*  Mr. Krebs stated those involved in the study "don't think one in five is a nationally representative statistic." *Id.*  This was because Mr. Krebs stated his sampling of only two schools "[i]n no way . . .  make[s] our results nationally representative." *Id.  See also* Heather Mac Donald, *An Assault on Common Sense*, The Weekly Standard (Nov. 2, 2105), *available at*  http://www.weeklystandard.com/an-assault-on-common-sense/article/1051200    (last visited 9/12/16) (detailing why a recent  survey conducted by the Association of American Universities has been improperly distorted to falsely suggest large percentages of female college students are being sexually assaulted on America's college campuses).

47.   Ms. Yoffe also noted that if the "one-fifth to one-quarter assertion [regarding sexual assaults on college campuses were accurate, that] would mean that young American college women are raped at a rate similar to women in Congo, where rape has been used as a weapon of war."  Emily Yoffe, *The College Rape Overcorrection*, Slate (Dec. 7, 2014), *available at* http://www.slate.com/articles/double_x/doublex/ 2014/12/college_rape_campus_sexual_assault_i-s_a_serious_problem_but_the

_efforts.html (last visited 9/12/16).  Ms. Yoffe also debunked the sexual assault statistics

relied on by President Obama and/or Drake by discussing a:

> [S]pecial report from the Bureau of Justice Statistics title "Rape
> and Sexual Assault Victimization Among College-Age Females,
> 1995-2013" . . . [which] found that contrary to frequent assertions
> by some elected officials, about the particular dangers female
> college students face, they are less likely to be victims of sexual
> assault than their peers who are not enrolled in college.  The report
> found . . . the incidence [of sexual assault] . . . was far lower than
> anything approaching 1 in 5: 0.76 percent for nonstudents and 0.61
> percent for students.

Emily Yoffe, *The Problem with Campus Sexual Assault Surveys*, Slate,  (Sept. 24, 2015),

*available    at*      http://www.slate.com/articles/double_x/doublex/2015/09/aau_campus_

sexual_assault_survey_why_such_surveys_don_t_paint_an_accurate.html   (last   visited

9/12/16).

48.  Drake's legitimate goal of preventing sexual assault is *not* the issue in, nor is

it the basis for, this Complaint.  Rather, this Complaint addresses Drake's unlawful and/or

gender-biased treatment of innocent male students like John Doe via sexual misconduct

proceedings that afford females unconstitutional preferential treatment.

49.  Drake's unlawful actions and/or gender bias created a hostile environment,

which in turn created an adverse educational setting in violation of Title IX in part

because Drake engages in sex stereotyping discrimination based on unlawful notions of

masculinity and femininity. This hostile environment causes innocent males on Drake's

campus to be unlawfully disciplined and treated and interferes with males' ability to

participate in or benefit from various activities including learning on campus.

50. Although Drake may allege Drake Policies are gender neutral, this is a pretext for Drake's anti-male discrimination implemented to subject and discipline innocent male students like John Doe to sexual misconduct proceedings that afford females unlawful preferential treatment.

51. Altogether, the information detailed above manifests Drake's pattern and practice of: (a) providing preferential treatment to females—like Jane Doe—who allege they were sexually assaulted by male students; and (b) imposing presumptions against male students—like John Doe—who are falsely accused of sexual misconduct.  In addition, the allegations detailed above, and the allegations to follow specific to John Doe, demonstrate that Drake was motivated by pro-female, anti-male bias that was, at least in part, adopted to refute criticism within the student body and public press that Drake was turning a blind eye to female complaints of sexual assault.

### *Agreements, Representations, Covenants, and Warranties Between Plaintiff and Drake*

52. Prior to enrolling at Drake, John Doe attended The Gow School for Dyslexia and Learning Disabilities in South Wales, New York, a college preparatory boarding and day school for students with dyslexia and similar language-based learning disabilities during the spring semester of 8th grade and his entire freshman year of high school.

53. As a high school sophomore, John Doe transferred to and eventually graduated from Walter Payton College Preparatory High School ("Walter Payton Prep"), a highly-ranked public high school in Chicago, Illinois. Walter Payton Prep

accommodated John Doe's language-based learning disability and ADHD-related learning disabilities for all 3 years of his tenure there.

54.     John Doe achieved the rank of Eagle Scout in the Boy Scouts of America program. He was on the student council, a two-sport varsity athlete, a member of the Jewish Student Union, and also held a part-time job working in a grocery store during his high school years.

55.     Setting his sights on a leading liberal arts education, and specifically the actuarial science program at the university where his father was an alumnus, John Doe applied and was accepted to Drake for admission to the Class of 2016.

56.     Upon his acceptance, Drake provided John Doe with copies of its school policies, including Drake's Sexual and Interpersonal Misconduct Policy ("Sexual Misconduct Policy" or the "Policy") and the Drake University Student Code of Conduct ("Code of Conduct") (collectively, the "Policies"), current copies of which are available on Drake's website.

57.     On its very first page, the Code of Conduct states "The principles of equal access and equal opportunity require that all interactions within the University be free from invidious discrimination. Drake University therefore prohibits discrimination based upon race, color, national origin, creed, religion, age, disability, sex, gender identity, sexual orientation, genetic information or veteran status." Code of Conduct, p. 1.

58.     With respect to cases involving allegations of sexual discrimination, sexual harassment, and sexual assault, Drake's Sexual Misconduct Policy provides as follows:

The purpose of this document is to set forth Drake University's policies and procedures related to Sexual and Interpersonal Misconduct. In addition, it is intended to ensure that the University's policies and procedures related to  Sexual and Interpersonal Misconduct are interpreted and applied consistently with Title VII, IX, the Violence Against Women Act (VAWA), the Clery Act, and other applicable law. It is also intended to notify victims/survivors of their rights and resources that are available to them when Sexual or Interpersonal Misconduct occurs. Drake University prohibits discrimination on the basis of sex in its educational programs and in employment. This includes, but is not limited to, discrimination in the form of sex-based harassment (including sexual harassment), sexual assault and sexual exploitation (collectively referred to herein as "Sexual Misconduct"). Drake also prohibits dating violence, domestic violence, and stalking (collectively referred to herein as "Interpersonal Misconduct"). Finally, retaliation against anyone seeking guidance, filing a complaint or participating in an investigation into Sexual or Interpersonal Misconduct is strictly prohibited.

59.     The Policy includes a Notification of Complainant's Rights, including Victim's Rights (under Iowa Code § 709.22).  No stated rights are afforded the accused.

60.     Accommodations and Protective/Interim Measures are provided for "survivors."  Twenty-nine resources for victims of sexual and interpersonal misconduct are listed in the Policy.  There is no support provided by Drake Policy for the accused of sexual or interpersonal misconduct.

61.     The Dean of Students' Office is responsible for resolving student conduct issues. The Code of Conduct provides the process by which students who have been accused of violating one or more of the enumerated Sexual Misconduct Policies are investigated, heard, and disciplined.

62.     All reports of incidents involving Sexual or Interpersonal Misconduct are referred to the Title IX Coordinator, Dean of Students, or Director of Human Resources. "For complaints against students, the Dean of Students/Designee conduct(s) the

investigation and Section III of Drake's Student Code of Conduct will govern the investigation and adjudication process."  Sexual Misconduct Policy, p. 4.

63.    Drake allows "[a]ny student, student organization, faculty member or staff member" to initiate a complaint against a student or student organization suspected of non-academic misconduct. The Code of Conduct directs students to contact the Dean of Students' Office or Title IX Coordinator in the case of alleged sexual misconduct, and states that "[a]lternatively, the Dean of Students office may initiate a complaint on his or her own initiative, in which case the Dean/designee will be considered the complainant. In any case, the Dean of Students will conduct an investigation into the complaint." Code of Conduct, p. 15.

64.    The Title IX Coordinator oversees the Dean of Students/Designee's investigation of any complaint of sexual misconduct against a student and will ensure complaints are appropriately processed under applicable University Policies and Procedures, as stated in the Code of Conduct.

65.    In cases where an investigation by the Dean of Students/Designee results in a recommendation of a suspension or expulsion, the matter moves to a Disciplinary Hearing with a hearing officer.  The Dean of Students/Designee designates the hearing officer.  "The term 'hearing officer' means an impartial faculty member, administrator or where circumstances warrant, member of the public who has not had prior involvement in the case or the circumstances giving rise thereto . . . ."  Code of Conduct, pp. 4-5.

66.    The Code of Conduct allows for the accused to have a personal representative present for the Hearing, and allows for that representative to be an

24

attorney. The accused, the complainant, and the Dean of Students/Designee may have a personal representative (including, but not limited to, an attorney) in attendance. The role of the personal representative is to provide counsel and advice, but a personal representative who is an attorney may also make an opening statement, a closing argument, and may present written questions to be read by the hearing officer to a witness, but generally are not allowed to speak on behalf of or for their client.  Code of Conduct, pp. 20-21.

67.     Furthermore, "[a]n accused student found by a hearing officer to have committed non-academic misconduct has the right to appeal."  The complainant and Dean of Students/Designee may also appeal the hearing officer's decision.

68.     In a direct conflict of interest, the accused and the complainant submit notices of intent to appeal and written responses to appeal the decision to the Dean of Students/Designee, who simultaneously can appeal the hearing officer's decision.

69.     The Dean of Students/Designee receives the appeal responses from the accused and/or complainant.  The Dean of Students/Designee has three business days until s/he must provide all responses, including his or her own, to the other appealing parties and the Chair of the Judicial Commission.

70.     The appeals are heard and decided by a three-member appeals panel.

71.     The Chair of the Judicial Commission selects the appeal panel from the Judicial Commission, which consists of twenty-one members inclusive of eleven faculty and ten students.  The appeals panel consists of, "no more than one student and/or two faculty members on any given appeals panel."

72.     The Code of Conduct states "a simple majority of the appeals panel is required to make its decision.  The decision on appeal is final, subject only to the concurrence of the President or Provost."  A student who has been expelled can be readmitted only by recommendation of the President.

73.     Drake applies a "preponderance of the evidence" standard to violations of the Code of Conduct. "A violation of this Code is established upon proof of a charge by a preponderance of the evidence; a preponderance of the evidence exists when it is more likely than not, or the greater weight of the evidence suggests, a violation occurred." Code of Conduct, p. 21.

74.     The Code of Conduct further explains that:

If, based on the investigation, the Dean of Students/designee does not form a reasonable belief that the charge or charges can be proven by a preponderance of the evidence, after considering reasonable defenses, the Dean of Students/designee shall inform the accused student or student organization the complaint is being closed (subject to reopening should additional information become available) and in cases where the alleged act of non-academic misconduct is a crime of violence, a non-forcible sex offense, sexual misconduct, dating violence, domestic violence, or stalking, the complainant shall also be provided written notice of this determination. If, based on the investigation, the Dean of Students/designee forms a reasonable belief that the charge or charges can be proven by a preponderance of the evidence, after considering reasonable defenses, the applicable procedures set forth below shall be followed.

Code of Conduct, p. 15.

### _The Night of October 8/9, 2015; "The Incident"_

75.     On the evening of Oct. 8, 2015, John Doe was in the study room in his fraternity house working on a class assignment that was due to be submitted that day.

76.     John Doe, who had been diagnosed with ADHD and dyslexia at the age of five, was prescribed medications for these conditions which he took as needed. He had

two prescriptions for the medication Adderall: 10 IR (immediate release) for which he stated the effects last from four to six hours and a 30 XR (extended release) for which he stated the effects last for approximately eight to ten hours. On October 8, 2015, he took both prescriptions at different times that day but "a lot later than usual" and submitted his assignment by 10:00 p.m.

77.     At approximately 11:00 to 11:30 p.m., John Doe received a text invitation to a house party.  After he arrived at the party, he played a drinking game and stated he drank six beers within the hour that he was there.  John Doe then left the party and went to Drake Bakery Café and Bar ("Drake Bakery").  It was there that he first saw Jane Doe that evening.

78.     John Doe had known Jane Doe since the spring of 2015. They would often text or phone each other and had a shared group of friends. Jane Doe would often visit the fraternity house where John Doe resided as a member of the fraternity. On the evening in question, Jane Doe allegedly attended a fraternity party at the Pi Kappa Phi house with friend MH (Non-Interviewed Witness #1).  Jane Doe claimed that, at the party, she purchased a $5 cup entitling the buyer to "all you could drink" alcohol.  Jane Doe stated that she remained at the party from approximately 9:30 p.m. until midnight.

79.     Jane Doe was later unable to provide the amount of alcohol that she consumed at the party; however, she stated she played "beer pong" and drank rum with Coke.

80.     From the Pi Kappa Phi house, where Jane Doe stated she was present from 9:30 p.m. until midnight, she allegedly left and went to Peggy's Tavern.  She claimed she

was at Peggy's for approximately twenty minutes.  Jane Doe said she remembered seeing

three witnesses: JB (Non-Interviewed Witness #2), CH (Witness C), and EJ (Witness E).

Jane Doe claimed she had one rum with Coke at Peggy's. The bartender has since refuted

this claim and said he did not serve her. Jane Doe stated she next went to Drake Bakery.

Her testimony was that en route to Peggy's Tavern, she fell and banged up her knee, but

the sober friend, CH (Witness C), that accompanied her to Peggy's Tavern testified that

he caught her before she fell and never indicated that she hurt herself. Upon information

and belief, this testimony by Jane Doe was made in an effort to appear more incapacitated

than she was that evening.

81.     John Doe was at Drake Bakery and had had consumed various alcoholic

drinks, including two whiskey Cokes containing two shots of alcohol each, two "bombs"

containing one shot of alcohol each, and another containing three shots of alcohol, in

addition to Red Bull (energy drink) shots.  Jane Doe texted John Doe before her arrival to

Drake Bakery to see if he was there. When John Doe saw Jane Doe in Drake Bakery, he

waved to her and she came over to him.

82.     John Doe described Jane Doe as having acted with him in a "flirty way."

Specifically, he stated that Jane Doe "was all over me and was biting my ear."  John Doe

then decided to leave, as he had to be at work the next morning by 9:00 a.m. John Doe

asked Jane Doe if she wanted to leave as well. When she replied in the affirmative, he

offered her a ride in the "sober cab"—a transportation option whereby a student can

request a sober driver who picks them up at a particular location.  Most, if not all,

fraternities at Drake offer a sober cab driver program whereby fellow fraternity members

take turns as "on call" drivers for brothers and their guests who are consuming alcohol and socializing away from the fraternity house.

83.     It was at the point when he stood up from his bar stool that John Doe reported that he was overcome by the combination of his prescription medication and the subsequent alcohol he drank that evening. John Doe's level of impairment was exacerbated and he had periods of time during which he "blacked out."

84.     Prior to standing up from his bar stool, John Doe called a sober driver from his fraternity to provide a ride for both Jane Doe and John Doe.  The driver sent a text to John Doe at 1:12 a.m. that he had arrived at Drake Bakery.  John Doe and Jane Doe got into the back seat of the car, and, according to the driver, they were "making out."  The driver stated that Jane Doe told him to take them to John Doe's fraternity house.

85.     At this point, John Doe and Jane Doe went inside the fraternity house, but, finding nowhere to be alone, they went back outside to John Doe's parked car and got into the back seat. Jane Doe then initiated oral sex on John Doe. As he testified, John Doe was so intoxicated that he only remembered bits and pieces of the oral sex; he stated he was blacked out for large portions of their time in the parked car, and he did not remember giving consent for the oral sex performed on him by Jane Doe. In fact, John Doe did not remember the oral sex performed on him in the parked car until he returned to the car the next morning looking for his debit card which he discovered had fallen out of his pocket.

86.     In the eventual hearing, Jane Doe admitted to initiating the oral sex on John Doe without his consent. Further, she defined "consent" to be when she initiated the sexual activity. She also stated during the hearing that she felt she was "just giving him what [she thought] he wanted."

87.     Jane Doe stopped performing oral sex on John Doe because John Doe was unable to maintain an erection. Jane Doe stated she then went inside the fraternity house to the second floor bathroom located outside John Doe's room because she said she needed to vomit. During the eventual hearing, Jane Doe testified that she ran into the house to get away from John Doe, but that would not have been possible because she could not gain access to the house without a security code. Access to the house was provided by John Doe as he entered the house together with Jane Doe.

88.     John Doe next remembered lying on his bed with Jane Doe standing on a chair next to his lofted bed, and telling him that she was leaving. John Doe has stated that he has no recollection of ever having sexual relations with Jane Doe other than Jane Doe performing oral sex on him in his car without his consent and while he was falling into and out of consciousness.

89.     Jane Doe, who had gone to the bathroom to vomit, claimed she next recalled being in John Doe's room and lying on a beanbag chair. She claimed that she remembered John Doe above her, his pants off and wearing a condom, although just moments earlier he was in his car with her, unable to maintain an erection. Jane Doe said she had her clothes on, pants pulled down, underwear pushed to the side. Jane Doe stated that they were having sexual intercourse.

30

90.     Jane Doe claimed she told him to stop.   She claimed John Doe immediately replied, "Fine, I've got whiskey dick anyway," because he could not maintain an erection.

91.     Jane Doe said she needed to leave the room to get sick again; instead, she went to the bathroom and texted a friend who lived at the annex of the Plaintiff's fraternity located across the street.

92.     Jane Doe then stated she walked to MH's (Non-Interviewed Witness #5) house and entered his bedroom.  She jumped on top of him in his bed. He said he told her to leave.

93.     Jane Doe then went to another fraternity member's bedroom in the same house and entered his bed. Jane Doe removed her shirt and at some point performed oral sex on him. She did not mention to him what had happened with John Doe.  Jane Doe stated that she stayed and slept with this fraternity member and left his house at 9:00 a.m. the next day.

94.     John Doe sent Jane Doe a text at 3:00 a.m. to ask if she got home safely, and she responded in the affirmative and added "all good, babe." In fact, she did not go home but was instead at the annex of the fraternity house across the street engaged in sexual activity with a fraternity member.

95.     Jane Doe claimed that on the morning of October 9, 2015, she met and discussed with her friends what had happened the night before since she claimed she did not remember all of it.   Jane Doe allegedly first met with her friend, MH (Non-Interviewed Witness #1).  She then contacted CH (Witness C) and NC (Non-Interviewed

Witness #3), and discussed the evening of October 8 with LL (Non-Interviewed Witness #4). Only CH (Witness C) was interviewed during the investigation. Because the Investigator decided not to interview the other three witnesses, it is unknown what was communicated amongst them.

96.     At approximately 10:00 a.m. on October 9, 2015, MH (Non-Interviewed Witness #1) went with Jane Doe to campus public safety to report John Doe for sexual assault.

97.     Jane Doe next went to Mercy Hospital in Des Moines to obtain a sexual assault exam. While waiting for the exam, Jane Doe stated that she began doubting herself wondering, "What am I doing?"  ""What if I did consent?" "What if I'm wrong?" "What if I made a mistake?"  After an initial exam by hospital staff, she declined the forensic sexual exam and left the hospital. Because Jane Doe never provided any evidence that she was examined at the hospital or any documented reports from the hospital, there is no evidence to determine whether the initial exam Jane Doe claimed to have by hospital staff indicated any findings of nonconsensual sexual activity.

### *Drake's Failure to Conduct a Thorough and Impartial Investigation and Hearing*

98.     The investigation was conducted by Mary Howell Sirna ("Defendant Sirna"), a Title IX Investigator employed by Drake.  Defendant Sirna was simultaneously was employed by Iowa State University as the Title IX Coordinator/Interim Director of the Office of Equal Opportunity and also as Administrative Advisor for the Iowa State University Police. She was a member of the Story County Sexual Assault Response Team.  Normally, Drake staff conducted sexual assault investigations, however, in the

matter of John Doe, Defendant Parker selected former prosecutor Ms. Sirna specifically because John Doe was the son of a Trustee. Upon information and belief, Ms. Sirna had never investigated a sexual assault under Drake's Code before. Defendant Sirna, formerly a 13-year prosecutor of crimes of sexual violence, inherently lacked impartiality when determining the responsibility of the accused John Doe.

99.     Defendants Sirna and McKinney were solely responsible for interviewing witnesses, writing the investigation report, and determining if the accused was responsible for a violation of Drake sexual misconduct policy.

100.    Additionally, Defendants Sirna and McKinney had the discretion to decide the relevance of all proffered evidence and determine whether certain types of evidence would be included or excluded in the determination of responsibility. This bias in the process made it possible for the investigators to influence and even predetermine the outcome.

101.    For instance, Defendant Sirna chose to dismiss the testimony of John Doe's roommate—who was the only other person in John Doe's room on the evening in question—because she deemed his testimony misleading and unreliable.

102.    Defendants Sirna and McKinney also determined which witnesses would be interviewed and which witnesses would be excluded. Critical testimony was eliminated when Defendants Sirna and McKinney decided not to interview witnesses who could have established a timeline on the night of the alleged incident. They failed to interview at least one witness who was with John Doe and Jane Doe and saw them with each other shortly before the alleged assault, who witnessed their level of intoxication

and how they were interacting with each other. In fact, there were at least nine witnesses that Defendants Sirna and McKinney chose not to interview who could have testified as to Jane Doe's capacity that evening, and/or her state of mind and capacity in the hours that followed.

103.    Specifically, the material witnesses that Defendant Sirna failed to interview included MH (Non-Interviewed Witness #1), who was with Jane Doe during the early evening of October 8, 2015, and the first person Jane Doe spoke with about the alleged incident on the morning of October 9, 2016; MH also accompanied Jane Doe to report the alleged sexual assault to campus security.

104.    Included in the morning discussion on October 9, 2015 with Jane Doe was LL (Non-Interviewed Witness #4), the complainant's roommate, who was not interviewed during the investigation.   Also privy to the discussion was NC (Non-Interviewed Witness #3), who was not interviewed.

105.    The Investigator failed to interview another critical witness, MH (Non-Interviewed Witness #5), to whom Jane Doe sent text messages throughout the night of the alleged incident and to whom Jane Doe went to see directly after leaving John Doe. Jane Doe left John Doe's room, went to the house across the street, entered MH's bedroom, and jumped on top of him while he laid his bed. His testimony could have offered valuable information as to Jane Doe's level of intoxication and capacity, however Defendant Sirna did not interview him. Furthermore, hearing officer Defendant Foxhoven did not allow testimony from anyone who was with Jane Doe after she left John Doe's room on the night of the alleged incident.

34

106.    The exclusion of these witness interviews betrays substantial bias by the Investigators in their failure to report testimony that could cast doubt on Jane Doe's allegations and lack of capacity.

107.    Further, the Investigators failed to utilize audio or video recordings of the interviews or to have a stenographer record a verbatim transcript of each witness interview. Instead, Defendant Sirna prepared summaries of what she presumed she had heard the witnesses testify. Critical testimony from John Doe's interview, for example the fact that he woke up fully clothed and with his shoes on, was omitted from the investigative report. When asked at the hearing about this omission, Defendant Sirna could only state that she couldn't recall John Doe telling her that.

108.    Witnesses were scheduled in back-to-back time slots not to exceed either 30 or 60 minutes. A thorough investigation would not have limited the time allowed for interviews in order to get complete information from each witness.

109.    In the investigative report, Defendant Sirna writes, "Therefore, given that there are no eyewitnesses to the event, and respondent claims not to recall the event, we then must turn to the evidence provided by Complainant." In other words, because John Doe had no recollection of the alleged assault, Defendant Sirna relied solely on Jane Doe's testimony. Defendant Sirna did not consider that the testimony of John Doe was accurate when he said he had no recollection that the alleged incident had occurred, because in fact, it had not occurred.

110.    The Drake Policy provides that the Dean of Students will conduct the investigation and Section III of Drake's Student Code of Conduct will govern the

investigation and adjudication process.  On the date of the Incident, Dean of Students

Defendant Bakari was on leave from the college, so his designee Defendant Parker,

Acting Dean of Students, was responsible for the investigation.

111.    Defendant Parker was first notified of the complaint by Campus Safety

Director Scott Law on the morning of October 9, 2015.  With knowledge only of Jane

Doe's allegations, he informed Assistant Dean of Students/Director of Residential Life

Lorissa Lieurance ("Ms. Lieurance").  Ms. Lieurance, after speaking with Jane Doe, sent

a Notice of Investigation ("NOI") to John Doe, which included a No Trespass Order.

112.    The NOI, which stated that orders regarding retaliation were reciprocal for

both the complainant and respondent, in fact included directives that were entirely

different for the respondent than for the complainant. A separate paragraph was

addressed to John Doe which discussed Drake's "zero tolerance" for retaliation and that

"any form [of retaliation] coming from you and/or your acquaintances towards Jane Doe

will be investigated"; however, no such detailed and specific warning was given to Jane

Doe addressing retaliation against the accused.

113.    As part of the initial assessment, the Policy provided a Notification of

Complainant's Rights with substantial, yet disproportionate, accommodations to the

complainant including publication of the Victim's Rights (under Iowa Code § 709.22), in

addition to thirty-two resources for Victims of Sexual and Interpersonal Misconduct. No

resources are listed for the respondent of an accusation against Drake Policy.

114.    Both parties may have an advisor or support person present at any meeting

related to the investigation.

115.    Drake Policy stated "the process will include a prompt, fair and impartial investigation and resolution. Investigator and adjudicators are trained annually on the issues related to Sexual and Interpersonal Misconduct and taught how to conduct an investigation and hearing process that *protects the safety of the victim and promotes accountability.*" (emphasis added).

116.    Drake policy clearly stated that the investigators and adjudicators are instructed to protect the victim and determine accountability, contrary to providing a "fair and impartial" process. Drake delayed nearly three weeks to begin the investigation, at which time witness memories started to fade and the opportunity to discuss testimony amongst the witnesses created a narrative that was biased against the accused.

117.    Leading the investigative process was the Dean of Students who was charged with conducting a "fair and impartial" investigation.  Defendant Parker was responsible for receiving the initial complaint from campus safety, meeting with the complainant and respondent to discuss the process and code of conduct, providing the Notice of the Hearing to both parties, and submitting the list of witnesses and exhibits.

118.    As Acting Dean of Students, Defendant Parker was responsible to act on all notifications of possible violations of the Policy at Drake.  This requirement included John Doe's statement during his interview with Defendant Sirna, and as reported in the investigation report, that Jane Doe had sexually assaulted him during the night of the alleged incident. It was Jane Doe who had initiated the sexual contact when she suggested that she and John Doe leave the fraternity house and go to John Doe's car to be alone.

119.    The investigation report stated, "When discussing his own intoxication level on October 9, 2015 the Respondent indicated, 'I was not in a state to be with her.'" Defendant Sirna then asked if Respondent felt Complainant took advantage of him that night. John Doe responded, 'Yes, but no. I was not able to give consent that night.' When asked if Jane Doe was able to give consent to sexual intercourse that night Respondent stated, 'She's not as bad as I was.' This was the extent of information Respondent provided regarding Complainant's intoxication level."

120.    This interview with John Doe was held on October 23, 2015, by Defendant Sirna and Defendant McKinney. There is no record that Defendant McKinney, a Drake public safety employee and mandated reporter of violations of Drake Policy, responded to John Doe's report of the sexual assault as required by the Clery Act and Drake Policy.

121.    On November 5, 2015, John Doe met with Defendants Parker and Overberg and Scott Law ("Mr. Law"), Director for Campus Public Safety.  John Doe reiterated his report that Jane Doe had nonconsensual oral sex with him, without his consent. John Doe also requested an additional interview with the investigators, Defendants Sirna and McKinney, to discuss his report of sexual assault by Jane Doe.

122.    On November 9, 2015, Defendant Overberg sent an email, which instructed Defendants Sirna and McKinney what questions they were to ask John Doe about his report of sexual assault. Defendant Overberg phrased the questions to ask John Doe if his report regarding Jane Doe was retaliatory; if he had new information to

provide; and finally, if he had additional witnesses relevant to the charge against Jane Doe.

123.   Defendant Overberg told the investigators that using "Scott's approach" by asking these questions, "your investigation will allow you to make a recommendation on [John Doe's] new charge since there would not be any new information."

124.   On November 10, 2015, Defendants Sirna and McKinney met with John Doe and he provided additional information about his feelings that he had been assaulted by the complainant.  In her investigation report, Defendant Sirna stated that she asked John Doe "if his opinion of the complaintant had changed" and if he had any new information or witnesses to provide. John Doe declined, and stated he was "verbalizing the issue." That was the last time the investigators spoke with John Doe. No further action was taken by Defendants Parker, Overberg, Sirna, or McKinney in response to John Doe's report of sexual assault.

125.   Had the Defendants investigated John Doe's claim of sexual assault, John Doe would have been designated a "victim" or "survivor," and would have been afforded all of the academic and psychological support services that had been offered to Jane Doe.

126.   On December 3, 2015, Defendant Sirna submitted her draft of the investigation report to Defendant Overberg for "additions/deletions/suggestions."

127.    Defendant Sirna questioned whether to address John Doe's assertion that Jane Doe remembered and had "made fun of his erectile dysfunction and therefore she was not incapacitated."

128.    Defendant Sirna further stated in her email to Defendant Overberg that she "assumed a couple of the procedure points" and she "reviewed the Student Code and never found a specific definition of incapacitation, so I just made my arguments based on observations set forth by witnesses and Complainant's report of blacking out."

129.    Defendant Sirna made her analysis and findings, and submitted the draft investigation report to Defendant Parker.  Defendant Parker made an appointment with Jane Doe to discuss the preliminary findings.  He informed Jane Doe that she could bring an advisor with her, and Jane Doe responded she might bring a friend.  Defendant Parker immediately sent an email to Defendant Overberg stating, "If she brings her friend, we will advise in reading the report and moving forward that a professional advocate might be best."

130.    In fact, upon learning that John Doe would have legal representation to be his advisor at the hearing, Defendant Parker contacted Jane Doe and said he would personally arrange legal representation for her to assist her for the hearing and serve as her personal representative. Defendant Parker arranged for an attorney for Jane Doe, forwarded all relevant documents (investigation report, list of witnesses, notice of hearing, and charge letter) to the attorney. He then offered to phone the attorney to provide her with background on the case.

131.    Further, after arranging an attorney for Jane Doe, Defendant Parker allowed her to bring an additional personal advocate into the hearing. Defendant Parker also reserved a private room for Jane Doe's mother and her friends to be present in the

building. Notwithstanding, John Doe was only allowed to have his attorney attend the hearing.

132.    Prior to issuing the final investigation report, Defendant Overberg sent the draft of the investigation report from Defendant Sirna to Defendant Parker so he could "send her the redlined edits."  On December 9, 2015, Defendant Parker sent his edited version of the investigation report to Defendants Overberg, Sirna, and McKinney.

133.    Simultaneously, John Doe's father contacted Defendant Parker to inform him of the sexual assault of John Doe by Jane Doe during the night of the alleged incident. In his phone conversation with Defendant Parker, John Doe's father requested an investigation of the nonconsensual sexual assault of John Doe. Defendant Parker stated the claim was retaliatory and he refused to investigate the report.

134.    During the phone conversation, John Doe's father discussed John Doe's disabilities; however, Defendant Parker dismissed those concerns and stated, "Wait for the report; it's very damning." Defendant Parker repeated that statement to John Doe's father before ending the phone call. That was the last conversation between John Doe's father and Defendant Parker. The Defendants had granted Jane Doe immunity for her sexual assault on John Doe, labeling his claims as "retaliation." Neither Drake's policies nor Title IX guidance allow a claim of sexual assault to be ignored, even if the University deems it to be retaliation.

135.    The original receipt of the investigation report containing testimony by John Doe of the nonconsensual sexual assault by Jane Doe duly informed Defendant Parker and Defendant Overberg of the alleged violation. Both the offices of the Dean of

Students and Title IX demonstrated deliberate indifference when they refused to investigate and dismissed the sexual assault claim by John Doe, a male complainant, as well as by John Doe's father, a trustee of the college who, like all trustees, have a duty to report such a claim to the University.

136.    The OCR has stated that failure by a university to investigate a claim of sexual assault can, in and of itself, create a hostile environment for the complainant. Significantly, John Doe was charged for an assault without an investigation of his own claim, creating a hostile environment for John Doe as complainant due to Defendants' actions and inactions.

137.    Ultimately, however, Defendant Parker represented Drake's interests as a third party, with his own counsel, as the matter moved forward to a hearing.  In the Notice of Hearing, Defendant Parker informed Jane Doe that "although I will present the evidence against John Doe on behalf of Drake University, you also have the right under the *Code* to call witnesses, conduct non-direct cross examination, and answer any evidence presented through rebuttal."

138.    Defendant Parker stated in his Notice of Hearing that the purpose of the hearing was to "decide whether the charge of Sexual Assault has been proven by a preponderance of the evidence."   Nonetheless, prior to the hearing determination and without a preponderance of the evidence ruling, Defendant Parker stated that, "As Associate Dean of Students, I am seeking Expulsion of John Doe as the sanction."

139.    Moreover, during a conversation between John Doe's father and Diane Caldbeck ("Ms. Caldbeck") from the Alumni and Development Office, Ms. Caldbeck

informed John Doe's father that Defendant Martin had told her that the evidence "was damning" and that John Doe "looked guilty." Evidently the Dean's office had shared their opinion of the student conduct matter involving John Doe with Defendant Martin.

140.    Procedures state that the written notice shall also indicate that the accused student has the right to review and request a copy of any exhibits/demonstrative aids and other documents within the possession of the Dean of Students/designee pertaining to the charges.

141.    Defendant Foxhoven, in a pre-hearing order, denied John Doe a fair and impartial hearing by limiting testimony. An order was issued to restrict the introduction of any evidence relating to other sexual activity or mental health conditions of either complainant or respondent.

142.    John Doe was refused admittance of witness testimony of Jane Doe's sexual conduct with another male only minutes after she had left John Doe's bedroom. This witness refuted Jane Doe's claim that she had been incapacitated when she entered his bedroom and jumped on him while he was in his bed. After this male student told her to leave his room, she left and entered the nearby room of another male student.

143.    This second student has stated that Jane Doe entered his room during the early morning hours of October 9, 2015. Jane Doe entered his bed while he was sleeping in it, woke him, removed her shirt and bra and initiated oral sex on him. He stated Jane Doe was not incapacitated nor was she exhibiting any signs of pain, which Jane Doe had stated she suffered from the alleged sexual intercourse with John Doe earlier that morning.

43

144.    During the hearing Jane Doe provided new medical information not previously disclosed during the investigation.   Jane Doe testified that she had an unspecified condition that made it physically painful for her to have sex unless her partner was careful, and for that reason she rarely had vaginal sexual relations.

145.    The Hearing Officer concluded that regardless of her state of inebriation, and lack of medical evidence, Jane Doe would not have consented to vaginal intercourse with John Doe given Jane Doe's testimony that, due to her medical condition "she does not participate in vaginal intercourse unless she knows the partner well, trusts that partner and is certain that the partner will be careful to minimize the pain for [her]."

146.    Jane Doe never provided medical information to the investigator nor did she provide evidence of a medical condition to the hearing officer. While the Report stated, "Complainant also agreed to provide a medical release to the investigator, if necessary for the date of  October 9th, 2015."   In fact, Jane Doe provided no medical evidence of having had sexual intercourse on the night of the alleged incident.  Jane Doe went to the hospital the day following the alleged incident but declined an exam by the Sexual Assault Nurse Examiner (SANE) and declined a rape kit.

147.    Further, upon information and belief, Jane Doe did not request testing for HIV, sexually transmitted diseases (STDs), pregnancy prevention, or preventative medication for any of these conditions when she went to the hospital.

148.    Additionally, Jane Doe claimed that she had kept the underwear she wore the night of the alleged incident and could have had the underwear analyzed and provided it as evidence, but she chose not to.

149.    On November 15, 2015, Jane Doe met with the investigators and stated "since last investigators had last spoken with her, she did secure a medical appointment and they confirmed she did not have a urinary tract infection."   However, Jane Doe provided no evidence of having had a medical appointment or further information that she had discussed her medical condition with the medical professional.

150.    Jane Doe failed to provide the investigators with evidence that was readily available to her to confirm her medical condition and to substantiate the alleged sexual assault.  Moreover, the investigators did not request the known evidence from Jane Doe; notwithstanding, the hearing officer cited that given Jane Doe's (unproven) medical condition, she "would not have consented to vaginal intercourse with [John Doe]."

151.    While John Doe's hearing lasted a full day, which included testimony from a dozen witnesses and review of a 42-page investigative report, 14 exhibits, and nearly 200 text and Facebook messages, the hearing officer arbitrarily decided to limit John Doe's counsel to only 10 minutes to make opening arguments, 10 minutes to make closing arguments, and 5 minutes for rebuttal based upon all of the evidence presented. These limitations were imposed by the hearing officer; one cannot find anything in Drake's policy that stipulates the procedural time limits.

152.    John Doe raised the procedural issue of limiting time for argument during the hearing in his appeal of the decision. The appeal panel found that the complainant, the Dean of Students, and the respondent were each allowed the same amount of time for opening and closing arguments and the "University is an independent actor and does not represent or take the side of either party."   Whereas, in an obvious conflict of that edict,

Defendant Parker, who represented the University at the hearing, clearly stated in his notice of the hearing, "I am seeking the expulsion of [John Doe]" and "I, or my designee, will present the evidence against [John Doe] to the hearing officer".

153.    Additionally, John Doe's father had intended to present John Doe's appeal. However, on his way to the campus on the night before the appeal, John Doe's attorney called John Doe's father to tell him that the Defendants were forbidding him from making the appeal.

154.    Upon information and belief, the three-person appeals committee tasked with reviewing John Doe's appeal never heard the audio of the nine-hour long hearing, due to technical problems, before rendering their short and vague affirmation of guilt against John Doe.

155.    John Doe faced prosecution during the hearing from counsel for the complainant and counsel for the university, yet was only provided one-third of the total allotted time for opening and closing arguments. Moreover, as a student with documented learning disabilities, John Doe was not provided with disability accommodations at any time throughout the investigation and hearing in order to fully defend himself. Given John Doe's unmet accommodations required for his learning disabilities, he was not qualified to serve as his own attorney for nine hours during the hearing process.

156.    Defendant Foxhoven's Ruling on the Disciplinary Matter was based on multiple inaccuracies: that "no one other than the respondent and complainant appears to have been present during the alleged sexual contact" when, in fact, Witness J was in the room and his testimony was disallowed; that "no sexual assault exam on the *Respondent*"

46

was completed, resulting in a lack of definitive evidence of a sexual assault; that "both parties were so intoxicated that they have no memory of the event; and that CH (Witness C) "saw complainant throwing up in the fraternity house, yet CH's testimony was that he remained on the first floor and did not go upstairs to see anything."

157.    The final step in Drake's process is the University President's review and approval of the expulsion decision. Defendant Martin spent seven days reviewing the investigative report, the hearing, and the appeal. He wrote to John Doe's attorney that he wanted to "take the time to ensure that the process was fair." By signing off on this expulsion, he formally acknowledged that he was ignoring John Doe's report of sexual assault and the Complainant's doctoring of evidence and lies that were exposed in the hearing, which are in and of themselves, according to Drake's own policies, grounds for expulsion from the University.

158.    Board of Trustee Chair Larry Zimpleman claimed to Board of Trustee members that he and Defendant Martin had been in close contact since October regarding all phases of the process. Thus, the Board Chairman, and by extension, the Board Affairs Committee and the entire Board of Trustees, were party to the discriminatory practices by not demanding an investigation of the Plaintiff's sexual assault claim.

159.    Drake's policy states that students may be readmitted to the University if the President chooses to do so. Both John Doe and his father appealed to Defendant Martin and the Board of Trustees to investigate this discriminatory process, however, to date they have still failed to initiate an investigation into the Plaintiff's sexual assault claim. Defendant Martin has taken no action to restore Plaintiff's reputation and

academic standing. In fact, after the Plaintiff's father sent various correspondence to the Board of Trustees, claiming his son's Title IX and ADA civil rights were violated, the Board of Trustees felt that was cause for Plaintiff's father to be dismissed from the Board of Trustees in a July 19, 2016 teleconference vote.

### *Failure to Provide Disability Accommodations for the Plaintiff*

160.    Notwithstanding that Drake had accommodated John Doe in his daily educational career at Drake, the University failed to afford John Doe any disability accommodations during the investigation and hearing process.

161.    John Doe had been diagnosed at the age of five with ADHD and language-based learning and word-retrieval disabilities. His disabilities were documented in a neuropsychological evaluation by Rush Neurobehavioral Center; testing by the Johnson O'Connor Research Foundation; and in the Individual Education Program (IEP) by John Doe's high school, which was provided to Drake.

162.    John Doe's disabilities, which were known and documented by Drake, required accommodations to allow extra time for John Doe to process and formulate responses. This deficit in John Doe's word retrieval was most evident during the investigation interviews and during the hearing when he was asked multiple times by the hearing officer to slow down, speak more clearly, and repeat what he had just said.

163.    Yet, in issuing its investigative report and conclusions, Drake omitted the fact that it had failed to provide John Doe with the proper accommodations, prevented John Doe from having someone speak for him at the hearing, and wholly disregarded John Doe's known disabilities when making assessments of credibility. As Drake

48

appeared to treat John Doe differently, and worse than, other non-disabled students because of his disabilities, the foregoing constituted discrimination against John Doe, in violation of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and other federal and state laws.

164.    Given that Defendant Sirna was charged with resolving disputed facts, it was vital to the integrity of the process that she understood how John Doe's disabilities affected the verbal and nonverbal cues on which people naturally rely to make credibility determinations. In a "he said/she said" situation such as this, in which there were no independent third party witnesses whose testimony was allowed or considered (Witness J's testimony was dismissed by investigators), it was crucial that the investigator make an accurate assessment of credibility.

165.    Defendant Sirna improperly based her conclusions regarding the credibility of each party on her observations of tone, demeanor, and affect. In doing so, she failed to consider how John Doe's disabilities, combined with the effects of his medications taken to control each, affected how others perceived him and how he presented himself. Instead, Defendant Sirna overlooked how John Doe's disabilities affected his presentation and demeanor during his interviews.

166.    Upon information and belief, John Doe's word retrieval deficit, delayed processing, and lack of verbal fluency were contributing factors to a finding of responsibility by the investigator and hearing officer who based their determinations on perceived credibility of the respondent.

49

167.    The OCR Q & A to the DCL states, "OCR enforces two civil rights laws that prohibit disability discrimination. Section 504 of the Rehabilitation Act of 1973 (Section 504) prohibits disability discrimination by public or private entities that receive federal financial assistance, and Title II of the American with Disabilities Act of 1990 (Title II) prohibits disability discrimination by all state and local public entities, regardless of whether they receive federal funding. *See* 29 U.S.C. § 794 and 34 C.F.R. part 104; 42 U.S.C. § 12131 *et seq.* and 28 C.F.R. part 35. OCR and the U.S. Department of Justice (DOJ) share the responsibility of enforcing Title II in the educational context."

168.    Significantly, Drake University was recognized in 2013 as it sought and was awarded the library and archives of Senator Tom Harkin, a key author of the Americans with Disabilities Act.  Drake founded the Harkin Institute, which has a public policy focus on people with disabilities.

## COUNT I
## Violation of Title IX of the Education Amendments of 1972

169.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

170.    Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) ("Title IX"), provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

171.    Title IX applies to an entire school or institution if any part of that school receives federal funds; hence, athletic programs are subject to Title IX, even though there is very little direct federal funding of school sports.

172.    For the year ending June 30, 2014, Drake had received $1,058,675 in federal funding and $8,988,122 in government grants and contracts.   *See* Drake University Audit Report, FY 2014, *available at* http://www.drake.edu/media/departmentsoffices/businessandfinance/busfin/documents/Final%20FY14%20Drake%20Audit%20Report%20(SHORT%20FORM).pdf  (last visited 9/12/16).

173.    Both the Department of Education ("DOE") and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or the regulations thereunder.  34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.[3]

174.    The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved."[4]

175.    The "prompt and equitable" procedures that a school must implement to "accord due process to both parties involved" must include, at a minimum:

- "Notice . . . of the procedure, including where complaints may be filed";

---

[3] *See generally* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties—Title IX* (2001) at 19-20, 21 & nn. 98-101.

[4] *Id.* at 22 (emphasis added).

- "Application of the procedure to complaints alleging [sexual] harassment";

- "Adequate, reliable and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";

- "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and

- "Notice to the parties of the outcome of the complaint . . . ."[5]

176.     Title IX also obligates schools to make sure that all employees involved in the conduct of the procedures have adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."[6]

177.     As explained hereinabove, since October 2014, Drake has been under investigation by the DOE's Office of Civil Rights ("OCR") for mishandling sexual assault cases.  On October 3, 2014, the OCR initiated a Title IX investigation against Drake.  Upon information and belief, that investigation is ongoing.

178.     The Code put in place by Drake deprived Plaintiff, on the basis of his sex, of his rights to due process and equal protection.  The Code discriminates against all respondents, who are habitually male.  Specifically:

- A single, typically female, investigator is responsible for conducting the investigation against the respondent, assessing the credibility of the witnesses, and determining whether the evidence demonstrates by "a preponderance of information" whether the respondent violated the Code;

- A review panel rubber stamps the investigator's findings and is prohibited from conducting its own investigation;

---

[5] *Id.* at 20.

[6] *Id.* at 21.

- Respondents are denied the right to examine the evidence in the investigator's file until after the Title IX investigator determines whether a Code violation has occurred; and

- The Hearing Officer singlehandedly decides the sanction to be imposed against the respondent.

179.     Upon information and belief, as well as by her own statements made during the hearing, the University's Investigator, Defendant Sirna, did not have enough time to properly handle her caseloads, as she was simultaneously acting as Title IX Coordinator at Iowa State University.

180.     Defendants also failed and/or refused to follow Drake's existing policies and procedures when investigating the charges against Plaintiff.  Specifically, Defendants openly refused to investigate John Doe's own complaint of sexual assault against Jane Doe.

181.     Drake's existing practices and procedures discriminate, on the basis of sex, against the male accused, including Plaintiff.  Drake conducted its investigation of the allegations against Plaintiff in a manner that was slanted in favor of the female accusers.  In fact, Drake refused to investigate or move forward on John Doe's complaint that he was sexually assaulted by Jane Doe, despite Jane Doe's own admission during the hearing that she performed oral sex on John Doe, admittedly without his consent, when he was too intoxicated and incapacitated to consent.

182.     Drake failed to provide Plaintiff an adequate opportunity to review and contest the specific allegations against him and did so without conducting a fair and equitable investigation and hearing. From the moment that Jane Doe filed her complaint, Drake treated John Doe as "guilty."

53

183.    Drake erroneously placed the entire burden on Plaintiff to prove his innocence, despite having knowledge of John Doe's language-based learning disability. Despite the fact that Drake accommodates John Doe's disability in the classroom, the University failed to provide him with adequate support and take measures to help John Doe understand the charges against him, make sure he was able to wage an adequate defense, give him extra processing time to find and formulate his responses to investigation and hearing questions, and have a representative from disability services at the hearing assist in the communication between John Doe and the hearing officer.

184.    Drake's policies effectuate a denial of due process for the student population, especially the male student population, because they are set up to encourage and facilitate false reports of sexual misconduct and/or other grievances without any recourse for the falsely accused.

185.    Drake's policies and procedures disproportionately affect the male population of Drake's community as a result of the higher incidence of female complainants of sexual misconduct versus male complainants of sexual misconduct.

186.    Drake has created an environment in which an accused male student is effectively denied fundamental due process by being prosecuted through the conduct process under the cloud of a presumption of guilt.  This one-sided process deprived Plaintiff, as a male student, of educational opportunities at Drake on the basis of his sex.

187.    Drake imposed sanctions on Plaintiff without conducting a fair, impartial investigation and without evidence that he engaged in non-consensual sex with Jane Doe. In fact, even the hearing officer, Defendant Foxhoven, stated in his finding that there was

no physical evidence that an assault on the complainant actually occurred. As a result, Plaintiff faces a permanent notation on his Drake transcript labeling him a sexual predator, even though he was never given an opportunity for a fair hearing.

188.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

<u>**COUNT II**</u>
<u>**Violation of the Fourteenth Amendment of the United States Constitution**</u>
<u>**Procedural Due Process**</u>

189.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

190.    On April 4, 2011, the United States, by and through its agent, the DOE, sent a 19-page "Dear Colleague" letter to colleges and universities all over the country, stating that "sexual violence" on campus was a form of "sexual harassment prohibited by Title IX" ("Dear Colleague Letter").

191.    Reversing previous federal policy, the Dear Colleague Letter threatened colleges and universities with hundreds of millions of dollars in de-funding penalties if they did not immediately begin investigating and adjudicating allegations of campus sexual assault under detailed procedures and terms dictated by the federal government.

192.    As a result of the Dear Colleague Letter and later statements, actions, and directives issued by the United States, colleges and universities were required to:

- Investigate and adjudicate campus sexual assault allegations regardless of whether the complainant reported his or her allegations to the police (whereas previous federal policy had permitted colleges to allow law enforcement to handle allegations of sexual assault);

55

- Establish a coordinated and centralized investigative and adjudicative procedure according to detailed rules mandated by the federal government and headed by a Title IX coordinator;

- Protect the anonymity of students accusing another student of sexual assault if the student making the allegations so requests;

- Apply a preponderance of the evidence standard when adjudicating such allegations (whereas previously colleges and universities frequently applied higher evidentiary standards, such as the clear and convincing evidence standard);

- Prohibit accused students from cross-examining witnesses; and

- Expel students found to have engaged in nonconsensual sexual intercourse with other students.

193.    Since 2011, the United States has consistently reaffirmed and adhered to the threat of substantial monetary penalties made in the Dear Colleague Letter.  For example, in July 2014, DOE Assistant Secretary for Civil Rights Catherine Lhamon stated that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter.  "Do not think it's an empty threat," Lhamon warned.  Shortly after this edict was issued, Drake was brought under investigation by the OCR for mishandling sexual assault cases.

194.    Upon information and belief, since the OCR opened its investigation against Drake in October 2014, the number of male students charged with sexual assault—including Plaintiff—has increased considerably.

195.    Upon information and belief, Drake acted in response to the federal government's threat that colleges refusing to comply would be found in violation of Title IX and be subject to extremely substantial, indeed crippling, monetary penalties.

56

196.     Accordingly, Drake was coerced by the United States into complying with the Title IX investigative and adjudicatory process mandated by the Dear Colleague Letter and by subsequent federal actions, statements, and directives.

197.     Drake applied the investigative and adjudicatory process dictated to it by the federal government when it investigated and adjudicated the complaint against Plaintiff.

198.     Under clear and controlling case law, a private actor required by the United States to investigate and adjudicate the violations of a federal statute under terms and procedures dictated by the federal government is a state actor when engaging in such investigation and adjudication.

199.     When Drake investigated and adjudicated the complaint made by Jane Doe against Plaintiff, and when it sanctioned Plaintiff, Drake was a state actor and was therefore required to honor the rights and guarantees set forth in the United States Constitution.

200.     In the course of Drake's investigation and adjudication, Drake flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its repeated acts of gender bias and deprivation of the minimal requirements of procedural fairness.

201.     Based on the foregoing, Drake was a state actor when it violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of the sexual assault complaints against Plaintiff.

202.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT III
## Breach of Contract

203.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

204.   Based on the aforementioned facts and circumstances, Drake created express and implied contracts when Plaintiff accepted an offer of admission to Drake and paid tuition and fees.

205.   Based on the foregoing facts and circumstances, Drake breached express and implied agreement(s) with Plaintiff.

206.   Drake committed several breaches of its agreements with Plaintiff during the investigation process.   A non-exhaustive list of Drake's breaches include the following:

**A.   Drake Failed to Conduct an Equitable Investigation of Jane Doe's Claims**

207.   The Policy states that, in sexual misconduct cases, "the University disciplinary process will include a prompt, fair, and impartial investigation and resolution process."

208.   Drake breached its contract with John Doe by failing to provide procedural equity: i) The investigation report cited unsubstantiated statements and hearsay; ii) The investigation report included numerous instances of opinion and errors in reporting witness statements; iii) The investigation report was positioned to support Jane

Doe's accusation of lack of consent and incapacitation; iv) The investigation report referenced John Doe's father as a trustee of the University and the implication was that there would be bias in the adjudication of the complaint; v) Plaintiff was not given the opportunity to have a personal representative—particularly a representative from disability services—present for the hearing as allowed by the Code of Conduct and particularly necessary in light of Plaintiff's language-based learning disability; vi) Plaintiff was forced to act as his own attorney for nine hours during the hearing  because his advisor was not allowed to speak, even though he clearly had trouble forming questions and communicating on his own behalf due to his disability; vii) The investigation and the evidence produced at the Hearing failed to establish when—if at all—John Doe and complainant had sex; vii) John Doe was denied any meaningful opportunity to appeal; and ix) The Sanction was unwarranted and disproportionate in light of the circumstances.

### B. <u>Drake Failed to Conduct an Equitable Investigation of Plaintiff's Claims</u>

209.    The Code states that, "Any student, student organization, faculty member or staff member may initiate a complaint against a student or student organization suspected of non-academic misconduct by contacting the Dean of Students office or Title IX Coordinator in the case of alleged sexual misconduct. Alternatively, the Dean of Students office may initiate a complaint on his or her own initiative, in which case the Dean/designee will be considered the complainant. In any case, the Dean of Students will conduct an investigation into the complaint." Code of Conduct, p. 15.

210.    Plaintiff explained to Defendant Sirna that he was "more drunk" than Jane Doe on the night of the incident and that he was not in a state to engage in sexual activity with her. He particularly stated, "I was not able to give consent that night."

211.    Multiple witness accounts as well as Jane Doe's own statements confirm that Plaintiff was visibly intoxicated on the night of the Incident.

212.    Jane Doe admitted in the disciplinary hearing against John Doe that she performed oral sex on John Doe in his parked car without his consent. John Doe also had claimed from the beginning of the investigation that he was falling into and out of consciousness and clearly incapacitated that evening.

213.    Despite the information and evidence pointing to non-consensual sexual activity on Plaintiff, coupled with Plaintiff's own complaint to Defendant Sirna that he was unable to give consent, Defendant Sirna and the University failed to conduct an investigation into Plaintiff's complaint of sexual assault.

**C.      Drake Discriminated Against Plaintiff on the Basis of Sex**

214.    The Code expressly prohibits discrimination on the basis of sex.  Code of Conduct, p. 1.

215.    As set forth, *supra*, Drake breached its contract with Plaintiff because it conducted its investigation of the allegations against Plaintiff in a manner that was biased against him.  Through Defendant Sirna's biased investigation, which was slanted in favor of Plaintiff's accuser, Drake engaged in sex-based discrimination against Plaintiff.

**D.      Drake Failed to Apply the Proper Burden of Proof**

60

216.    The Code provides that "[a] violation of this Code is established upon proof of a charge by a preponderance of the evidence; a preponderance of the evidence exists when it is more likely than not, or the greater weight of the evidence suggests, a violation occurred." Code of Conduct, p. 21.

217.    Drake breached its agreement with Plaintiff because the University failed to utilize the preponderance of the evidence standard when reaching its decision.  A fair reading of the evidence reveals that Jane Doe could not recall all of the events in question and much of what she stated was rebutted by third-party witnesses.   Additionally, Defendant Sirna relied on hearsay statements made by others as well as statements of opinion.  Based on the foregoing, Defendant Sirna improperly placed the burden of proof on Plaintiff to establish that he was innocent of the charges against him.

218.    As a direct and foreseeable consequence of the foregoing breaches, Plaintiff sustained damages, including, without limitation, emotional distress, loss of educational and career opportunities, financial injuries, and other direct and consequential damages.

219.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT IV
## Breach of the Covenant of Good Faith and Fair Dealing

220.    Plaintiff repeats and realleges every allegation hereinabove as if fully set forth herein.

221.   In the hearing, Defendants allowed Jane Doe to admit to her own sexual assault of John Doe without his consent, allowed her to lie in her testimony without consequences, and allowed her to doctor her text message evidence to try to prove the plaintiff was stalking her. This was all a clear violation of Drake's own policy on "perjury" and itself, subject to expulsion proceedings, but Defendants took no action against Jane Doe for these violations.

222.   Based on all of the aforementioned facts and circumstances, Drake breached and violated the covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff by meting out the disproportionately severe sanction of expulsion where there was a lack of credible evidence concerning the claims against him.

223.   As a direct, reasonable and foreseeable consequence of this breach, Plaintiff sustained damages, including, without limitation, emotional distress, economic injuries, the inability to complete his studies at Drake, impact on his future career and higher education prospects, and other direct and consequential damages.

224.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## COUNT V
## Negligent Infliction of Emotional Distress

225.   Plaintiff repeats and realleges every allegation hereinabove as if fully set forth herein.

62

226.   Drake owed duties of care to John Doe. Such duties included, without limitation, a duty of reasonable care in conducting the investigation of the allegations against him in a fair and impartial manner.

227.   Drake breached its duties owed to John Doe.

228.   Such breach by Drake created an unreasonable risk of causing John Doe emotional distress in that John Doe's academic and disciplinary record is irrevocably and irreversibly tarnished.

229.   As a direct and foreseeable consequence of Drake's actions, John Doe sustained tremendous damages, including, without limitation, severe emotional distress, loss of educational and career opportunities, economic injuries, and other direct and consequential damages.

230.   The emotional distress was severe enough that it has resulted in illness and/or mental harm to John Doe.  John Doe is regularly seeing a counselor and appears to be suffering from depression as a result of this experience.  He is also unable to find viable employment as a result of the sanctions unfairly imposed on him.

231.   Drake's extreme and outrageous conduct was the cause of John Doe's distress.

232.   Considering that John Doe's entire academic and future employment opportunities would suffer as a result of the adverse decision, Drake should have recognized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or harm.

233.   John Doe's distress is reasonable in light of Drake's conduct.

63

234.    As a result of the foregoing, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT VI
## Discrimination Based on Disability Under Title II of the ADA

235.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

236.    Plaintiff is a "qualified individual with a disability" as defined in 42 U.S.C. § 12131(2).

237.    The ADA and its implementing regulations require entities such as Drake to provide programs and services in an integrated setting and to make reasonable modifications in policies, practices, and procedures that deny equal access to individuals with disabilities.

238.    Plaintiff has been denied the modifications in Drake's practices, namely its investigation and hearing processes.

239.    As a result of Drake's denial of modifications to the investigation and hearing processes, Drake violated the ADA by discriminating against Plaintiff due to his disability.

240.    As a direct and proximate result of Drake's unlawful discrimination, John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT VII
## Estoppel and Reliance

241.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

242.    Drake's various policies constitute representations and promises that Drake should have reasonably expected to induce action or forbearance by Plaintiff.

243.    Drake expected or should have reasonably expected Plaintiff to accept its offer of admission, incur tuition and fee expenses, and choose not to attend other colleges based on its express and implied promises that Drake would not tolerate, and Plaintiff would not suffer, harassment by fellow students, and would not deny Plaintiff his procedural rights should he be accused of a violation of Drake's policies.

244.    Plaintiff relied to his detriment on these express and implied promises and representations made by Drake.

245.    Based on the foregoing, Drake is liable to Plaintiff based on estoppel.

246.    As a direct, reasonable, and foreseeable consequence of these breaches, Plaintiff sustained tremendous damages, including without limitation, emotional distress, economic injuries, the inability to complete his studies at Drake, and other direct and consequential damages.

247.    As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## COUNT VIII
## Declaratory Judgment

248.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

249.    Drake has committed numerous violations of the Parties' contracts and of federal and state law.

250.    Plaintiff's future has been severely compromised and damaged.  Without appropriate redress, the Sanction imposed as a result of Drake's biased investigation will continue to cause irreversible damage to Plaintiff's educational, career, and future employment prospects, with no end in sight.

251.    As a result of the foregoing, there exists a justiciable controversy between the parties with respect to the outcome, permanency, and future handling of Plaintiff's formal student record at Drake.

252.    By reason of the foregoing, Plaintiff requests, pursuant to 28 U.S.C. § 2201, a declaration that: (i) the outcome and findings made by Defendants Sirna and Overberg be reversed; (ii) the Sanction be reversed; (iii) Plaintiff's reputation be restored; (iv) Plaintiff's disciplinary record be expunged; (v) the record of Plaintiff's expulsion be removed from his education file; (vi) any and all records pertaining to the investigation be destroyed; and (vii) Drake's Code is unconstitutional as applied.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Drake University as follows:

66

(i)     on the first count for violation of Title IX of the Education Amendments of 1972, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, damages to compensate Plaintiff for the inability to complete his studies at Drake, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(ii)    on the second count for violation of the Fourteenth Amendment of the United States Constitution, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, damages to compensate Plaintiff for the inability to complete his studies at Drake, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(iii)   on the third count for breach of contract, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, damages to compensate Plaintiff for the inability to complete his studies at Drake, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(iv)    on the fourth count for breach of the covenant of good faith and fair dealing, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, damages to compensate Plaintiff for the inability to complete his studies at Drake, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(v)     on the fifth count for negligent infliction of emotional distress, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, damages to compensate Plaintiff for the inability to complete his studies at Drake, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(vi)    on the sixth count for discrimination based on disability under Title II of the ADA, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, damages to compensate Plaintiff for the inability to complete his studies at Drake, impact on his future career and higher

education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(vii)    on the seventh count for estoppel and reliance, a judgment in an amount to be determined at trial, including, without limitation, emotional distress, economic injuries, damages to compensate Plaintiff for the inability to complete his studies at Drake, impact on his future career and higher education prospects, and other direct and consequential damages, plus prejudgment interest, attorneys' fees, costs and disbursements;

(viii)   on the eighth count for a declaratory judgment pursuant to 28 U.S.C. § 2201, a declaration that (i) the outcome and findings made by Defendants Sirna and Overberg be reversed; (ii) the Sanction be reversed; (iii) Plaintiff's reputation be restored; (iv) Plaintiff's disciplinary record be expunged; (v) the record of Plaintiff's expulsion be removed from his education file; (vi) any and all records pertaining to the investigation be destroyed; and (vii) Drake's Code is unconstitutional as applied.

## Jury Demand

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

**Dated: December 1, 2016**

### Respectfully submitted,

_____/s/ David H. Goldman_____
David H. Goldman, Esq.
Maggie E. White, Esq
BABICH GOLDMAN, P.C.
501 S.W. 7th Street, Suite J
Des Moines, Iowa 50309
Telephone: (515) 244-4300
Email: dgoldman@babichgoldman.com
Email: mwhite@babichgoldman.com

**-and-**

_____/s/ Andrew T. Miltenberg_____
Andrew T. Miltenberg, Esq.(*pro hac vice* pending)
Diana R. Warshow, Esq. (*pro hac vice* pending)

NESNOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
 Telephone: (212) 736-4500
Email: AMiltenberg@nmllplaw.com
Email: DWarshow@nmllplaw.com


**ATTORNEYS FOR PLAINTIFF JOHN DOE**