IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| THOMAS ROSSLEY, JR.<br><br>          Plaintiff,<br><br>vs.<br><br>DRAKE UNIVERSITY, DRAKE UNIVERSITY BOARD OF TRUSTEES,<br><br>          Defendants. | Civ. No. 4:16-cv-00623-RGE-SBJ<br><br>[Redaction of Plaintiff's Brief] *<br><br>**PLAINTIFF'S BRIEF IN SUPPORT OF HIS RESISTANCE TO DEFENDANTS' MOTION FOR SUMMARYJUDGMENT** |

## TABLE OF CONTENTS

PRELIMINARY STATEMENT…………………………………………...…………………...…1

STATEMENT OF THE FACTS…………….……………….…………………………………3

    A.    October 8 and 9, 2015 ……………………………………………………..3

    B.    Allegation of Sexual Misconduct……………………………………….…6

    C.    Investigation ……………………………………………………………7

    D.    Hearing, Ruling and Appeal ……………………………………………8

ARGUMENT ……………………………………………………………………...……9

I.    THOMAS' TITLE IX CLAIMS ARE BASED ON ACCEPTED TITLE IX THEORIES OF LIABILITY…………….……………….....10

II.    SUMMARY JUDGMENT MUST BE DENIED AS TO THOMAS' TITLE IX "ERRONEOUS OUTCOME" CLAIM: RECORD FACTS SUPPORT THERE WAS AN ERRONEOUS OUTCOME HAVING GENDER BIAS AS A MOTIVATING FACTOR ……………………………………11

    A.    Record Facts Show There Are Disputed Facts Regarding The Accuracy of the Outcome Prong Of The Erroneous Outcome Theory of Title IX Liability …………………………………………..………12

*Redactions in this document are shown formatted as follows: [xxxxxx], however where "[Thomas]" or "[Rossley]" appear, those were in the original.

1. The Facts In A Light Most Favorable To Plaintiff Support The Conclusion There Was An Erroneous Outcome………………………….…..12

2. Drake's Argument Against Erroneous Outcome Is Erroneous……………….15

    a. Drake's Selection of Sirna To Lead The Investigation Is Beside The Point……………………………………………………...…..16

    b. Sirna's Investigation Was Incomplete and Gender Biased…………..…..16

    c. Drake's Handling of Jane Doe's Sexual Actions The Night In Question Was Erroneous and Resulted In An Erroneous Outcome………17

    d. The Two-Versus-One Hearing Was Discriminatory and Contributed To the Erroneous Outcome……………………………..18

    e. The Hearing Officer's Findings Were Not Supported By Substantial Evidence and Were Dependent Upon Gender Biased Erroneous Exclusions of Evidence………..………………20

    f. The Appeal Panel Rubber Stamped An Erroneous Outcome …………….22

B. Record Facts Establish That There Is A Genuine Factual Dispute Regarding Whether Gender Bias Was A Motivating Factor…………….24

III. SUMMARY JUDGMENT MUST BE DENIED AS TO THOMAS' TITLE IX "SELECTIVE ENFORCEMENT" CLAIM: RECORD FACTS SHOW THE SEVERITY OF THE PENALTY AGAINST THOMAS AND DECISION NOT TO INITIATE A PROCEEDING AGAINST JANE DOE WAS AFFECTED BY THEIR GENDERS ………………………………...……….28

A. The Similarly-Situated Members of the Opposite Sex Treated More Favorably Requirement Is Not A Requirement…………………….…...28

B. Drake's Pointing To The Obligation To Investigate Misses The Point Of Thomas's" Selective Enforcement" Claim………………..………30

C. There Is A Material Disputed Issue of Fact Whether Gender Was A Motivating Factor in Drake's Differing Treatment of Thomas and Jane Doe……………………………………….………………31

IV. SUMMARY JUDGMENT MUST BE DENIED AS TO THOMAS' TITLE IX "DELIBERATE INDIFFERENCE" CLAIM: RECORD FACTS SHOW DELIBERATE INDIFFERENCE TO WRONGFUL CONDUCT AGAINST THOMAS BECAUSE OF HIS GENDER………………..…..32

A.      It Is A Material Disputed Issue Of Fact Whether There Was
        A Requisite Systemic Effect……………………………………………..32

B.      It Is A Material Disputed Issue Of Fact Whether Drake Was
        Deliberately Indifferent ……………………………………………………33

C.      It Is A Material Disputed Issue Of Fact Whether Thomas' Gender
        Was A Motivating Factor In Drake's Actions …………………………..…34

V.      SUMMARY JUDGMENT MUST BE DENIED AS TO THOMAS'
        AMERICANS FOR DISABILITIES ACT CLAIM: A REQUEST WAS
        MADE TO ACCOMMODATE THOMAS' KNOWN DISABILITIES
        AND ACCOMMODATION WERE NOT PROVIDED DURING THE
        DISCIPLINARY PROCESS TO HIS PREJUDICE………………………….....35

        A.      A Request Was Made To Accommodate Thomas'
                Known Disabilities………………………………………………………36

        B.      Reasonable Accommodations Would Not Have Unduly
                Burdened Drake's Disciplinary Process………………….…………….. 39

        C.      Under *Merson*, The Failure To Accommodate Is The Requisite
                Adverse Action Based On The Disability………………………….…41

VI.     SUMMARY JUDGMENT MUST BE DENIED AS TO THOMAS'
        BREACH OF CONTRACT AND QUASI-CONTRACT CLAIMS:
        RECORD FACTS SHOW A DENIAL OF THE PROMISED
        FUNDAMENTALLY FAIR PROCESS…………………………………….…41

CONCLUSION………………………………………………………………………44

CERTIFICATE OF SERVICE ……………………………………………………45

## PRELIMINARY STATEMENT

Plaintiff Thomas Rossley Jr. ("Thomas") respectfully submits this Brief in support of his resistance to the motion for summary judgment brought by Defendants Drake University and Drake University Board of Trustees (collectively, "Drake").  Drake's motion should be denied: there are genuine issues of material facts and Drake is not entitled to judgment as a matter of law.

Drake, at the outset of its Brief, misstates what this case is about.  This case is not about second-guessing Drake based on Thomas's personal dissatisfaction with the disciplinary case result.  Rather, this case is about Drake's violations of federal law in its gender biased disciplining of Thomas: Drake engaged in unlawful Title IX discrimination when erroneously disciplining Thomas for an alleged sexual assault he did not commit when a motivating factor was the sex of Thomas, selectively enforcing discipline due to gender bias and showing deliberate indifference to Thomas's report of a sexual assault by Jane Doe.  This case is also about Drake's failure to provide a fair process in its disciplinary proceeding concerning alleged sexual misconduct and Drake's failure to accommodate Thomas's ADHD and dyslexia disabilities during the disciplinary proceeding.

A fundamental fatal flaw in Drake's motion is that it relies upon a narrow statement of facts mostly limited to its asserted adherence to Drake procedures coupled with the notion that Drake's judgment based on its alleged adherence to is own procedures should therefore be deferred to by the Court as if this Court were an appellate court reviewing a trial court jury verdict or bench trial.  Drake ignores the larger record in this case -- the story of the case, if you will -- that triggers the application of Title IX, contract law and the Americans with Disabilities Act that overrides Drake's judgment.

1

No set of undisputed facts show that this Court must uphold the outcome of Drake's proceedings against Thomas on his Title IX claims. The preponderance of the evidence shows Thomas did not commit sexual assault against Jane Doe once the gender biased rationalizations of and rulings with respect to Jane Doe's behavior are removed from consideration and instead taken into account are Jane Doe's behavior inconsistent with a sexual assault having occurred, the lack of medical evidence, the effects of Adderall on Thomas resulting in erectile dysfunction, the lack of DNA or other physical evidence, the timeline of events, Jane Doe's voluntary performance of oral sex on Thomas before the alleged assault and the improbability of the alleged assault by Thomas given Jane Doe's description of it -- all of which Drake did not take into proper account due to gender bias; the gender biased "trauma trope" struck again. Further, Drake ignored what was sexual assault against Thomas committed by Jane Doe under Drake's Code that unquestionably happened but sanctioned Thomas with the severest sanction of expulsion based on an untrue accusation, and Drake was advised of what was sexual assault against Thomas under Drake's Code and Drake did not seriously investigate it due to gender bias.

No set of undisputed facts show that this Court must uphold Drake's proceedings against Thomas on his complaint for failure to accommodate his ADHD and word retrieval disabilities in the disciplinary proceedings, as Drake ignores, among many things, that the university hearing featured two versus one with a university Dean acting as prosecutor expressly seeking Thomas's expulsion and Thomas expected to handle the questioning of witnesses with no accommodations. Nor is there any set of undisputed facts that show this Court must uphold Drake's proceedings Thomas on his contract claims, because Drake did not provide its promised fundamentally fair procedure.

## STATEMENTS OF THE FACTS

Missing from Drake's Brief is a statement of facts; instead, Drake proceeds immediately into "analysis." Thus obscured is how the facts of the whole record do not fit into Drake's "analysis." Drake relies upon a sanitized view of their actions and procedures and ignores the record facts that make summary judgment improper. Accompanying this Brief are Plaintiff's Rule 56 Statements responding to Drake's statement of material facts and setting forth Plaintiff's additional material facts. The following is an abridged statement of the facts.

**A.**    **October 8 and 9, 2015.**

This case arises out of the disciplinary expulsion of Thomas by Drake a month before his scheduled graduation following a hearing pursuant to his being charged with a violation of the Non-Academic Code of Student Conduct. The allegation of Jane Doe was that Thomas had sexually assaulted her sometime after 2:00 am on Sunday, October 9, 2015. (Thomas' Rule 56 Statement of Additional Facts ¶¶ 1, 17-19, 77-79.)

This case is about what happened late in the evening on Friday, October 8, 2015 and on Saturday, October 9, 2015. Thomas Rossley, who was born in Costa Rica and grew up in Chicago, Illinois was in his senior year at Drake University and was living at his Theta Chi fraternity house on 34th Street in Des Moines. Jane Doe was in her junior year at Drake University. (Thomas' Rule 56 Statement of Additional Facts ¶¶ 1, 12.)

On the evening of October 8, 2015, Thomas was working on an assignment that was due that night and had taken a dose of Adderall to help him concentrate. Thomas had from the age of five been diagnosed with ADHD and dyslexia. After he finished his work, a friend texted him about 11:00-11:30 pm to come to a house party. He did and joined in a beer drinking game, drank six beers and was pretty drunk. Sometime after midnight he decided to go to a bar called the Drake

3

Bakery where he had more drinks.  Thomas saw Jane at the Drake Bakery, waived to her and she came over to him and acted in a flirty way.  She was all over him and biting his ear. He had known Jane Doe for approximately two years.  She described him a "good friend." Jane Doe was friends with a number of Thomas fraternity brothers.  Jane had dated and hooked up with guys in his fraternity. Thomas thought she had hooked up with 15- 20 guys in his fraternity. Thomas and Jane did not have a romantic relationship.  (Thomas' Rule 56 Statement of Additional Facts ¶¶ 1, 12-13, 18.)

After a while, Thomas asked Jane Doe if she wanted to leave, and she said she did.  Thomas called the fraternity's safe cab driver  [Witness B]   who was a then a freshman with the Theta Chi.  Thomas and Jane Doe went outside to wait for the safe cab and sat down on the ground making out.  At around 1:15 am to 1:20 am,  [Witness B]  picked to the two up and drove them to the Theta Chi house.[Witness B]would tell Thomas that he found the two, and Thomas and Jane Doe got into the safe cab and the driver,   [Witness B]  , the driver asked where they want to go. Thomas asked Jane and Jane agreed to go to the Theta Chi House.  The driver took them there arriving no later than 1:40 am probably closer to 1:30 am, 1:35 am.  (Thomas' Rule 56 Statement of Additional Facts ¶ 13.)

When Jane and Thomas arrived in his room there two fraternity brothers playing video games.  Jane Doe asked Thomas if he had his car and asked if they could go there.  Jane Doe and Thomas went outside the Theta Chi house to Thomas' car and got inside it.  There, Jane Doe initiated oral sex on Thomas, but Thomas could not get stimulated and could not ejaculate. According to Thomas, Adderall cuts off sex drive.  Thomas and Jane left his car and returned to the fraternity house  [Redaction Correcting Misstatement in the Original]   .  (Thomas' Rule 56 Statement of Additional Facts ¶ 14.)

4

Thomas next remembers being in his fraternity room, lying on his loft bed with Jane Doe standing on a mesh chair and making out with Jane Doe. Thomas was not concerned about Jane Doe's state because she could stand on the mesh chair which was hard to stand on.  Jane Doe then said to Thomas "Alright, I'm going to go."  Thomas did not recall any sexual interaction with Jane Doe in Thomas' room other than making out, did not recall any concern about the state of his room and did not have any novelty or colored condoms.        [Witness J],   who was in another bed in the room, did not hear any sexual activity by Thomas and Jane Doe.  (Thomas' Rule 56 Statement of Additional Facts ¶ 15, 42.)

At 1:54 AM Jane responded to earlier text message sent to her by her friend  [Student M]  .  At 1:39 AM  [Student M] had texted "Are you okay" At 1:53 AM [Student M] had texted "Do you want me to come?? I will be there in a heartbeat if so." At 1:54 AM Jane sent the following text to  [Student M]      "If I don't test you in a minute I am not ok."  Then, almost immediately, also at 1:54 AM, Jane texted to [Student M] "I am going to [Student P] ." Jane Doe went from Thomas's room across the street to [Student P]'s room in the Theta Chi Annex  which was in the Theta Chi annex just across the street. [Student P] was in his bed and she jumped on him.  He asked her to leave and she did going to another fraternity brother's room.  After Jane had left [Student P] room  [Student P] almost immediately texted her at 2:03 AM saying "Did you leave."  (Thomas' Rule 56 Statement of Additional Facts ¶¶  15, 36,

Jane Doe went to another room in the Theta Chi Annex to   [Witness I] . Jane Doe climbed into   [Witness I] 's bed, took off her shirt and got in bed with him where they "spooned" and she talked about having a relationship. They talked and slept and talked until approximately 6:45 – 7:00 am when she left having performed oral sex on  [Witness I] before leaving. At no time during

the hours that [Witness I] spent with Jane Doe on October 9, 2015, did Jane Doe say that Thomas

had sexually assaulted her. (Thomas' Rule 56 Statement of Additional Facts ¶¶ 15, 36, 41.)

At 3:59 am, while Jane was apparently still in bed with[witness I], Thomas sent Jane a text saying

"Make it back?" She replied "Yeah I'm good babe." Thomas replied "Okay, want to make sure"

(DRAKE OO12151) At around 3:59 am, Thomas texted Jane Doe asking "Make it back?", to

which Jane Doe texted "Yeah I'm good thks babe" to which Thomas in turn responded "Okay,

wanted to make sure." (Thomas' Rule 56 Statement of Additional Facts ¶¶ 15.)

**B.     Allegation of Sexual Misconduct.**

At approximately 10:30 AM on October 9, 2015 Drake's Office of Public Safety was told

that Jane Doe wanted to file a sexual assault report. Officer Mark Risvold met with Jane Doe and

her friend[Student M]. She told Officer Risvold that Thomas, who she described as a "good friend"

*Id.* had walked her back to the Theta Chi house from the Drake Bakery. She told him that after

they arrived she blacked out and that the next thing she was aware of was Thomas on top of her

having sexual intercourse with her. She reported that she asked him to stop and he would not so

she then told him she was going to sick so he then stopped to let her go to the bathroom. She said

she did not get sick but at that time left and went to a friend's house in the area and declined to

give Officer Risvold the name of the friend. Jane Doe reported that she had at about 9:00 AM

called and left messages for Responder Alysa Mozak and the Drake Title IX Coordinator. When

asked if she wanted to file a police report, Jane Doe said she didn't want the police called. Jane

Doe said that [Student M] was now going to take her to Mercy Hospital for a "rape kit." (Thomas' Rule

56 Statement of Additional Facts ¶¶ 17-19.)

Tricia McKinney recorded her understanding of what Jane Doe told her and lead

investigator, Mary Sirna. Jane Doe reported her recollection that Thomas had driven her back to

the Theta Chi house although she said she had asked him to take her place at the Drake West

Village.   She then said she remembered Thomas trying to make out with her in his car in the

parking lot of the Theta Chi house. She told the Sirna and McKinney about some, but not all of

the texts exchanged with  [Student M]     prior to 2:00 AM and did not mention the text she sent

to [Student M]saying she was going to[Student P]'s.   She told McKinney and Sirna that she had no

intention of making out with Thomas.  She reported that after she got Thomas to stop having sex

with her she went to the bathroom and texted [Witness I]  asking if she could sleep on his couch.

*Id.* at 1972.  He did not respond so she went to the Red Lion (Theta Chi Annex) and jumped on

[Student P] who told her to get out and she went to Witness I's room.   (Thomas' Rule 56 Statement of

Additional Facts ¶¶ 34-36.)

**C.     Investigation.**

The investigation report confirms that there was no physical evidence of a sexual assault

reviewed by the investigators or presented at the hearing record makes shows that there was no

introduction of any physical evidence.   The investigators were, however, aware that there was

potential physical evidence.  That was never provided.  There was no rape kit test performed. Jane

Doe said that she left the hospital before the test was conducted because she had doubts about what

had happened.  No medical evidence was obtained despite Jane Doe telling Investigator Sirna that

she would provide a medical release, but it was not. The investigation report made no report of the

oral sex initiated by Jane Doe on Thomas despite Thomas having told the investigators about it.

There is no indication anywhere in the report that Jane Doe was ever even asked about the oral sex

Thomas had reported to them.   The investigation report states that Jane said that while they were

in Thomas' car he tried to make out with her and she told him "No, I don't like you like that.  And

she left the car and ran into the Theta Chi house in order to get away from him."  The investigation

7

did not present any reason to doubt this factual account other than it conflicted with Thomas' recollections. But at the Hearing it became clear that Jane had initiated performing oral sex on Thomas and stopped when he could not maintain an erection. The Investigation Report makes no attempt to construct a timeline of events.          [Witness J], Thomas' roommate who was in their room at the time of the alleged sexual assault heard or saw nothing to indicate any kind of sexual activity.

Sirna rationalized away Jane Doe's behavior after the alleged sexual assault using a gender biased trauma trope, failed to record Jane Doe's performance of oral sex on Thomas before the alleged sexual assault, discounted the absence of medical and physical evidence supporting a sexual assault and aggressively went after Thomas's roommate who was in the room at the time of the alleged sexual assault and did not see or hear it. (Thomas' Rule 56 Statement of Additional Facts ¶¶ 32-48.)

**D.      Hearing, Ruling and Appeal.**

At the hearing, Jane Doe, Thomas, and eleven other witnesses provided testimony. All the witnesses at the university hearing were called either by Dean Parker or Thomas and none by Jane Doe. During the opening statements, an opening statement was made Jane Doe's legal representative, Dean Parker, and Thomas' attorney. Dean Parker acted as a prosecuting attorney making an opening statement saying Jane Doe should be believed and he (the Dean) was seeking the expulsion of Thomas and calling witnesses to achieve expulsion. During the presentation of witnesses, Thomas had to conduct the questioning; it was a two versus one situation (Dean Parker and Jane Doe as complainant versus Thomas as respondent). (Thomas' Rule 56 Statement of Additional Facts ¶ 57.)

At the hearing, Hearing Officer Foxhoven ruled that evidence of Doe's sexual activity on the night in question after Jane Doe went to the Theta Chi annex to see [Student P]   and [Witness I] was not admissible because Foxhoven misperceived Thomas' attorney as arguing both Thomas and Jane Doe were incapacitated (Thomas's attorney argued that both were intoxicated but not incapacitated).  At the hearing, Thomas testified that he had no memory "at all" of having sexual intercourse with Jane Doe.  At the hearing, there was no evidence submitted from a rape test and no evidence submitted from DNA physical evidence.  Hearing Officer Foxhoven without supporting evidence, rewrote the facts of the alleged sexual assault to make it possible, disregarded the many inconsistencies of Jane Doe's statements and ruled irrelevant the conduct of Jane Doe that was inconsistent with a sexual assault having occurred.  Foxhoven recommended expulsion. (Thomas' Rule 56 Statement of Additional Facts ¶¶ 56-70.)

On March 30, 2016, the appeal panel denied Thomas' appeal, issuing a two-page decision that was a rubber stamp; the appeal panelist who testified showed little understanding of the record. University he President Martin, limiting his review to the hearing officer's decision and the appeal panel decision, concurred as a ministerial act. He had little understanding of the record.  On April 8, 2016, Dean Parker ordered Thomas expelled. Thomas had no prior disciplinary complaints against him for sexual misconduct, Thomas was one month away from graduation when expelled and Thomas's case was the only case of expulsion for sexual misconduct at Drake. (Thomas' Rule 56 Statement of Additional Facts ¶¶ 73-80.)

## ARGUMENT

The legal standards governing summary judgment are well stated by Judge Stephanie M. Rose in *Gustafson v. Genesoc, Inc., et al.,* Case 4:16-cv-00478-SMR-CFB, pp. 12-13 (S.D. Iowa June 8, 2018) (emphasis supplied)

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Paulino v. Chartis Claims, Inc*., 774 F.3d 1161, 1163 (8th Cir. 2014). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)). **Courts must view "'the facts in the light most favorable to the nonmoving party and giv[e] that party the benefit of all reasonable inferences that can be drawn from the record.'"** *Pedersen v. Bio-Med. Applications of Minn*., 775 F.3d 1049, 1053 (8th Cir. 2015) (quoting *Johnson v. Wells Fargo Bank, N.A.,* 744 F.3d 539, 541 (8th Cir. 2014)). To preclude the entry of summary judgment, the nonmovant must make a sufficient showing on every essential element of its case for which it has the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323 (1986). But "the nonmoving party [need not] produce evidence in a form that would be admissible at trial in order to avoid summary judgment." Id. at 324."

A copy of Judge Rose's opinion can be found in the Appendix at 1404-1434.

## I.

## THOMAS' TITLE IX CLAIMS ARE BASED ON ACCEPTED TITLE IX THEORIES OF LIABILITY

Title IX provides, in relevant part, that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault, *Davis v. Monroe Bd. Of Education*, 526 U.S. 629 (1999), or by "the imposition of university discipline where gender is a motivating factor in the decision to discipline," *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994).  In either case, the statute is enforceable through an implied private right of action.  *Yusuf*, 35 F.3d at 714.

Challenges to university disciplinary proceedings for sex discrimination are generally recognized as falling in three categories: (i) "erroneous outcome" cases, in which "the claim is that plaintiff was innocent and wrongly found to have committed an offense" and "gender bias was a

motivating factor behind the erroneous findings," *Yusuf*, 35 F.3d at 715; (ii) "selective enforcement" cases, in which "the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender," *Yusuf*, 35 F.3d at 715; and (iii) "deliberate indifference" cases, in which the institution was deliberately indifferent to wrongful conduct against a student because of gender bias, *Wolfe v. Fayetteville, Ark, Sch. Dist.*, 648 F.3d 860, 865 (8th Cir. 2011).

Drake accepts these three accepted theories of Title IX liability.  (Drk. Br. 3.)  What Drake "does not get" is that record facts here support application of these three theories of Title IX liability in this case, establishing there are disputed genuine material issues precluding summary judgment.

## II.

### SUMMARY JUDGMENT MUST BE DENIED AS TO THOMAS' TITLE IX "ERRONEOUS OUTCOME" CLAIM: RECORD FACTS SHOW THERE WAS AN ERRONEOUS OUTCOME HAVING GENDER BIAS AS A MOTIVATING FACTOR

Thomas's first Title IX claim is "erroneous outcome."  Drake mistakenly argues that all Thomas can prove is that he would have arrived at a different outcome and that he requests the Court to substitute its judgment for Drake's.  Drake quotes *Plummer v. Univ. of Houston*, 860 F.3d 767, 772 (5th Cir. 2017), which in turn quoted *Wood v. Strickland*, 420 U.S. 308, 320 (1975), that it is not the role of federal courts to set aside school administrator decisions viewed as lacking in wisdom or compassion.  The quoted language, however, was not part of a Title IX ruling in *Plummer*, but rather was used in reference to that case's constitutional due process challenge, and the quoted language in *Wood v. Strickland* was also used in reference to a constitutional due process challenge, not Title IX, brought by two female high school students to their expulsion for possession of alcoholic beverages on school grounds.  Here, what Thomas seeks is a fact finder

review of the evidence which, viewed in a light most favorable to the non-moving party, shows that a reasonable juror could conclude that the outcome was erroneous.

A Title IX "erroneous outcome" case has two basic elements: (A) proof casting doubt on the accuracy of the outcome of the disciplinary proceedings, and (B) proof that gender bias was a motivating factor behind the erroneous findings.  Record facts here fully support both elements of Thomas's "erroneous outcome" Title IX claim, establishing there are disputed genuine material issues precluding summary judgment.

**A.**    **Record Facts Show There Are Disputed Facts Regarding The Accuracy of the Outcome Prong Of The Erroneous Outcome Theory of Title IX Liability.**

To support the point that the record facts support the doubt as to the accuracy of the outcome prong of the erroneous outcome theory of Title IX liability, (1) a list is provided of evidence supporting a finding of erroneous outcome, and (2) the Drake argument is examined.

**1.**    **A List of Evidence In A Light Most Favorable To Plaintiff Supporting An Erroneous Outcome.**

Thomas' Rule 56 Statement of Additional Facts, in the course of giving a detailed narrative at ¶¶ 12-63, reviews the evidence in the  record.  The following lists evidence, viewed in a light most favorable to the non-moving party (Thomas), weighs in support of a possible inference by a reasonable juror that the conclusion that Thomas engaged in non-consensual sexual intercourse with Jane Doe was erroneous:

(i)     Jane Doe decided not to take the rape kit test at Mercy Hospital where she had doubts that she had been sexually assaulted by Thomas, and thus a rape kit test result was not available.

(ii)     While Jane Doe said she had her underwear from the night in question, the underwear was not provided and Drake did not obtain DNA evidence from Jane Doe's underwear that could be traced to Thomas.

(iii)    Jane Doe's description of the sexual assault would make vaginal intercourse unlikely if not possible.  Jane Doe described sitting on the floor lying up against the bean bag in the middle of Thomas' room and having her pants pulled down and her underwear pushed to the side; however, Jane Doe's pants were still on, which would restrict the spread of her legs for vaginal intercourse with a stocky male.  Hearing Officer Foxhoven, without record support, rewrote the facts so as to say the pants were pulled off in order to make sexual intercourse possible.

(iv)    The timeline of events did not allow for the alleged sexual assault to occur as described by Jane Doe involving her being passed out and coming to on the ban bag in the center of Thomas' room at the Theta Chi house; indeed, Drake's investigator Sirna admitted she could not place the time of the alleged sexual assault.  From the time of Thomas and Jane Doe being picked up at the Drake Bakery by the sober cab driver after 1:15 am, to the drive to the Theta Chi fraternity house, to entry into the Theta Chi fraternity house, to the encountering of fraternity brothers [Witness G] and  [Witness H] in Thomas' room playing video games, to Thomas and Jane Doe leaving the fraternity house and going to Thomas's car where, inter alia, Jane Doe initiated oral sex on Thomas and eventually stopped when Thomas could not maintain an erection because of the amount of alcohol he had consumed combined with the Adderall medication he had taken, to returning to the fraternity house, to Jane Doe becoming ill and vomiting in the bathroom and other students arriving checking up on Jane Doe, to going to Thomas's room where Thomas recalls being kissed good night by Jane Doe when he is in his loft bed and Jane Doe then leaving, to Jane Doe texting      [Student M]  at 1:54 am saying she was going to   [Student P]'s  room.  The time

records and contents of text messages thus indicate a departure by Jane Doe by 1:55 am from the Theta Chi house to her walking across the street to the Red Lion Inn, the Theta Chi annex, where the rooms of  [Student P]   and   [Witness I]  were located.

(v)      Thomas does not recall having sexual intercourse with Jane Doe, but rather recalls that right before Jane Doe left Thomas' room, he was kissed good night by Jane Doe when he is in his loft bed and she was standing on the chair next to his loft bed.

(vi)      Thomas was suffering from erectile dysfunction due to the effects of mixing Adderall (the medication to treat his ADHD) and alcohol.  That Thomas could not cum was in reference to Thomas not being able to ejaculate when Jane Doe performed oral sex on Thomas.

(vii)      One of Thomas' roommates,  [Witness J]      , was in the room at the time of the alleged sexual assault and his bed has a clear view and is in the vicinity of the bean bag in the center of the room between Thomas' bed and      [Witness J]'s bed.      [Witness J]    told investigators that he heard Jane Doe and Thomas in the room and did not hear any sex occurring.  [Witness J]       adhered to that report even after Drake's investigator Sirna advised him that that aiding and abetting sexual misconduct was a Drake Code violation.

(viii)      Jane Doe, right after the alleged sexual assault, went to     [Student P]'s room in the fraternity annex across the street, "jumping" on him in his bed.  She said he kicked her out, but  [Student P]    texted Jane Doe at 2:03 am asking where she went.  Had Jane Doe suffered from the medical condition she stated at the university hearing, the last things he would be doing is going to one of Thomas' fraternity brothers and "jumping" on him.

(ix)      After Jane Doe left  [Student P]  , she went to    [Witness I]'s room where she took off her shirt and got into bed with him.  There, she made out and spent the rest of the early morning talking with  [Witness I]   about having a relationship and sleeping some, but never telling

14

[Witness I] about the alleged sexual assault.  Jane Doe performed oral sex on  [Witness I]  before leaving in the morning.

(x)     In response to Thomas asking at 3:59 am whether she got home, Jane Doe texted to Thomas saying "Yeah I'm good thx babe."

(xi)     Thomas said his back hurts after having sexual intercourse, and his back did not hurt after the night in question.

(xii)     Thomas testified that he woke up the next day fully clothed.

(xiii)     The case that non-consensual sex occurred rests solely on Jane Doe's word but her credibility is matter to evaluated by a fact finder not the Court: she did not tell the Drake investigators about her initiating and giving oral sex to Thomas, nor did the investigators ask her about did despite their having been told by Thomas that it had occurred; by her own account, she backed out of taking the rape kit test when doubting a sexual assault occurred; Jane Doe submitted only portions of her text messages to Drake investigators to make it appear she was on less friendly terms with Thomas than she was; Jane Doe refused to provide medical records, yet at the hearing provided entirely new medical information; the safe cab driver said that it was Jane Doe who requested to be driven to the Theta Chi house.  In this connection, Dr. Bender's expert testimony about Drake's failure to take custody of Jane Doe's memories is pertinent.

(xiv)     Thomas did not own specialty colored condoms and thus did not have a yellow condom Jane Doe said she saw Thomas wearing.

**2.   Drake's Argument Against Erroneous Outcome Is Erroneous.**

Drake reviews six contentions that Drake says it shows Thomas cannot cast doubt on the accuracy of the disciplinary proceeding.  (Drk. Br. 4-15.)  An examination of those six contentions as well as additional material facts further supports, to the contrary, that a reasonable juror could make an inference that there was an erroneous outcome.

15

### a.  **Drake's Selection of Sirna To Lead The Investigation Is Beside The Point.**

Drake's first contention is that Drake's selection of Mary Sirna, a former prosecutor, to lead the investigation of Jane Doe's complaint was not erroneous.  (Drk. Br. 4-5.)  As the list of evidence supporting erroneous outcome discussed above shows, Thomas' argument on erroneous outcome does not rest on Sirna's selection in itself.  As Dr. Bender's report shows, Sirna and McKinney made mistakes, and that is what is of probative significance.

### b.  **Sirna's Investigation Was Incomplete and Gender Biased.**

Drake's second contention is that Sirna's investigation was thorough, competent and compliant with Drake's Code.  (Drk. Br. 5-8.)  The record points to a different conclusion: that Sirna's investigation failed to interview key witnesses, failed properly to evaluate he information developed in the investigation and suffered from gender bias in misusing "trauma" to explain away Jane Doe's inconsistent accounts of events and of her behavior inconsistent with a sexual assault by Thomas having occurred and in dealing with witnesses providing information contrary to the desired narrative against Thomas.

In her report, Sirna concluded that Thomas had engaged in the sex act of penile vaginal penetration based on the hearsay statement of  [Witness K] ascribed to Thomas and crediting the account given by Jane Doe.  Reliance on hearsay and crediting the female complainant despite the accumulated evidence reflected a gender biased reaching for a conclusion that objective evidence did not permit: (i) Jane Doe declined to take the rape kit test; (ii) there was no physical (DNA) evidence; (iii) the description of the sexual assault would not make intercourse possible; (iv) Thomas was suffering from erectile dysfunction due to the effects of Adderall and alcohol -- that Thomas could not cum was in reference to Thomas not being able to ejaculate when Jane Doe performed oral sex on Thomas (to use hearsay and linking it to the alleged sexual assault while

ignoring the erectile dysfunction and the oral sex by Jane Doe reflected gender bias); (v) one of Thomas' roommates was in the room at the time who had a clear view of the bean bag in the center of the room and he told investigators he did not hear any sex occurring; (vi) Thomas did not own specialty colored condoms; (vii) the timeline of events did not allow time for the alleged sexual assault to occur (Sirna admitted she could not place the time of the alleged sexual assault); (viii) Jane Doe, right after the alleged sexual assault, went to    [Student P]'s room in the fraternity annex and jumped into his bed; after Jane Doe left [Student P]   , she went to    [Witness I]'s room where she took off her shirt and made out, spent the rest of the early morning talking with [Witness I] about having a relationship, but never telling [Witness I]    about the alleged sexual assault,  and performed oral sex on him before leaving; (ix) Jane Doe texted to Thomas at 3:59 am saying "Yeah I'm good thx babe"; (x) Sirna's misuse of "trauma" to rationalize away Jane Doe's behavior plainly inconsistent with a sexual assault having occurred is gender biased bad science.  (Thomas App. 27-28, 436-440, 446-451, 461, 492-493, 501-502, 514, 586, 751, 808, 818, 1122-1175: Sirna 5 12/09/2015 Investigation Report, DRAKE 0003344-0003345, 000353-0003354, Foxhoven 11 Hearing tr. 29, 194, 241, 251; Sirna tr. 87:23-90:10, 97:14-98:1-3, 102:14-21, 127:12-129:12, 131:13-132:8, 133:19-134:11, 139:23-143:18, 145:2-148:13, 189:15-19; Sirna Ex. 11, Thomas tr. 105:8-13, 110:10-111:17; Dr. Bender report.)

At a minimum there are genuine factual disputes regarding how Sirna regarding and dealt with information she did collect and information she chose not to collect.

### c.   Drake's Handling of Jane Doe's Sexual Actions The Night In Question Was Erroneous and Resulted In An Erroneous Outcome.

Drake's third contention is that Drake's handling of Jane Doe's sexual history and her response to the sexual assault was appropriate and did not impact the outcome of the proceeding. (Drk. Br. 8-11.)  Drake showed gender bias in its handling of Jane Doe's sexual activity the night

17

in question and in dealing with Jane Doe's sexual history in general, and the exclusion of consideration of what Jane Doe did with [Student P]   and  [Witness I]   right after the alleged sexual assault could reasonably be found to have more likely than not have an impact the outcome of the proceeding resulting in a finding there was a sexual assault.

The treatment of this subject by Drake reflected the "training" Drake personnel had in "trauma" as an explanation for what Sirna called Jane Doe's "counterintuitive behavior" after the alleged sexual assault, in going to   [Student P]'s room and "jumping" on him and then going to [Witness I]   and spending the rest of the morning with him talking about having a relationship with him and giving him oral sex before leaving at 7:00 pm.  The short answer to Drake is that as Dr. Bender explains, Drake is relying upon gender biased junk science.  A reasonable juror could find Dr. Bender to be credible and correct in his opinions.

Hearing Officer Foxhoven ruled that evidence of Doe's sexual activity on the night in question after Jane Doe went to the Theta Chi annex to see   [Student P] and [Witness I]   was not admissible because Foxhoven misperceived Thomas' attorney as arguing both Thomas and Jane Doe were incapacitated (Thomas's attorney argued that both were intoxicated but not incapacitated).  (Thomas App. 335, 539, 540, 595-597: Foxhoven 11 Hearing tr. 38-40, Foxhoven tr. 80:21-82:4, 84:19-85:14, Parker tr. 133:1-20.)   Hearing Officer Foxhoven thus excluded probative evidence against finding that a sexual assault by Thomas occurred.

### d.  The Two-Versus-One Hearing Was Discriminatory and Contributed To the Erroneous Outcome.

Drake's fourth contention is that the "procedural management of the hearing" was consistent with Drake's Code and did not impact the outcome of the proceeding.  (Drk, Br. 11-12.) What "procedural management of the hearing" refers to is that there was a "two versus one" line up of what Drake calls the parties: the Dean, Jane Doe as the complainant and Thomas as the

18

respondent, with the Dean and Jane Doe on one side and Thomas on the other; and that "two versus one" line up most certainly impacted the outcome of the proceeding.

At the hearing, all the witnesses at the university hearing were called either by Dean Parker or Thomas and none by Jane Doe.  During the opening statements, an opening statement was made Jane Doe's legal representative, Dean Parker, and Thomas' attorney. Dean Parker acted as a prosecuting attorney making an opening statement saying Jane Doe should be believed and he (the Dean) was seeking the expulsion of Thomas and calling witnesses to achieve expulsion.  During the presentation of witnesses, Thomas had to conduct the questioning; it was an unfair two versus one situation (Dean Parker and Jane Doe as complainant versus Thomas as respondent).  Thomas explained in his deposition:

> Q. Okay. I probably asked a bad question. I understand your position concerning opening and closing. How could you have been given time and a half during the questioning process?
>
> **A. Well, maybe not time and a half, but having a kid with a learning disability and a word retrieval problem acting as his lawyer for a whole hearing is a task and a half, and something that should not have been expected and put on me. Like, it was very difficult for me to, first off, remember everything I had to ask and talk, because I couldn't speak to my lawyer. He could only whisper in my ear. So I'm acting as my own attorney with a reading disability, a word retrieval disability, and ADHD, and they expect me to act as my own attorney, and that was completely -- completely --**
>
> Q. You lost me because you said you couldn't speak to your lawyer, but then you said your lawyer could whisper in your ear?
>
> **A. Like he -- the lawyer could not talk on my behalf except for opening and close. Like, between questions he -- we could, like, talk really quickly but once the questioning started, you know, I couldn't talk to him.**

No accommodations were extended to Thomas in the hearing procedure. (Thomas App. 34, 529, 559-561, 570-571, 710-717, 887-889: Thomas tr. 133:20-134:25, Martin Ex. 3, Foxhoven tr. 39:9-40:21, Foxhoven 11 Hearing tr. 2-4,13-14, 153-160, Martin Ex. 3.)

**e.  The Hearing Officer's Findings Were Not Supported
By Substantial Evidence and Were Dependent Upon
Gender Biased Erroneous Exclusions of Evidence.**

Drake's fifth contention is that the hearing officer's credibility findings were supported by evidence and that disagreement with them is insufficient.  (Drk, Br. 13-14.)  Record facts show that the hearing officer's findings, whether or not supported by substantial evidence, relied upon gender biased erroneous exclusions of evidence.  Title IX precludes acceptance of the hearing office's findings.  This Court is not bound by the hearing officer's credibility determinations.

Foxhoven wrote "that a preponderance of the evidence supports the fact that vaginal intercourse between [Jane Doe] and [Thomas] was either attempted or completed on the evening in question," that Jane Doe woke up to find Thomas violated her, that Jane Doe's "pants were off and her underwear were pushed aside" that Jane Doe has a condition making vaginal intercourse painful, that walking when leaving the Theta Chi house was painful. . (Thomas App. App. 851-862: Foxhoven Ex. 16.)  Foxoven's statements in his ruling: (i) rewrote the facts of the alleged sexual assault without supporting evidence to make penetration possible (Jane Doe's pants were said to have been pulled off instead of just pulled down); (ii) disregarded Jane Doe's initiation and performance of oral sex on Thomas; (iii) disregarded Thomas's erectile dysfunction resulting from mixing Adderall and alcohol; (iv) disregarded not having a timeline for when the supposed sexual assault occurred; (v) disregarded the many inconsistencies of Jane Doe's statements, (vi) disregarded the lack of medical and physical evidence; (vii) disregarded that Jane Doe texted to Thomas at 3:59 am saying "Yeah I'm good thx babe"; (viii) erroneously ruled as inadmissible the conduct of Jane Doe that was highly inconsistent with a sexual assault having occurred, including "jumping" on [Student P]    and cuddling, making out and giving oral sex to [Witness I]  ; and (ix) relied upon surprise testimony that should have been disregarded in absence of corroborating

medical evidence that Jane Doe had refused to produce during the investigation -- all of these artifices being done to render a politically correct gender motivated decision that, on cross-examination by Drake counsel testified was done to railroad him.  (Thomas App.: 5, 8-9, 192-211, 469-483, 492-493, 586, 851-862: Foxhoven tr. 83:4-8, Foxhoven Ex. 16, Thomas appeal brief, Foxhoven 11 Hearing tr. 29; Thomas tr. 19:20-21:6, 32:14-33:4; Sirna Ex. 5 12/09/2015 Investigation Report, DRAKE 0003321-000335, 0003344-0003345.)

In contrast, Thomas testified that Jane Doe gave him a kiss good night and left, which made sense with the excluded evidence that Jane Doe, right after the alleged sexual assault, went to [Student P]'s room in the fraternity annex and jumped into his bed, after which Jane Doe left [Student P], and went to  [Witness I]'s room where she took off her shirt, spent the rest of the early morning talking with [Witness I]   about having a relationship, but never telling [Witness I] about the alleged sexual assault, and performed oral sex on        [Witness I]         before leaving.  (Thomas App.: 5, 8-9, 192-211, 469-483, 492-493, 586. 851-862: Foxhoven tr. 83:4-8, Foxhoven Ex. 16, Thomas appeal brief, Foxhoven 11 Hearing tr. 29; Thomas tr. 19:20-21:6, 32:14-33:4; Sirna Ex. 5 12/09/2015 Investigation Report, DRAKE 0003321-000335, 0003344-0003345.)

The hearing officer's ruling also stated the conclusion that Jane Doe had not consented to intercourse with Thomas, relying in particular upon Jane Doe's surprise testimony that should have been disregarded in absence of corroborating medical evidence that Jane Doe had refused to produce during the investigation.  (Thomas App.7, 335, 467-477, 851-862: Parker tr.110:19-112:24, Sirna Ex. 5 12/09/2015 Investigation Report, DRAKE 0003319-0003329, Thomas tr. 25:23-26:23, Foxhoven Ex. 16.) It is clear that the evidence of whether or not a sexual assault occurred is a disputed factual issue; consent and level of intoxication do not matter if no sexual assault occurred.

The hearing officer's ruling rejected, as not credible, what was said to be Thomas' argument that "he was basically 'blacked-out' and that, therefore, he should not be held responsible for his conduct with [Jane Doe]." Thomas App.: 540, 851-862: Foxhoven tr. 83:4-8, Foxhoven Ex. 16,) Thomas had not so argued, and that portion of the ruling  was gender biased because its purpose was to demonize Thomas as an irresponsible male.  Foxhoven's zeal was reflected in his deposition testimony when despite all the evidence against a sexual assault having taken place and despite never reading the investigation report, Foxhoven said "All I can tell you is that Mr. Rossley sexually assaulted her one way or the other, and I have no – no hesitation to say that I believe that." (Thomas App. 534, 541: Foxhoven tr. 58:9-59:3, 89:21-90:10.)  His purportedly believing it does not make it true and a juror is not bound to draw the same inference as the Hearing Officer did.

Foxhoven's ruling recommended the disciplinary sanction of expulsion, which he recognized to be the most serious sanction that could be imposed but which he justified by the aggravating factor that Thomas had taken advantage of a drunk, incapacitated girl. (Thomas App.: 851-862: Foxhoven Ex. 16.)  But no sanction was appropriate because, as stated above, the preponderance of the evidence was decidedly that no sexual assault occurred.

**f.   The Appeal Panel Rubber Stamped An Erroneous Outcome.**

Drake's sixth contention is that the appeal panel's conduct was consistent with Drake's Code.  (Drk, Br. 14-15.)  Record facts indicate, however, that Drake's Code limits appeals to certain grounds of error that can only be sustained if there is proof that a reasonable mind would accept as adequate to reach a given conclusion, and that the appeal panel acted as a rubber stamp facilitating a gender biased erroneous outcome.

The appeal panel rejected Thomas' argument objecting to the exclusion of evidence as to Jane Doe's behavior after the alleged sexual assault on the ground that the level of Jane Doe's

intoxication after the alleged sexual assault is not an issue in determining whether the alleged sexual assault took place.  (Thomas App.1097-1098: Peters Ex. 17 Appeal Panel Decision.)  But that does not answer the point the excluded evidence indicated Jane Doe was not incapacitated and it sidestepped one reason why the excluded evidence was important: that it supported a finding that no sexual assault occurred.

Thomas' argument objecting to the same amount of time for argument for complainant and respondent at the hearing was rejected on the ground that the university is an independent actor and does not represent or take the sides of either party.  (Thomas App.1097-1098: Peters Ex. 17 Appeal Panel Decision.)  But that was simply false and contrary to the record.

Thomas' argument objecting to the failure to interview certain witnesses was rejected on the ground that it was not sufficient to suggest a change in the hearing officer's decision. (Thomas App.1097-1098: Peters Ex. 17 Appeal Panel Decision.)  But information from the first person to whom Jane Doe went after the alleged sexual assault, the former boyfriend and the girlfriend Jane Doe was texting that might have changed the decision.

Thomas' argument there was not substantial evidence supporting the decision (no rape test done, no physical evidence, no medical records) was rejected on the ground that there was evidence supporting the decision, including a statement by Thomas the following morning.  (Thomas App.1097-1098: Peters Ex. 17 Appeal Panel Decision.)  But the hearing testimony refuted that such a statement was made, and there was no contrary hearing testimony, which meant the whole case rested solely on Jane Doe's word and Jane Doe had serious credibility issues.

Thomas' argument that the sanction was excessive was rejected on the ground that there was evidence supporting sexual intercourse with an incapacitated woman. (Thomas App.1097-1098: Peters Ex. 17 Appeal Panel Decision.)  But that ignored the expulsion occurred a month

23

before graduation, Thomas had no prior disciplinary record involving sexual misconduct and the evidence of a violation was underwhelming.

The appeals panel simply acted as a rubber stamp without real understanding of the case. Appeal panelist Peters did not recall Dean Parker's role at the hearing in terms of making arguments and presenting evidence. (Thomas App.1032: Peters tr. 34:25-35:4.)  Appeal panelist Peters did not recall that Thomas did not recall having sexual intercourse with Jane Doe, did not recall counsel for Thomas trying to establish a timeline to show the sexual assault did not happen and did not recall that Jane Doe had given Thomas oral sex before the alleged sexual assault. (Thomas App. 1046-1047: Peters dep tr. 90:23-91:12, 91:13-94:18, 96:4-10.)   Peters referred to "trauma" when asked about pointing to the actions of the complainant after the alleged sexual assault to indicate a sexual assault did not occur.   (Thomas App.1045: Peters dep tr. 88:8-90:15.) When asked about the appeal decision statement that the university did not take sides in light of Dean Parker arguing for believing Jane Doe and expelling Thomas, Peters said that he did not have a clear recollection of the positions of the parties and that he did not recall from listening to the audio of the hearing Dean Parker presented witnesses.  (Thomas App.1049-1050: Peters dep tr. 103:15-108:6.)

## B.      Record Facts Establish That There Is A Genuine Factual Dispute Regarding Whether Gender Bias Was A Motivating Factor.

Drake has a misconceived notion of the operation of gender bias in Title IX discrimination cases.  (Drk. Br. 15-17.)

Proscribed gender bias is reflected in how the sexual misconduct process is structured and how decisions are made.  Title IX by text and legislative history is a non-discrimination statute, for requiring fairness for men and women, and does not justify procedurally defective and biased tribunals staffed by individuals who treat females as "victims" whose inconsistencies can be

24

explained away by "trauma" and males as rapists engaged in victim blaming and unlikely to be telling the truth.  This is one reason why Dr. R. Christopher Bender's expert testimony is important.  Such views as he critiques and are present here are found neither in the text or legislative history of Title IX.  For the importance of text in statutory interpretation, *see* A. Scalia, *Reading Law: The Interpretation of Legal Texts* (West Pub. 2012); and for the argument for examining legislative history, *see* R. Katzman, *Judging Statutes* (Oxford Univ. Press 2014).   Title IX does not countenance institutions, like Drake, that choose to address sexual assault through favoring female complainants and discriminating against male respondents.

In *Doe v. Columbia*, 831 F.3d 46, 57 (2d Cir. 2016), the Second Circuit stated: "[w]hen the evidence substantially favors one party's version of a disputed matter but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer . . . that the evaluator has been influenced by bias."  Here, the bias was gender based because of what can be called the trauma trope.  The testimony of Sirna, McKinney and Dean Parker showed the embrace of the idea of "trauma" which was used to explain away Jane Doe's inconsistencies and "counterintuitive" behavior that would clearly point to no sexual assault having occurred and led to a prosecutorial approach toward witnesses such as  [Witness J] whose information clearly pointed to no sexual assault having occurred.  (Thomas App. 285, 429-431, 308-309, 429-431: Sirna tr. 60:2-68:24, McKinney tr. 50:6-51:22, Parker tr. 25:6-27:10; Thomas' Rule 56 Statement of Additional Facts, ¶¶29-62.) It also led to Dean Parker's denunciation, as "slut shaming, of citing Jane Doe's "counterintuitive" behavior to show a sexual assault did not occur.   (Thomas App. 308-309, 336-338: Parker tr.25:6-27:10, 135:3-145:16)  Dr. Bender's expert report explains how this gender biased notion of "trauma" critically influenced Drake's proceedings against Thomas to Thomas' prejudice.

Drake seeks to excuse its behavior on the ground that even if the accused are overwhelmingly male, evidence of bias against the accused for the victim is not bias against men. For this proposition, the cases cited by Drake are inapposite.  In *Doe v. University of St. Thomas*, 240 F.Supp.3d 984 (D. Minn. 2017), a member of a sexual assault task force was additionally a part time police officer.  In *Sahm v. Miami University*, 110 F.3d 774 (S.D. Ohio 2015), the Title IX investigator held multiple roles as part-time police officer, a member of a task force on sexual assault and Title IX investigator.  These multiple role cases do not pose conflicts of interest contrary to Title IX guidance carrying the risk of biased decision-making.  Invoking inapposite cases does not alter the point that to say the process is "victim centered, but not gender biased" is: (i) trumping reality with a theoretical but non-existent possibility of females being both victims and accused and males being both victims and accused; and (ii) ignoring what these university sexual misconduct tribunals have been about.

If the system is victim centered, it is not neutral and impartial; and the reality at Drake and elsewhere is that males are the "accused" respondents and females are the "victim" complainants. Drake internal tracking statistics show that for Fiscal Year 2016 (October 19 2015 through June 30, 2016), there were 51 cases of sexual misconduct, and in those 51 cases of sexual misconduct, the complainants were all female and the respondents were all male except for one same sex male case and two cases in which the gender information was apparently unavailable. Title IX Coordinator could not give a number of female respondents in sexual misconduct cases.  (Thomas App. 226, 905-914, 1190, 1194-1204: Macro Ex. 6 & Second RFA Ex. A, Drake 0014956-0014965, Overberg tr. 47:2-48:7, 49:19-23.)

Furthermore, the conception of these campus sexual misconduct tribunals has been to protect women. The April 2011 Dear Colleague Letter premised the need for colleges to discipline

sexual misconduct, using a preponderance of the evidence standard, with the false statistic that 1 in 5 *women* on campus were victims of sexual assault, https://www2.ed. gov/about/offices/list/ocr/ letters/colleague-201104.html; the real number of college women assault victims is .03 in 5. *Rape and Sexual Assault Victimization among College Age Females, 1995-2013* (Special Report), U.S. Department of Justice, December 2014, http://www.bjs.gov.content/pub/pdf/ ravcaf9513.pdf.   To deny the female protectionist nature of campus sex tribunals is not law, but a misconceived political effort to undercut fairness for respondents.   Universities such as Drake can deny all they want about being "pressured" (never mind the federal funding involved), but universities have acted aggressively in implementing measures to protect "survivors" and "victims."   *Doe v. Miami*, 882 F.3d 579 (6th Cir. 2018) ("pressure" one factor in establishing gender bias).

Indeed, Drake Sexual Misconduct Policy has a whole section for "Option for Survivors of Sexual or Interpersonal Misconduct" with a statement of victims' rights, orders of protection and accommodations and interim measures.   There is another section for "Resources for Victims of Sexual or Interpersonal Misconduct" with a listing of telephone numbers.   There is another section on "Prevention and Awareness" of sexual assault and misconduct.   There is no section in Drake's Misconduct Policy for respondents' rights and resources.   (Thomas App.98-119, 256, 259-261: Thomas Ex. D-2, Overberg tr. 167:3-17, 181:18-187:22.)

Drake's reliance upon *Doe v. Purdue Univ.*, 281 F.Supp.3d 754 (N.D. Ind. 2017), for denying gender bias is misplaced.   That case is presently on appeal to the Seventh Circuit, and its many defects are exposed in the Appellant Brief (included in the Thomas' Appendix 1435-1561 ), including its embrace of the district court opinion already reversed by the Second Circuit in *Doe v. Columbia*, 101 F.Supp.3d 356 (S.D.N.Y. 2015), *rev'd*, 831 F.3d 46 (2d Cir. 2016), the *Doe v.*

*Purdue* district court's ignoring or rationalizing away of applicable precedent and its ignoring or rationalizing away facts supporting finding gender bias.

### III.

**SUMMARY JUDGMENT MUST BE DENIED AS TO THOMAS' TITLE IX "SELECTIVE ENFORCEMENT" CLAIM: RECORD FACTS SHOW THE SEVERITY OF THE PENALTY AGAINST THOMAS AND DECISION NOT TO INITIATE A PROCEEDING AGAINST JANE DOE WAS AFFECTED BY THEIR GENDERS**

Thomas' second Title IX claim is "selective enforcement": "the claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender," *Yusuf*, 35 F.3d at 715  Here, Defendants are liable to Thomas for Title IX discrimination under the "selective enforcement" theory because Defendants  gave the back of the hand treatment to what under Drake's Code was sexual assault against Thomas (a male) committed by Jane Doe (a female) that unquestionably happened (Jane Doe testified at the university hearing to the oral sex she initiated on Thomas) but sanctioned Thomas (a male) with the severest sanction of expulsion based on a highly contested accusation of non-consensual sexual intercourse that, lacking a rape kit test, physical DNA evidence and production of medical records, would never have proceeded in the courts and that once stripped of the gender biased assumptions about :trauma," was not supported by the preponderance of the evidence.  *Yusuf*, 35 F.3d at 715.

Drake responds with three arguments denying a Title IX "selective enforcement" claim. All three are ill-focused.

### A.   The Similarly-Situated Members of the Opposite Sex Treated More Favorably Requirement Is Not A Requirement.

Drake's first argument, citing again *Doe v. Purdue Univ.*, 281 F.Supp.3d at 784, is that it is necessary for a "selective enforcement" claim that a similarly-situated member of the opposite

sex was treated more favorably than the plaintiff due to gender.  (Drk. Br. 18.)  This was also the approach of the reversed district court in *Doe v. Columbia* on "selective enforcement."  It is, as stated, a misconceived approach.  It requires the untrue assumption that males are bringing sexual assault complaints against females on university campuses in such numbers that there is a comparative basis for male students to allege that female respondents in similar circumstances are treated more favorably.  That's not what has been happening; it is not sensible to pretend otherwise.

There is no basis in *Yusuf* to impose a requirement that similarly-situated members of the opposite sex be treated more favorably. In *Yusuf*, the plaintiff Yusuf was attacked physically and injured by his roommate James Weisman, after which Weisman and his girlfriend asked Yusuf to drop his complaint with Vassar and his charges with the local authorities; but when Yusuf did not drop his complaint and his charges, Weisman's girlfriend filed a complaint with Vassar accusing Yusuf of sexual harassment.  The Court, while upholding the pleading of plaintiff Yusuf's "erroneous outcome" claim against the ensuing university disciplinary proceeding, rejected the "selective enforcement" claim because: (1) Yusuf was complaining that Weisman, a male, did not receive a punishment equal to what Yusuf received and Weisman was another male; and (2) Yusuf did not allege "an inconsistency that warrants further inquiry."  35 F.3d at 715-716.  Yusuf, in short, had not alleged the severity of his punishment was affected by his gender.

A requirement to plead and prove "selective enforcement" discrimination because of sex does not justify framing a requirement that cannot realistically be satisfied, especially when the *Yusuf* category of "selective enforcement" can be established, as here, by the disparate treatment of the male and the female in the case when both parties have engaged in behavior said to be in violation of the school's disciplinary code.  Is there even a sliver of doubt that had Thomas initiated

performing oral sex on Jane while she was as inebriated as Thomas, that there would been another finding of sexual assault against Thomas?

**B.**   **Drake's Pointing To The Obligation To Investigate Misses**
     **The Point Of Thomas's" Selective Enforcement" Claim.** ____

Drake's second argument is that Thomas cannot prove "selective enforcement" by Drake's investigation of Jane Doe's complaint.  (Drk. Br. 18-21.)  Drake goes at length about how it was required to investigate Jane Doe's complaint.  Drake thereby misses the point of Thomas' "selective enforcement" claim.  Drake's obligation to investigate Jane Doe's complaint may be acknowledged without undercutting one bit Thomas' Title IX "selective enforcement" claim.

Thomas' claim contrasts, on the one hand, Drake's failure to conduct a serious investigation into Jane Doe's initiation and giving of oral sex (a fact that cannot be disputed given Jane Doe's university hearing testimony) when Thomas was arguably not in a position to consent with, on the other hand, the severe sanction of expulsion handed down to Thomas for alleged non-consensual sexual intercourse that lacked a forensic medical test and physical evidence and depended critically upon the word of the female who had admittedly performed oral sex on Thomas.  (Compare ¶¶26-31 with ¶¶ 32-79 in Thomas' Rule 56 Statement of Additional Facts.)  Drake Title IX personnel were mandatory reporters and thus could not rely upon a technicality of whether Thomas formally pressed a complaint.  (Thomas App. 49: Thomas tr.  191:23-194:2.)  Sirna's report, however, described the investigators' second interview with Thomas, which seemed to be obsessed with who was the female friend of Thomas who told him he was a victim, but otherwise did not deal with Thomas' expressed issue about having been sexually assaulted by Jane Doe performing oral sex on him when he was arguably not able to consent.  (Thomas App. 448, 501-503: Sirna Ex. 5 12/09/2015 Investigation Report, DRAKE 0003353-0003355, Sirna tr.135:11-137:1.)  In contrast, Thomas was put through a full disciplinary proceeding and, as

discussed above, erroneously found responsible and expelled.  (Thomas' Rule 56 Statement of Additional Facts, (¶¶ 32-79.)

## C.    There Is A Material Disputed Issue of Fact Whether Gender Was A Motivating Factor in Drake's Differing Treatment of Thomas and Jane Doe.

Drake's third argument is that Drake's investigation of Jane Doe's complaint and response to Thomas raising an issue of sexual assault was not based on gender.   (Drk. Br. 21-22.)  Again, Drake misconceives the thrust of Thomas's "selective enforcement" claim: Thomas was expelled and Jane Doe faced no disciplinary repercussions, not that Jane Doe's complaint was investigated and Thomas' issue was not pursued.   Ironically, Drake quotes Thomas's deposition testimony, elicited by Drake counsel, which reflects the gender basis of Drake's differing treatment of Thomas and Jane Doe and which bears repeating:

Q Do you think that she was somehow treated in a privileged way by Drake?

**A. Oh, yeah, 100 percent.**

Q. Have you thought about why?

**A. Because they saw her as the victim because she was the female and I was just the male, and like I said, Drake leaned one way. They were very into the Dear Colleague Letter and they picked a side and they backed it the whole way, even when we proved that she was lying and fabricating evidence and, you know, manipulating evidence. She was deemed the credible one. . . .**

(Thomas App. 6: Thomas tr. 21: 13-24.)   Thomas' testimony did not reflect mere subjective impressions, as Drake tries to call them, but rather pointed to objective reality that is framed by the same evidence of gender bias as to the Title IX "erroneous outcome" claim discussed above is applicable here to the Title IX "selective enforcement" claim.   It is a material issue of fact requiring a jury to resolve whether Drake's differing treatment of Thomas and Jane Doe was gender based. Drake again invokes the inapposite cases of *Doe v. University of St. Thomas*, 240 F.Supp.3d 984,

and *Sahm v. Miami University*, 110 F.3d 774, but they do not operate to save Drake from a "selective enforcement" claim supported by the record in this case.

**IV.**

**SUMMARY JUDGMENT MUST BE DENIED AS TO THOMAS'
TITLE IX "DELIBERATE INDIFFERENCE" CLAIM: RECORD
FACTS SHOW DELIBERATE INDIFFERENCE TO WRONGFUL
CONDUCT AGAINST THOMAS BECAUSE OF HIS GENDER**

Thomas' third Title IX claim is "deliberate indifference." For this claim, Drake correctly notes that Thomas must show that Drake was (i) deliberately indifferent (ii) to known acts of discrimination (iii) which occur under its control. *Wolfe v. Fayetteville, Ark, Sch. Dist.*, 648 F.3d at 865, *Shrum ex rel Kelly v. Kluck*, 240 F.3d 773, 782 (8th Cir. 2001). (Drk. Br. 22.) Here, these elements are satisfied: Thomas claims that Drake showed (i) deliberate indifference to Thomas' expressed issue (ii) that he had been sexually assaulted by Jane Doe when she performed oral sex on him when he was not in a position to consent and Drake knew about it (Thomas met with the Dean responsible for enforcement of the Drake Code, the Title IX Coordinator and the investigators about it) and (iii) that would subject Jane Doe to school discipline under its Code.

Drake responds with three arguments denying Thomas' Title IX "deliberate indifference" claim. All three are without merit.

**A.     Is A Material Disputed Issue Of Fact Whether
There Was A Requisite Systemic Effect.**

Drake's first argument against the "deliberate indifference" claim is that a "deliberate indifference" claim requires proof a systemic effect of denying the victim of equal access to the educational program or activity," citing *K.T. Culver-Stockton Coll.*, 865 F.3d 1054, 1059 (8th Cir. 2017). Drake also cites *Doe v. Miami Univ.*, 882 F.3d at 591-592, to argue that a single incident is not enough to sustain a deliberate indifference claim. (Drk. Br. 23-24.) *Doe v. Miami Univ.*,

however, involved but one isolated incident of non-consensual kissing that did not have the effect of denying the plaintiff equal access to the educational programs and activities at Miami University.  Here, Jane Doe brought a complaint of sexual misconduct against Thomas based on disputed alleged conduct after the oral sex performed on Thomas by Jane Doe that she admitted to at the university hearing but did not tell the investigators about, and the ultimate effect of Jane Doe's complaint was the expulsion of Thomas from Drake. Thomas was denied not just equal access but any access.  It is at least a material disputed factual issue whether there was a requisite systemic effect.

**B.**      **It Is A Material Disputed Issue Of Fact Whether Drake Was Deliberately Indifferent.**

Drake's second argument is that "undisputed facts" show Drake was not deliberately indifferent.  Drake defends its response to Thomas' expressed issue, focusing on his not saying he was filing a formal complaint.  (Drk. Br. 24-25.)  Drake's defense is woefully deficient for two reasons and thus cannot rest be said to rest on undisputed facts.  It is a material issue of fact whether Drake was deliberately indifferent.

First, it was made clear by Dean Parker to Thomas and his father that a complaint of sexual misconduct could not be made by Thomas because it would be considered retaliation in violation of the Drake's Code.  Drake has a policy that prohibits retaliating against students who file a complaint for sexual misconduct, and it was invoked to rationalize indifference to Thomas' expressed issue of sexual misconduct.  When at the meeting of Thomas, Dean Parker and Overberg, Dean Parker told Thomas that he could not take action to retaliate against Jane Doe in the context of Thomas raising the issue of Jane Doe committing sexual assault against Thomas by performing oral sex when Thomas was not arguably not able to consent, which Dean Parker indicated was retaliatory.  Dean Parker subsequently told Thomas' father that Thomas bringing a

complaint against Jane Doe would be retaliation.  (Thomas App.: 26, 27, 28, 38, 235, 259-260, 1176-1182: Thomas tr. 104:19-105:13, 110:10-111:17, 151:11-18, 151:22-153:16, Overberg tr. 82:21-83:13, 179:8-16; Tom Sr Declaration; Drake App. 115-116: Code § II A.25.)   At a minimum, it is a matter of disputed material fact as to Dean Parker's real purpose and intent was in telling Thomas about how an allegation by him of being sexually assaulted could be seen as an act of retaliation.  There is no law that requires the court or a fact finder to accept Defendants' vouching for the purity of his intent without hearing testimony with the benefit of the examination being conducted by a practicing attorney.

Second, all that was done in the investigation concerning Thomas' expressed issue was that the investigators Sirna and McKinney had a second interview of Thomas at which time the interest of Sirna was focused on finding out who was the female friend of Thomas who told him he was a victim rather than exploring facts to determine whether Drake's Code was violated.  Sirna was a mandatory reporter, and so an investigation had to be done regardless of Thomas' personal feelings.  (Thomas App. 48-49,502, 1021-1022: Thomas tr.191:23-194-3, Sirna Ex. 5 12/09/2015 Investigation Report, DRAKE 0003354, Macro Ex. 7 & Second RFA Ex. C, Drake 0002007-0002008.)   But Sirna's report described the investigators' second interview with Thomas but otherwise did not deal with Thomas' expressed issue about having been sexually assaulted by Jane Doe performing oral sex on him when he was arguably not able to consent.  (Thomas App. 448, 501-503: Sirna Ex. 5 12/09/2015 Investigation Report, DRAKE 0003353-0003355, Sirna tr.135:11-137:1.)

**C.    It Is A Material Disputed Issue Of Fact Whether Thomas'**
**Gender Was A Motivating Factor In Drake's Actions.**

Drake's third argument is that there is no evidence that a motivating factor in Drake's action was Thomas' gender.  (Drk. Br. 25.)  Drake cross-references its discussions denying the

34

gender bias as a motivating factor for the Title IX "erroneous outcome" and "selective enforcement" claims.  But for the same reasons discussed above why there is evidence supporting gender bias as a motivating factor for the Title IX "erroneous outcome" and "selective enforcement" claims, it is a material disputed factual issue of fact whether a motivating factor in Drake's "deliberately indifferent" actions was Thomas' gender.

**V.**

**SUMMARY JUDGMENT MUST BE DENIED AS TO THOMAS' AMERICANS FOR DISABILITIES ACT CLAIM: A REQUEST WAS MADE TO ACCOMMODATE THOMAS' KNOWN DISABILITIES AND ACCOMMODATION WERE NOT PROVIDED DURING THE DISCIPLINARY PROCESS TO HIS PREJUDICE**

Thomas' claim for failure to accommodate disabilities in the disciplinary process is brought under the Americans with Disabilities Act, 42 U.S.C. § 12182(a) ("ADA") and asserts that Drake is liable to Thomas because a request was made to accommodate Thomas's known disabilities and Drake's failure to provide Thomas with accommodations in the disciplinary process (*e.g.*, requiring Thomas to do the questioning at the disciplinary hearing when a Dean was effectively acting as prosecutor expressly seeking Thomas's expulsion) materially contributed to Thomas's expulsion.

Drake and Thomas agree on some basic points about the ADA.  Title III of the ADA applies the ADA to private schools such as Drake. *Argenyi v. Creighton Univ.*, 703 F.3d 441 (8th Cir. 2013); *DeBord v. Bd. of Educ. Of Ferguson-Florissant Sch. Dist.*, 126 F.3d 1102, 1106 (8th Cir. 1997).  The purpose of the ADA is to ensure that a person with a disability has "an equal opportunity to gain 'a like' or 'equal' benefit" as a non-disabled person.  *Argenyi v. Creighton Univ.*, 703 F.3d at 1027.  The Eighth Circuit has stated a four-part test for a Title III ADA: (i) the plaintiff must show he is disabled within the meaning of the ADA; (ii) the defendant is a private entity owning, leasing or operating a place of public accommodations; (iii) the defendant took

35

adverse action against the plaintiff based on the disability; and (iv) the defendant failed to make reasonable modifications that do not fundamentally alter the nature of the public .accommodations *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir. 1999); *Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076-1077 (8th Cir. 2006).

Thomas satisfies the ADA four-part test. Drake does not contest that Thomas satisfies the first two elements of the ADA test: Thomas has disabilities under the ADA (ADHD and language-based and word-retrieval disabilities) and Drake owns, leases or operates places of public accommodations. Drake does dispute the third and fourth elements of the ADA test with three arguments. Drake's three arguments are in error.

## A.    A Request Was Made To Accommodate Thomas' Known Disabilities.

Drake's first argument is that Thomas bore the initial burden of requesting reasonable accommodations and did not do so, citing *Mershon*. (Drk. Br. 27-28.) Drake has badly misrepresented the record.

1.    Drake's Student Conduct Code and Sexual Misconduct Policy contain no mechanism through which a respondent in a sexual misconduct investigation proceeding can or is required to make a formal request for an accommodation for a disability. The only reference to accommodations in the sexual misconduct policy is for "survivors" of sexual misconduct. (Thomas App. 64-119: Thomas Ex. D-1, Thomas D-2.)

2.    Drake concedes that Thomas had previously requested accommodations for his classes through Drake's Disability Services. (Drk. Br. 28.) While Drake characterizes this as "individual requests for academic accommodations to some of his professors," Thomas gave a different description in his deposition testimony, that Ms. Laughlin of the Office of Disability Services would give Thomas a signature from the Office so that Thomas would take it to his

professors and that while there was some individual variation in different classes, there was a general rule of time and a half for assignments in his courses.  The Office of Disability Services, after finding accommodations are necessary as in Thomas' case, approved academic accommodations generally.  (Thomas App. 33,43: Thomas tr. 130:15-20, 169:20-172:16.)

      3.     Drake's assertion that there was no reason for anyone in the disciplinary process to know about Thomas' accommodations for classes (Drk. Br. 27) is absurdly wrong.  Thomas told the investigators in his interview on October 23, 2015, that he has ADHD and language-based and word-retrieval disabilities and he takes Adderall. In his deposition, Drake counsel asked Thomas:

Q. Did you tell either of the two investigators that you had a disability?

**A. Well, yeah. When -- during my -- oh, yeah, of course I did. When I told them I took Adderall for my ADHD and my meds for my anxiety, just telling them that in the hearing, should -- is telling them that I have a disability. At that point, I assume they'd put one and two together and know that me taking my Adderall and my anxiety medication and now my anti-depressants, obviously there's something going on and he, you know, probably gets accommodations for something and we should find out why, but that was too much work for them.**

(Thomas App. 31: Thomas tr. 123:1-13.)  The investigation report states that Thomas told them he has ADHD and language-based and word-retrieval disabilities and he takes Adderall.  (Thomas App. 473-477: 12/09/2015 Investigation Report, DRAKE 0003325-0003329.)  Dean Parker, by his own admission, was informed by Thomas' parents in a phone call in November 2015 that Thomas had ADHD and a form of dyslexia.  (Thomas App. 360: Parker tr. 232:6-233-1.)  Thomas, when asked if the people in the disciplinary process knew about the information that Ms. Laughlin had, responded "[t]hey should have done their due diligence. . . . That's not a hard phone call."  (Thomas App.: 31: Thomas tr. 122:18-25.)   That Dean Parker oversaw the Drake Office of Disability Services (Thomas App. 1180: Tom Sr Declaration ¶ 11) only makes Drake's position more unjustifiable.

4.     Courts have found that a university can be required to take action when it is on constructive notice of a disability. *See Nathanson v. The Medical College of Pennsylvania*, 926 F.2d 1368, 1382-83 (3d Cir. 1991) (medical school was on notice of student's disability based on administrator's conversation with student and there were issues of fact concerning whether request was made for reasonable accommodations); *Redding v. Nova Southeastern Univ., Inc.*, 165 F. Supp. 3d 1274 (S.D.Fla. 2016) (University was on notice of disability based on informal request for an accommodation and there was issue of fact whether student failed to follow written procedures which, in any event, was not fatal to her failure to accommodate claim).

5.     In a contentious phone call with Dean Parker in December 2015, Thomas' father requested accommodations for Thomas in the upcoming hearing.  (Thomas App.: 1179-1180: Tom Sr Declaration ¶ 10.)

6.     The testimony of Tom Rossley Sr. on this issue should be noted:

I demanded that he both accommodate Thomas' disabilities in the upcoming hearing and that he investigate Thomas' claim that he had been sexually assaulted while incapacitated.  Jerry Parker never addressed this request for disability accommodations, and the call ended abruptly when Jerry Parker's only response was that Drake would not be investigating Thomas' claim because they believed Thomas' claim to be retaliatory and he told me to wait until I read the investigative report because it was very damning.
. . . .

The day after my December 2015 phone conversation with Dean Parker, I received the encrypted investigation report.  When I read Mary Sirna's investigative report, I saw that in his first meeting with investigator Mary Sirna, Thomas had not only disclosed the medications he was taking but also disclosed the disabilities with which that he was dealing.  As a parent with a son with ADHD, anxiety, and language-based learning disabilities, I know from experience that the very nature of ADHD, anxiety, and language-based learning disabilities can prevent a student with such disabilities as Thomas from asking for specific accommodations.  A student who discloses his or her medications and disabilities, as Thomas did, should be considered effectively asking for accommodations.  Investigator Mary Sirna should have engaged him in a discussion about these disabilities, and a Student Code of Conduct that addresses and identifies appropriate disability accommodations in the disciplinary process would better served students with

disabilities such as Thomas so that they might ask for specific accommodations. As a Drake alumnus and former Board of Trustees member who served on a Committee examining Drake's sexual assault policy, I know that Drake is home to The Harkin Institute. So why wouldn't I, a parent with a son with ADHD, anxiety, and language-based learning disabilities, assume that Drake would take proper steps to accommodate disabilities in a disciplinary process?

(Thomas App. 1179-1181: Tom Sr. Declaration ¶¶ 10, 12.)

**B.    Reasonable Accommodations Would Not Have
        Unduly Burdened Drake's Disciplinary Process.**

Drake's second argument is that the accommodations now requested by him were offered or speculative or would have been an undue burden. (Drk. Br. 28-30.) The argument relies upon nonsensical assertions and inapposite cases and, in any case would not a determination of unduly burdensome require a weighing of evidence, i.e. essentially be a factual determination.

Thomas testified at length in his deposition to specific reasonable accommodations for the investigation and the hearing that could have been provided but were not: (i) having someone else with him in the room the meeting with the investigator; (ii) having questions by the investigators written down before Thomas would be expected to answer them; and (iii) time and a half, or at least more time at the hearing in a situation where it was two "parties" (Dean Parker and complainant Jane Doe) versus one "party" (Thomas as respondent). (Thomas App.: 32-34: Thomas tr. 127-21-130:14, 133:3-134:18.)   Thomas explained in his deposition:

Q. Okay. I probably asked a bad question. I understand your position concerning opening and closing. How could you have been given time and a half during the questioning process?

**A. Well, maybe not time and a half, but having a kid with a learning disability and a word retrieval problem acting as his lawyer for a whole hearing is a task and a half, and something that should not have been expected and put on me. Like, it was very difficult for me to, first off, remember everything I had to ask and talk, because I couldn't speak to my lawyer. He could only whisper in my ear. So I'm acting as my own attorney with a reading disability, a word retrieval disability, and ADHD, and they expect me to act as my own attorney, and that was completely -- completely --**

39

Q. You lost me because you said you couldn't speak to your lawyer, but then you said your lawyer could whisper in your ear?

**A. Like he -- the lawyer could not talk on my behalf except for opening and close. Like, between questions he -- we could, like, talk really quickly but once the questioning started, you know, I couldn't talk to him.**

(Thomas App. 34, 529, 559-561, 570-571, 710-717, 887-889: Thomas tr. 133:20-134:25, Martin Ex. 3, Foxhoven tr. 39:9-40:21, Foxhoven 11 Hearing tr. 2-4,13-14, 153-160, Martin Ex. 3.)

Given the two versus one alignment of the "parties" at the hearing, Drake's argument that allowing Thomas more time at the hearing would violate Title IX is wrong. Drake relies upon the now revoked April 4, 2011 Dear Colleague Letter. *See* OCR's September 22, 2017 Dear Colleague letter. But even as stated in Drake's Brief (Drk. Br. 29), the April 4, 2011 Dear Colleague Letter requires that parties have an equal *opportunity* to present relevant witnesses and other evidence; the April 4, 2011 Dear Colleague Letter does not state that each side must have equal *time*. Moreover, Drake offers no support for the contention that allowing more time to Thomas would have been unduly burdensome to Drake; indeed, nothing in Drake's argument shows that there was an undue burden to what Thomas outlined as reasonable accommodations.

Drake cites *Banks v. Deere*, 829 F.3d 661 (8th Cir 2016), but it is inapposite. *Banks* is a race discrimination case and has nothing to do with the adequacy or reasonableness of requested accommodations for disability. Drake also cites *Mershon*, 442 F.3d at 1078, is readily distinguishable. *Mershon* dealt with a plaintiff's affidavit—not deposition testimony—in which the plaintiff generally asserted that the University stopped providing him accommodations and that it resulted in several incomplete grades in courses that he did not identify and for reasons that were not clearly articulated. Here, Thomas testified as to the specific manner in which Drake could have provided accommodations during the Title IX process based on his experience with his disability and accommodations that were previously made by Drake in his classes.

C.   **Under *Merson*, The Failure To Accommodate Is The
      Requisite Adverse Action Based On The Disability.**

Drake's third argument is that the discipline was not based on Thomas' disability. (Drk. Br. 30.)  Drake misapprehends the law.  The Eighth Circuit ruled in *Mershon* that the failure to accommodate is a separate form of prohibited discrimination: "Because the alleged failure to accommodate is the adverse action and no other act is claimed as discriminatory, there is no requirement to demonstrate any adverse action other than failure to accommodate itself." 442 F.3d at 1077 & n.5. Thus, Thomas' assertion that Drake failed to provide a reasonable accommodation satisfies the requisite adverse action here.  Thomas testified in his deposition about what that meant:

> **Therefore all they would have to do is look at it and realize this kid's going through a lot. He's acting as his own attorney and his own lawyer, and speaking for hours, and we're not at all acknowledging the fact that he has a word retrieval problem, he has a -- what's the word -- ADHD and then anxiety, and he has issues formulating the words that are truly in his thoughts, but to them that didn't matter to them. They used that my indecision and my inability to always get the answer out in the most effective manner as me being evasive and, I guess, lying and not deeming me credible, which using my disability as a discreditation is one of the most insulting things I've ever encountered.**

(Thomas App.: 31: Thomas tr. 121:24-122:12.)

## VI.

**SUMMARY JUDGMENT MUST BE DENIED AS TO THOMAS' BREACH
OF CONTRACT AND QUASI-CONTRACT CLAIMS: RECORD FACTS
SHOW A DENIAL OF THE PROMISED FUNDAMENTALLY FAIR PROCESS**

Thomas has asserted claim for breach of contract, breach of the implied contract duty of good faith and quasi-contract (estoppel) that at this point in the litigation should be combined because arguments over technical compliance with Drake's Code miss the core problem that those claims have been seeking to address: that Drake expelled Thomas a month short of graduation (after spending all the money for four years of a college degree) without the promised

fundamentally fair process.  Drake has its rationalization for why the investigation, hearing and appeal were handled the way they were (Drk. Br. 34-40); and while Thomas can, and in connection with the discussion of Thomas' Title IX and ADA claim has, pointed out the deficiencies of the investigation, the hearing and the appeal for which Drake does not have satisfactory answer, the recurring problem throughout is that there was a lack of "equitable" conduct.

In *Am. Tower, L.P. v. Local TV Iowa, L.L.C.*, 809 N.W.2d 546, 550 (Iowa Ct. App. 2011), the implied contract duty of good faith under Iowa law was stated:

> In Iowa, "[i]t is generally recognized that there is an implied covenant of good faith and fair dealing in a contract." *Harvey v. Care Initiatives, Inc.,* 634 N.W.2d 681, 684 n. 4 (Iowa 2001) (citing Restatement (Second) of Contracts § 205, at 99 (1981)); *accord Midwest Mgmt. Corp. v. Stephens,* 291 N.W.2d 896, 913 (Iowa 1980) (stating that a contract affording one of the parties "sole discretion" to terminate the contract required party "to exercise that discretion in a reasonable manner on the basis of fair dealing and good faith"). "The underlying principle is that there is an implied covenant that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." 13 Richard A. Lord, *Williston on Contracts* § 38.15, at 437 (4th ed.2000) [hereinafter *Williston on Contracts*]. This implied covenant generally operates upon an express condition of a contract, the occurrence of which is largely or exclusively within the control of one of the parties. *Williston on Contracts* § 38.15, at 435.

In looking to the implied duty of good faith and fair dealing, Thomas is not seeking to alter or add to the terms of the contract, but rather to invoke the duty implied by law that operates on the terms of the contract, which is here the Drake Code.

Drake states it is committed to a fair disciplinary process for sexual misconduct.  Vanessa Macro, Chief Administrative Officer for Drake, testified that Drake is committed to providing due process to respondents in sexual misconduct cases and that Drake recognizes there must be sufficient process so there is fairness. (Thomas App. 903: Macro tr. 47:15-22.)  Dean Parker testified that Drake was obligated to treat Thomas fairly throughout the process of the investigation, the hearing and the imposition of sanctions. (Thomas App. 342: Parker tr. 159:4-8.)

President Martin wrote about the need for a "fundamentally fair outcome." (Thomas App. 386-387: Martin Ex. 1.)

The doctrine of estoppel operates here to bind Drake to its promise of a fair disciplinary process that is fair to respondents. *Schoff v. Combined Ins . Co. of Am.*, 604 N.W.2d 43, 49 (Iowa 1999). The implied duty of good faith and fair dealing makes it a contractual commitment on Drake's part to provide a fair disciplinary process that is fair to respondents. That duty, Drake breached in Thomas' case; as Thomas complained about in his deposition, Drake railroaded him and treated Jane Doe "as the victim because she was female." (Thomas App. 3, 5-6: Thomas tr. 12:21, 20:19-22, 21:7-24.) Operating a disciplinary proceeding with the gender bias discussed above is a breach of the implied duty of good faith and fair dealing. Holding a hearing where there are two "parties" (the Dean and complainant) versus one "party" (the respondent) and the Dean has made an opening statement saying the complainant should be believed and the respondent expelled and calls witnesses to achieve those ends and accommodations are not made to the respondent who has ADHD and word-retrieval disabilities and is expected to handle the examination of witnesses is breaching the implied duty of good faith and fair dealing. (Thomas App. 34, 529, 559-561, 570-571, 710-717, 887-889: Thomas tr. 133:20-134:25, Martin Ex. 3, Foxhoven tr. 39:9-40:21, Foxhoven 11 Hearing tr. 2-4,13-14, 153-160, Martin Ex. 3.)

Drake uses a preponderance standard for the burden of proof, but it is well to remember that in civil cases using the preponderance standard, procedural protections exist in rules of evidence, attorneys conducting the case, right of cross-examination, the right to jury trial of one's peers. Departing from such procedural protections means risking error that does damage. The practical reason why due process matters is so that cases are not decided "on the basis of an

erroneous or distorted conception of the law or the facts." *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980).

## CONCLUSION

For the reasons stated above, Thomas respectfully submits that the Court should deny Defendants' Motion for Summary Judgment and order such further and other relief as the Court deems just and proper.

**Dated: June 22, 2018**
Redacted on July 13, 2018

**Respectfully submitted,**

/s/ David H. Goldman
David H. Goldman, Esq.
BABICH GOLDMAN, P.C.
501 S.W. 7th Street, Suite J
Des Moines, Iowa 50309
Telephone: (515) 244-4300
Email: dgoldman@babichgoldman.com

-and-

/s/Philip A. Byler
Philip A. Byler, Esq. (*pro hac vice*)
Andrew T. Miltenberg, Esq. (*pro hac vice*)
NESNOFF & MILTENBERG, LLP
363 Seventh Avenue, Fifth Floor
New York, New York 10001
Telephone**:** (212) 736-4500
Email: PByler@nmllplaw.com
Email: AMiltenberg@nmllplaw.com

***ATTORNEYS FOR PLAINTIFF THOMAS
ROSSLEY JR.***

## CERTIFICATE OF SERVICE

The undersigned certifies that this document was served by electronic filing upon the

attorneys of record for each party to the above-entitled case at the e-mail address shown below on

July 13, 2018:

| | |
|---|---|
| NYEMASTER GOODE P.C. | NYEMASTER GOODE P.C. |
| Frank Boyd Harty, Esq. | Frances M. Haas, Esq. |
| Mary E. Funk, Esq. | |
| 700 Walnut Street – Suite 1600 | 625 First Street SE – Suite 400 |
| Des Moines, Iowa 50309 | Cedar Rapids, Iowa 52401 |
| Telephone: 515.283.3100 | Telephone: 319.286.7000 |
| Facsimile: 515.283.8045 | Facsimile: 319.286.7050 |
| E-Mail: fharty@nyemaster.com | fmhaas@nyemaster.com |
| mef@nyemaster.com | |

_____*Philip A. Byler, Esq.*_____
Philip A. Byler, Esq.