**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| THOMAS ROSSLEY, JR.,<br><br>    Plaintiff,<br><br>v.<br><br>DRAKE UNIVERSITY and DRAKE UNIVERSITY BOARD OF TRUSTEES,<br><br>    Defendants. | **No. 4:16-cv-00623-RGE**<br><br>**ORDER RE: DEFENDANTS'**<br>**MOTION FOR**<br>**SUMMARY JUDGMENT** |

## I.    INTRODUCTION

Plaintiff Thomas Rossley, Jr. brings this suit against Defendants Drake University and Drake University Board of Trustees, challenging Defendants' Title IX investigation that concluded Plaintiff sexually assaulted a female student, and contesting Defendants' failure to investigate his own sexual assault allegations. Plaintiff asserts Defendants violated both Title IX of the Education Amendments Act of 1972 and the Americans with Disabilities Act (ADA). Plaintiff also brings state law claims alleging breach of contract, breach of the covenant of good faith and fair dealing, and estoppel.

Defendants move for summary judgment on all of Plaintiff's claims, asserting: 1) Plaintiff has not identified any genuine issues of material fact showing gender was a motivating factor in the disciplinary process; 2) Plaintiff did not request a reasonable accommodation and thus cannot bring an ADA claim; and 3) Plaintiff has not shown Drake violated any promise or contractual provisions contained in its Code of Conduct or Sexual Misconduct Policy. The Court grants Defendants' motion for summary judgment as to Plaintiff's Title IX claim regarding Plaintiff's erroneous outcome and deliberate indifference theories, but denies Defendants' motion for summary judgment on Plaintiff's Title IX claim regarding Plaintiff's selective enforcement theory.

The Court grants Defendants' motion for summary judgment as to Plaintiff's Americans with Disabilities Act claim. As for Plaintiff's state law claims, the Court first determines Plaintiff's estoppel and breach of covenant of good faith and fair dealing claims are subsumed by his breach of contract claim. The Court denies Defendants' motion for summary judgment on some but not all of Plaintiff's alleged breaches of contract. The Court also dismisses Plaintiff's claim of negligent infliction of emotional distress because Plaintiff does not resist Defendants' motion for summary judgment on this claim.

## II.   FACTUAL & PROCEDURAL BACKGROUND

The following facts are either uncontested or, if contested, viewed in the light most favorable to Plaintiff. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587−88 (1986); *Munz v. Michael*, 28 F.3d 795, 796 (8th Cir. 1994).

### A.   Drake's Code of Conduct & Sexual Misconduct Policy

Two documents govern sexual assault investigations and discipline at Drake: the Code of Student Conduct ("the Code") and the Sexual and Interpersonal Misconduct Policy and Notification of Complainant's Rights ("the Policy"). Defs.' Suppl. App. Supp. Defs.' Mot. Summ. J. at APP. 099–132, 133–51, ECF No. 137. The Code addresses various forms of academic and non-academic misconduct. *Id.* at APP. 102–03. The Policy specifically addresses Drake's "policies and procedures related to [s]exual and [i]nterpersonal [m]isconduct" and is meant to ensure those policies are "interpreted and applied consistently with Title . . . IX . . . and other applicable law." *Id.* at APP. 133. Additionally, the Policy is "intended to notify victims/survivors of their rights and resources that are available to them when [s]exual or [i]nterpersonal [m]isconduct occurs." *Id.*

"Sexual assault" is defined in the Code and Policy as "an extreme form of sexual misconduct ranging from forcible rape to nonphysical forms of pressure that compel individuals

2

to engage in sexual activity against their will." *Id.* at APP. 111, 134. "The term 'consent,' in the context of sexual activity, means by clear, unambiguous action, agreeing, giving permission or saying yes to sexual activity with someone else . . . an individual cannot give consent if incapacitated from doing so due to the influence of drugs, alcohol, or other condition." *Id.* at APP. 105; *see also id.* at APP. 134. Neither the Code nor the Policy defines "incapacitation." When there is no consent, "[s]exual intercourse (vaginal, anal, oral)" and "[o]ral sex," among other conduct, constitute sexual assault. *Id.* at APP. 111–12, 134. Additionally, "[e]ngaging in sexual activity with a person who is unable to provide consent due to the influence of drugs, alcohol, or other condition" is considered sexual assault. *Id.* The Code states Drake students "acknowledge[ ] the right of the University to initiate disciplinary procedures when an allegation or a complaint of non-academic misconduct is made and to impose disciplinary sanctions when it has been determined that non-academic misconduct has occurred." *Id.* at APP. 103. Such discipline may include expulsion from the University. *Id.*

In cases of alleged non-academic misconduct, "[a]ny student, student organization, faculty member or staff member may initiate a complaint against a student or student organization . . . by contacting the Dean of Students office or Title IX Coordinator in the case of alleged sexual misconduct." *Id.* at APP. 116. "Alternatively, the Dean of Students office may initiate a complaint on his or her own initiative, in which case the Dean/designee will be considered the complainant." *Id.* Under the Policy, "[a]ny University employee who is not statutorily prohibited from doing so . . . who becomes aware of [s]exual or [i]nterpersonal [m]isconduct should bring the information to the Title IX Coordinator/Equity and Inclusion Policy Specialist, Dean of Students, or the Director of Human Resources." *Id.* at APP. 138.

Following a report of alleged sexual misconduct, the Dean of Students will conduct an investigation into the complaint. *Id.* at APP. 116–17.[1] The individuals responsible for coordinating and investigating the complaint "receive special training or have experience in (1) handling complaints of sexual and/or interpersonal misconduct; and (2) applicable confidentiality requirements." *Id.* at APP. 131. Both the complainant and respondent are advised they may have a personal advisor present "at any stage of the process." *Id.* at APP. 138. Following the investigation, the Dean of Students or his designee may initiate formal disciplinary proceedings if he has a "reasonable belief that the charge . . . can be proven by a preponderance of the evidence." *Id.* at APP. 117; *see also id.* at APP. 119–20 (setting forth disciplinary hearing process). "A preponderance of the evidence exists when it is more likely than not, or the greater weight of the evidence suggests, a violation occurred." *Id.* at APP. 106.

At the disciplinary hearing, a hearing officer must determine "(1) whether a preponderance of the evidence establishes the accused student engaged in non-academic misconduct; and (2) recommended disciplinary sanction(s), if any." *Id.* at APP. 121. All of the University's evidence against the accused will be presented by the Dean of Students or his designee. *Id.* Each party's personal representative may only provide counsel and advice and is otherwise prohibited from "advocat[ing] or tak[ing] an active role in the hearing." *Id.* at APP. 121–22. However, a personal representative who is an attorney "may make an opening statement, a closing statement and may present written questions to be read by the hearing officer to a witness." *Id.* at APP. 122. The hearing officer is not required to read any written questions he determines "to be inappropriate or irrelevant." *Id.*

---

[1] The Policy governs conduct of students, employees, and certain third parties. ECF No. 137 at APP. 134. If the Policy is invoked in a complaint against a student, the Policy instructs that the procedures outlined in the Code govern the investigation and adjudication process. *Id.* at APP. 138.

During the hearing, "[t]he accused, the complainant and the Dean/designee may call witnesses, conduct cross-examination, and may answer any evidence presented by others through rebuttal." *Id.* Following the hearing, the hearing officer will provide a written decision to the complainant, respondent, and Dean of Students detailing the hearing officer's decision and any associated sanctions. *Id.* at APP. 123.

If a respondent is found to be responsible for sexual misconduct, the respondent, complainant, or the Dean of Students may appeal the decision or sanctions in writing. *Id.* Following notice of an appeal, the parties can submit a written response. *Id.* at APP. 123–24. A party may request a hearing before the appeals council. *Id.* at APP. 125. The appeals council will then "meet with the appealing and responding parties (and their personal representatives, if any)." *Id.* at APP. 124–25. "[A]n appeal is limited to a review of the record from the disciplinary hearing, the notice(s) of appeal and the response(s)." *Id.* at APP. 124. After reviewing the applicable materials, the appeals council may dismiss the appeal, affirm the hearing officer's determination, or reverse the previous decision. *Id.* at APP. 125. If the President concurs with the council's findings, "the Dean/designee shall have the authority to impose the sanction of expulsion." *Id.* at APP. 126. "Only the President of the University may recommend readmission of a student who has been expelled." *Id.*

### B.  Factual Background

Plaintiff is a former student of Defendant Drake University, a private university located in Des Moines, Iowa. Am. Compl. ¶¶ 5–6, ECF No. 46; Pl.'s Resp. Defs.' Statement Undisputed Material Facts ¶¶ 1–2, ECF No. 111-2. Defendant Drake University Board of Trustees is Drake's governing body. ECF No. 46 ¶ 7; ECF No. 111-2 ¶ 2.

In the fall of 2015, Jerry Parker was the acting Dean of Students. ECF No. 111-2 ¶ 3; Defs.' App. Supp. Defs.' Mot. Summ. J. at APP. 041, Parker Dep. 14:1–22, ECF No. 103. In the

spring of 2016, Parker was the Associate Dean of Students, acting as the Dean's designee for the disciplinary proceeding against Plaintiff. *Id.* In these positions, Parker was responsible for enforcing Drake's Code of Conduct. ECF No. 111-2 ¶ 3; Parker Dep. 164:8–10, ECF No. 103 at APP. 049. Kathryn Overberg was Drake's Title IX Coordinator and her duties included overseeing Defendants' response to complaints of sexual misconduct. ECF No. 111-2 ¶ 4; *see* Overberg Dep. 16:21–17:2, ECF No. 103 at APP. 025. Overberg began working in her position shortly after the female student known to the Court as Jane Doe filed her complaint of sexual misconduct against Plaintiff. *See* Parker Dep. 40:22–41:1, ECF No. 103 at APP. 042.

### 1. Plaintiff's Disabilities

Plaintiff suffers from a mild form of dyslexia, ADHD, and word-retrieval issues. Defs.' Resp. Pl.'s Statement Material Facts ¶ 1, ECF No. 133; *see* Pl.'s Dep. 129:1–9, 172:20–173:4, ECF No. 103 at APP. 009, APP. 014–15; Pl.'s Sealed App. Supp. Pl.'s Resp. Defs.' Mot. Summ. J. at APP. 775–76, Hr'g Tr. 218:17–219:12, ECF No. 118-8. Due to his disabilities, Plaintiff regularly requested and received academic accommodations through Drake's Disability Services. *See* Pl.'s Dep. 169:16–170:24, ECF No. 103 at APP. 014; Defs.' Br. Supp. Mot. Summ. J. 27–28, ECF No. 104. Although Plaintiff was generally awarded "time and a half" for exams, the accommodations he requested and utilized "varie[d] class to class." Pl.'s Dep. 170:6–14, ECF No. 103 at APP. 014. In order to secure accommodations, Plaintiff met with each professor individually to determine what accommodations were necessary. Pl.'s Dep. 169:23–170:5, ECF No. 103 at APP. 014. Due to his word-retrieval disability, Plaintiff was often permitted to refer to written notes during oral presentations rather than doing the presentations by memory. Pl.'s Dep. 171:2–15, ECF No. 103 at APP. 014.

### 1. The Report & Investigation

On the morning of October 9, 2015, Jane Doe, a female Drake student, contacted Drake Public Safety reporting she had been sexually assaulted by Plaintiff. *See* App. Supp. Defs.' Mot. Summ. J. at APP. 155, ECF No. 103-1 (noting in Drake University Public Safety Report "Incident Discovered/Called In" at 10:21 a.m. on October 9, 2015). Jane Doe explained the previous night she had consumed a large amount of alcohol and had accompanied Plaintiff, who she considered a friend, to his fraternity house, Theta Chi. *Id.* at APP. 172. Jane Doe stated she "blacked out for an unknown amount of time" after they arrived. *Id.* She explained that, the next thing she remembered was that she was on a bean bag chair and Plaintiff was on top of her having sexual intercourse with her. *Id.* Jane Doe reported Plaintiff was wearing a condom. *Id.* Jane Doe stated she told Plaintiff to stop but he refused. *Id.* When she explained she was going to be sick, he stopped and let her go to the bathroom. *Id.* Jane Doe reported she did not get sick at that time but instead left Theta Chi and went to a friend's house in the area. *Id.* Jane Doe did not file a report with the police but, per the Policy, Drake University Public Safety filed a case report with the Dean of Students. *See id.* at APP. 155; ECF No. 137 at APP. 138 ("Reports to Campus Public Safety . . . will automatically be referred to . . . the Dean of Students . . . , who will follow up for further processing.").

The same day Jane Doe filed her report with Drake University Public Safety, the Dean of Students' Office sent Plaintiff an email with a letter informing him about the complaint. ECF No. 103-1 at APP. 152–53. The letter provided Jane Doe's name and noted the section of the Code of Conduct the complaint was filed under. *Id.* It also explained two "interim provisions" prohibiting Plaintiff from contacting Jane Doe or retaliating against her for filing the complaint. *Id.* at APP. 152. The letter also listed the University Counseling Center as an available service.

7

*Id.* at APP. 153. Finally, Plaintiff was informed he would need to attend a later-scheduled meeting and that he was permitted "to bring a personal representative to this meeting." *Id.* at APP. 152.

At the time Jane Doe filed her complaint, Parker was ill and thus could not conduct the investigation himself. Overberg Dep. 65:25–66:6, ECF No. 103 at APP. 027–28; Parker Dep. 39:5–24, ECF No. 103 at APP. 042. Consequently, Drake hired an outside investigator, Mary Howell Sirna, to serve as the lead investigator. Parker Dep. 39:14–24, ECF No. 103 at APP. 042; ECF No. 111-2 ¶ 041. At the time she was appointed to investigate Jane Doe's complaint, Sirna was serving as Iowa State University's interim Title IX coordinator. Sirna Dep. 9:12–10:5, ECF No. 103 at APP. 054–55. Prior to working at Iowa State University, Sirna served as a prosecutor for thirteen years and prosecuted crimes of sexual violence. Sirna Dep. 8:14–23, ECF No. 103 at APP. 054; ECF No. 111-2 ¶ 42. She had received training on handling student complaints of sexual assault. Sirna Dep. 18:2–21:24, ECF No. 103 at APP. 056. Sirna was paired with Tricia McKinney, Drake's Assistant Director of Public Safety, to conduct the investigation. McKinney had also received training on how to handle sexual assault complaints. *See* McKinney Dep. 14:16–15:16, ECF No. 103 at APP. 097.

According to the investigative report Sirna and McKinney produced, on October 14, 2015, Parker met with Plaintiff to discuss Jane Doe's complaint and the investigative process. ECF No. 103-1 at APP. 185. Parker discussed "internal and external resources" available to Plaintiff, Jane Doe's ability to bring criminal charges, and Plaintiff's right to "have a personal representative of his choosing to attend any and all meetings throughout the disciplinary process." *Id.* Parker also met with Jane Doe that day and discussed the same topics. *Id.*

On October 23, 2015, Sirna and McKinney interviewed Jane Doe. *Id.* at APP. 188. Jane Doe explained that, although she and Plaintiff had never interacted one-on-one, they had mutual friends and had each other's cell phone numbers. *Id.* Jane Doe stated she believed Plaintiff was

8

attracted to her and that he often texted Jane Doe to invite her to hang out with him or visit him at Theta Chi, which Jane Doe described as "annoying." *Id.* at APP. 188–89. Jane Doe explained that on the night of October 8, 2015, she had attended a party at the Pi Kappa Phi fraternity house from approximately 9:30 p.m. to midnight. *Id.* at APP. 189. She attended the party with her friend, Student M, and consumed alcohol. *Id.*; *see also* Sealed Joint Suppl. App., ECF No. 134 (providing a reference key for the names of students and witnesses).[2] Although Jane Doe could not remember the exact number of drinks she had consumed, "[s]he described herself as getting tired and noticing she was stumbling." ECF No. 103-1 at APP. 189. Following the house party, Jane Doe went to Peggy's Tavern, a nearby bar, with Witness C, Student O, and Witness E. *Id.* When interviewed by Sirna and McKinney, the students with Jane Doe at Peggy's Tavern reported that she was noticeably drunk. *Id.* at APP. 201, 204. Jane Doe stated she only had "flashes of memories" at Peggy's Tavern and believed she had only one rum and Coke drink while there. *Id.* at APP 189. Witness F worked as a bartender at Peggy's Tavern that night and informed the investigators that she had refused to serve Jane Doe because of Jane Doe's level of intoxication. *Id.* at APP. 205–06.

After Peggy's Tavern, Jane Doe went to Drake Bakery Café and Bar, a nearby restaurant, where she first interacted with Plaintiff. *Id.* at APP. 189. Although she described herself as "pretty drunk," she told investigators she believed Plaintiff was sober because he offered to drive her home. *Id.* Witness C told investigators he observed Plaintiff with his arm around Jane Doe and that they were "talking close." *Id.* at APP. 201. Witness C stated Jane Doe was "by far in worse shape" than Plaintiff and recalled seeing Jane Doe holding onto Plaintiff while she stumbled. *Id.* at APP. 201. Witness C described Plaintiff as walking straight. *Id.* Witness A, a bartender at Drake Bakery, told investigators he believed both Plaintiff and Jane Doe were drinking but could

---

[2] The Court uses this key throughout this Order and, when necessary, replaces the names of witnesses and students with their identifying letters. *See* ECF No. 134.

9

not recall any signs that they were impaired. *Id.* at APP. 197. Witness A stated Plaintiff and Jane Doe appeared "flirty and were laughing and touching but not groping." *Id.* at APP. 198.

Jane Doe stated she then recalled getting into the backseat of a car and telling Plaintiff to take her home because she was drunk. *Id.* at APP. 189. Witness B later told investigators that he was responsible for driving the "sober cab" on the night of October 8, 2015, to transport intoxicated fraternity brothers home. *Id.* at APP. 198. Witness B stated that after receiving a call from Plaintiff at approximately 1:15 a.m., Witness B picked up Jane Doe and Plaintiff. *Id.* Witness B explained that when he asked where they wanted to go, Jane Doe stated she wanted to go to Theta Chi. *Id.* at APP. 198–99. Jane Doe told investigators she recalled Plaintiff attempting to kiss her and that she told him she "did not like [him] like that." *Id.* at APP. 189. Witness B stated both Jane Doe and Plaintiff appeared drunk and that "[s]he may have been a little more drunk than him." *Id.* at APP. 199. When asked about Plaintiff's level of intoxication, Witness B explained, "He was drunk. He was not belligerently hammered. He was not vomiting." *Id.* When they arrived at Theta Chi, Jane Doe told Plaintiff she felt ill and ran into the Theta Chi house. *Id.* at APP. 189. Witness B stated he "noticed the girl falling" when she exited the car. *Id.* at APP. 199. Another student, Witness L, told investigators she had observed a woman being pulled into Theta Chi that evening and that "the guy was pulling her into the house" while the "girl was stumbling over herself." *Id.* at APP. 219. Witness L stated Plaintiff was walking straight, "seemed sober," and was pulling the woman "a distance behind him." *Id.*

Jane Doe told investigators she recalled vomiting in the second floor bathroom after she entered Theta Chi. *Id.* at APP 189. After realizing she did not have her purse, she left the bathroom to look for Plaintiff, at which point "everything [went] black." *Id.* at APP. 190. Meanwhile, at Pi Kappa Phi, where Jane Doe began her evening, Witness E, a student who met Jane Doe at Pi Kappa Phi earlier that night, told investigators Witness C approached her and stated he had

"lost" Jane Doe and that she had left "with some random guy from Theta Chi." *Id.* at APP. 204. Witness E, Witness C, and Student O then went to Theta Chi, where they were informed that a drunk woman was upstairs vomiting. *Id.* Witness E stated she entered the bathroom stall to check on Jane Doe. *Id.* at APP. 204–05. According to Witness E, Jane Doe was visibly impaired but still able to converse. *Id.* at APP. 205. When Witness E asked Jane Doe whether she needed assistance, Jane Doe stated Plaintiff would take her home. *Id.* Witness E then told Plaintiff, who had entered the bathroom, that he should take Jane Doe home when she was feeling better. *Id.* According to Witness E, Plaintiff was packing a bowl of marijuana, "was responsive to questions and didn't seem that drunk or messed up." *Id.* Witness C told investigators that when Witness E and Student O came back downstairs, they stated Jane Doe was "pretty drunk" and that Plaintiff had agreed to take her home. *Id.* at APP. 202. Witness E, Witness C, and Student O then left Theta Chi and returned to Pi Kappa Phi. *Id.* According to Witness C, on the way back to Pi Kappa Phi, Witness E told him "I don't know of anyone who's a monster enough to have sex with someone . . . like that." *Id.*

Jane Doe told investigators after she had vomited in the bathroom, she was "fairly certain [she] passed out" due to alcohol consumption. *Id.* at APP. 190. Jane Doe explained she then woke up to Plaintiff "on top of [her] and assaulting [her]" in his room. *Id.* She stated half of her body was on a beanbag chair and half was on the floor. *Id.* Jane Doe reported her pants were unbuttoned and pulled down and that she was still wearing her underwear but it had been "pushed to the side." *Id.* Jane Doe told investigators she told Plaintiff to stop, at which point Plaintiff stated, "Fine. I've got whiskey dick anyway." *Id.*[3] Jane Doe told Plaintiff she needed to leave because she was going to be sick. *Id.*

---

[3] The Court understands "whiskey dick" to be slang for an individual's inability to maintain an erection due to alcohol consumption. *See* ECF No. 46 ¶ 90; ECF No. 103-1 at APP 190.

Jane Doe explained that after exiting Plaintiff's room and entering the bathroom, Jane Doe texted Witness I asking if she could sleep on his couch. *Id.* When Jane Doe did not receive a response from Witness I, Jane Doe walked to Witness I's house, which was close to Theta Chi. *Id.* at APP. 191. When Jane Doe entered Witness I's house, she woke up Student P by jumping on him. *Id.* Student P told Jane Doe she was "drunk" and asked her to get out of his room. *Id.* Jane Doe explained she then went to Witness I's room, where she got into bed with him, removed her shirt, and began kissing him. *Id.* She did not tell Witness I what had happened with Plaintiff. *Id.* When interviewed, Witness I told investigators Jane Doe appeared intoxicated, but not "overly intoxicated" and that there was nothing unusual about her appearance. *Id.* at APP. 211. Witness I explained they talked for about two or three hours and Jane Doe only said she felt "weird around [Plaintiff]" and that "[Plaintiff] was being weird." *Id.* at APP. 211–12. At approximately 6:45–7:00 a.m. that morning, Jane Doe performed oral sex on Witness I and then left. Pl.'s Sealed App. Supp. Pl.'s Resp. Defs.' Mot. Summ. J. at APP. 493, ECF No. 118-5.[4] At 3:59 a.m., Plaintiff texted Jane Doe and asked "Make it back?", to which Jane Doe responded, "Yeah I'm good thx babe." ECF No. 126-1 at APP. 181.001.

After returning to her apartment, Jane Doe told investigators, she requested Student M, Witness C, and Student Q come to her apartment in order to recreate the events of the previous night. ECF No. 103-1 at APP. 191. After discussing the evening with them, Jane Doe contacted

---

[4] Witness I's statement regarding his sexual encounter with Jane Doe was in the original investigative report Sirna filed with Parker. *See* Sirna Dep. 147:16–148:8, ECF No. 118-5 at APP. 451; *compare* ECF No. 118-5 at APP. 493, *with* Overberg Dep. 128:5–20, ECF No. 103 at APP. 35. Overberg stated a request was made by Jane Doe to redact that information from the original report. Overberg Dep. 129:5–15, ECF No. 103 at APP. 35. Plaintiff had also requested comments about his father and additional "gossip" regarding that night be redacted. Overberg Dep. 99:6–24, 128:25–129:3, ECF No. 103 at APP. 32, 35. Both Plaintiff and Jane Doe's requests were followed. *Id.* The report that was ultimately submitted to Jerry Foxhoven, the hearing officer, during the disciplinary hearing did not include the redacted information. Parker Dep. 130:5–25, ECF No. 103 at APP. 48.

Drake Public Safety and filed a report against Plaintiff. *Id.* Jane Doe then went to Mercy Hospital, where she received a preliminary exam. *Id.* Jane Doe told investigators she began "freaking out" at Mercy, began doubting herself, and thought: "'[w]hat am I doing?', '[w]hat if I did consent?', '[w]hat if I'm wrong?', '[w]hat if I made a mistake?'" *Id.* Jane Doe then declined to take a forensic sexual exam. *Id.* When asked about her doubts, Jane Doe reiterated to investigators that she did not recall giving consent to Plaintiff nor did she believe she was capable of giving consent. *Id.* Jane Doe explained she had retained her underwear from the night of the assault and that she had noticed blood stains on her underwear. *Id.* Jane Doe agreed to provide a medical release to the investigators, if necessary. *Id.* Sirna later stated that Jane Doe's medical record and underwear were not available to her during the investigation. Sirna Dep. 143:11–16, ECF No. 103 at APP. 066.

On October 23, 2015, investigators interviewed Plaintiff. Plaintiff did not bring a personal representative and later stated he had not finished reading the email he was sent regarding Jane Doe's complaint, which stated he could do so. *See* Pl.'s Dep. 176:23–177:14, ECF No. 103 at APP. 015–16. During the interview, Plaintiff explained he was friends with Jane Doe and they texted each other, but they had not "hung out one-on-one." ECF No. 103-1 at APP. 192–93. Plaintiff reported on the night of October 8, 2015, he had an assignment due. *Id.* at APP. 192. Due to his ADHD and dyslexia, he took Adderall to focus. *Id.* After he completed the assignment, Plaintiff explained, he began playing a drinking game with friends, during which he drank approximately six beers within thirty or forty-five minutes. *Id.* He described himself as "pretty drunk." *Id.* Plaintiff explained when he mixes Adderall and alcohol, he remains sober longer but then the alcohol "hits him" and his blackouts are more severe. *Id.* at APP. 193. However, Plaintiff stated he "still functions during a blackout." *Id.* Plaintiff told investigators he also experiences a decreased sex drive when he takes Adderall. *Id.*

13

Plaintiff explained, following the drinking game, he and his friends went to Drake Bakery, where he had additional drinks. *Id.* Witness A, a bartender at Drake Bakery, told investigators he recalled serving Plaintiff multiple drinks. *Id.* at APP. 197. Plaintiff told investigators he remembered Jane Doe entering Drake Bakery and believed he was "more drunk tha[n] she was." *Id.* at APP. 193. Plaintiff explained Jane Doe acted in a "flirty way" toward him and that when he asked if she wanted to leave, she agreed. *Id.* Plaintiff then called the "sober cab," which arrived at around 1:12 a.m. *Id.* Plaintiff reported that although he could not remember getting into or out of the car, Witness B told him later that he and Jane Doe were "making out." *Id.* Plaintiff could not tell investigators who decided to go to Theta Chi. *Id.*

Plaintiff told investigators he recalled going to his room with Jane Doe after arriving at Theta Chi. *Id.* at APP. 194. Plaintiff stated two fraternity members, Witness G and Witness H, were playing video games in his room. *Id.* Plaintiff explained he then began to black out. *Id.* Witness G confirmed Plaintiff and Jane Doe arrived at Plaintiff's room that evening, but stated he did not see Jane Doe walk or talk at that time. *Id.* at APP. 207. Witness G told investigators Plaintiff appeared pretty drunk and was "tipping a little bit." *Id.* He also stated Plaintiff appeared "zoned out." *Id.* Witness H stated he was playing video games in Plaintiff's room and noted Jane Doe had slurred speech. *Id.* at APP. 209. When asked about Plaintiff's intoxication, Witness H said he did not have an opinion. *Id.*

Plaintiff stated he next recalled Jane Doe performing oral sex on him in his car, which was parked outside the Theta Chi house. *Id.* at APP. 194. He was only aware of this for fifteen to twenty seconds before blacking out again. *Id.* He reported he did not believe he ejaculated "because [he] can't get stimulated" while drinking. *Id.*

Plaintiff's last memory involving Jane Doe was waking up and finding Jane Doe standing on a chair next to Plaintiff's loft bed. *Id.* He stated he had no idea how he had gotten onto his loft

bed. *Id.* Plaintiff reported to investigators he was not concerned about Jane Doe's state of intoxication because the chair she was standing on was mesh and therefore difficult to stand on when the person was sober. *Id.* at APP. 179–80. When investigators asked whether anything physical or sexual had occurred in his bed, he stated he only remembered Jane Doe kissing him good night and leaving. *Id.* at APP. 194. Plaintiff told investigators he did not recall having any sexual intercourse with Jane Doe that night. *Id.* at APP. 195. He did not remember Jane Doe appearing sick at any time during the evening. *Id.* When asked about his own intoxication level, Plaintiff explained: "I was not in a state to be with her" and "I was not able to give consent that night." *Id.* Plaintiff reported Jane Doe was "not as bad as [he] was." *Id.* He stated he was "confused about the situation" and said: "I don't know what happened. I don't know if we had sex." *Id.* He also explained because of a back injury, he usually experiences pain after having intercourse, but that on the morning of October 9, 2015, his back was not sore. *Id.* He stated he did not wake up until 12:30 p.m. the afternoon after the alleged assault, and thus missed his shift at work. *Id.* Finally, Plaintiff explained Witness I had told him that, when Jane Doe came into Witness I's room, she was "bitching because you [Plaintiff] couldn't cum." *Id.* at APP. 196. Plaintiff was informed about resources on campus, including the counseling center. *Id.*

The investigators also interviewed Plaintiff's roommate, Witness J, who was present in his dorm room during the alleged assault. Both Witness G and Witness H described Witness J as being intoxicated the night of October 8, 2015. *See id.* at APP. 207, 209. However, Witness J told investigators he had not consumed any alcohol or marijuana that evening. *Id.* at APP. 212. Witness J explained he initially went to sleep and remembered Plaintiff and a "girl" walking into the room. *Id.* at APP. 213. He then went back to sleep. *Id.* Witness J stated that, approximately 15 minutes later, he heard "them" get down from Plaintiff's bed, based on the sound of Plaintiff's ladder. *Id.* Witness J explained he did not hear anything indicative of people having sex. *Id.* Witness J also

15

explained Plaintiff knew he was in the room and never asked him to leave. *Id.* Witness J stated when he left to get some water, he saw Jane Doe in the stall of a bathroom and observed Plaintiff in the bathroom outside the stall. *Id.* at 213. Once he was sure Jane Doe was taken care of, he returned to the room and went to bed. *Id.* The investigators interviewed Witness J a second time because they believed "Witness J was being less than forthcoming." *Id.* at APP 215. Witness J reiterated what he had previously said. *See id.* at APP. 215–16.

The investigators also interviewed Witness K, a member of Theta Chi. *Id.* at APP 217. Witness K explained that, on the morning of October 9, 2015, Student T was making fun of Plaintiff for leaving Drake Bakery with a girl. *Id.* Plaintiff then admitted to "hooking up" with the girl and explained he had "wasted a condom because he couldn't cum." *Id.*

Following his interview with Sirna and McKinney, Plaintiff requested a meeting with Parker and Overberg in November 2015. Overberg Dep. 62:15–24, ECF No. 103 at APP. 027. During that meeting, Plaintiff explained that a friend had told him that since he could not remember part of the evening of October 8, 2015, and because Jane Doe had performed oral sex on him, perhaps he was a victim as well. Overberg Dep. 63:6–12, ECF No. 103 at APP. 027. Overberg stated she was unsure why Plaintiff was telling them this information and wanted to ensure that whatever information he wanted to share would be included in the investigative report. Overberg Dep. 83:18–84:6, ECF No. 103 at APP. 30. In response to Plaintiff's comments, Overberg and Parker set up a second interview with the investigators. Overberg Dep. 85:24–87:8, ECF No. 103 at APP. 030–31. Overberg then emailed Sirna and McKinney, explaining they should ask Plaintiff whether he was "sharing this information in response to the allegations against [him], or [is he] asking that a conduct charge be filed against [Jane Doe] for sexual assault?" *Id.* at APP. 308. Overberg directed Sirna and McKinney to get the necessary information from Plaintiff if he was requesting that a charge be filed against Jane Doe. *Id.* Additionally, Overberg

explained to Sirna and McKinney that, although it was likely they could perform an investigation into both claims simultaneously, they "would need to be sure the investigation into [Plaintiff's] charge was complete." *Id.*

On November 10, 2015, McKinney met with Plaintiff in person while Sirna joined them on the phone. Sirna Dep. 134:16–23, ECF No. 103 at APP. 065; *id.* at APP. 182. Plaintiff explained to the investigators that a female friend of Plaintiff's had suggested he had been sexually assaulted, since Jane Doe had made fun of Plaintiff for not being able to ejaculate and Plaintiff had no memory of such an issue. *Id.* at APP. 220; *see* Sirna Dep. 134:1–11, ECF No. 103 at APP. 065. Sirna asked whether there was any additional information or witnesses he wanted to provide at that time concerning his statement, and he responded "I don't think so." *Id.* at APP. 182, 220. When asked whether he wanted to file a complaint against Jane Doe, he stated he did not want to file a conduct charge at the time and said: "I'm just verbalizing the issue." Sirna Dep. 135:5–13, ECF No. 103 at APP. 065; *id.* at APP. 182–83. Sirna asked if Plaintiff needed any additional resources, Plaintiff explained he was fine. *Id.* at APP. 183. Plaintiff later stated he had told the investigators he was not that bothered by the investigation because "it took me months to be able to admit that I was a victim." Pl.'s Dep. 181:4–11, ECF No. 103 at APP. 017. Plaintiff's father, Thomas Rossley, Sr., stated in a declaration that during a phone call with Parker, Parker stated the school would not investigate Plaintiff's alleged assault because it was a form of retaliation. Pl.'s Sealed App. Supp. Pl.'s Resp. Defs.' Mot. Summ. J. at APP. 1179–80, Rossley, Sr. Decl. ¶ 10, ECF No. 118-13. Plaintiff stated his father told him about this meeting and Parker's belief regarding retaliation. Pl.'s Dep. 153:23–154:5, ECF No. 103 at APP. 012.

On December 9, 2015, Sirna submitted the investigative report to Parker. *Id.* at APP. 184. In the course of their investigation, the investigators interviewed twelve witnesses, including Plaintiff and Jane Doe. *Id.* Sirna listed nine other students they had not interviewed and briefly

17

explained why they had not been questioned. *Id.* at APP. 186–87. For instance, Sirna explained Student P, who Jane Doe had jumped on after leaving Theta Chi, had a "limited interaction with [Jane Doe]." *Id.* at APP. 187. Similarly, Student T, who was present during the conversation between Plaintiff and Witness K in which Plaintiff is reported to have said he wasted a condom, "would [have] provided duplicative statements." *Id.* at APP. 186. The investigators also did not interview Student N, Jane Doe's ex-boyfriend, because Jane Doe had asked them not to contact him and he had not been present that evening. *Id.* at APP. 187.

Sirna ultimately determined there was a preponderance of evidence suggesting a sex act had occurred and the act was not consensual, because Jane Doe was either unconscious or incapacitated. *Id.* at APP. 221–22. Sirna based this determination largely on six facts: 1) there were no eye witnesses and Witness J, Plaintiff's roommate who was reportedly in the room during the alleged assault, had limited credibility because there were inconsistent reports about whether he was drinking that evening; 2) Plaintiff's claims regarding his lack of memory were "contradicted by [his] own words to Witness K . . . when he . . . stated he 'wasted a condom because he couldn't cum'"; 3) although both parties were drinking that evening, multiple witnesses corroborated Jane Doe's "impairment and eventual incapacitation"; 4) neither Witness I nor Jane Doe stated that Jane Doe had complained that Plaintiff had been unable to "cum"; 5) if Jane Doe had made such a comment, "it was likely she was merely repeating what [Plaintiff] had told her when she regained consciousness during the assault"—namely, that he had "whiskey dick"; and 6) there was little evidence that Plaintiff was incapacitated, as the witnesses indicated either they had not formed an opinion about his level of intoxication or he wasn't as drunk as Jane Doe. *Id.* at APP. 222–24. In the conclusion section, Sirna noted Jane Doe was largely credible because Jane Doe had made statements to investigators "against her own interest," including an admission she had doubted herself at Mercy Hospital and had engaged in sexual activity with Witness I following the assault.

18

*Id.* at APP. 225. Sirna's report mentions Plaintiff thought he might also be a victim during his second interview, but the report does not analyze Plaintiff's complaint nor does it make any findings about these allegations. *Id.* at APP. 184–225.

### 2. The Disciplinary Hearing

After reviewing Sirna's report, Parker determined a disciplinary hearing on the matter was warranted. Parker Dep. 73:8–15, ECF No. 103 at APP. 043. Parker emailed Plaintiff in January 2016 to inform him of this decision and discuss the report. Parker Dep. 95:14–96:4, ECF No. 103 at APP. 45.

Jerry Foxhoven was serving as Drake's hearing officer at the time. Parker Dep. 102:7–21, ECF No. 103 at APP. 046. Foxhoven had received training regarding sexual misconduct. Foxhoven Dep. 11:18–12:17, ECF No. 103 at APP. 073. Prior to the hearing, Foxhoven issued a notice to all parties (Jane Doe, Parker, and Plaintiff) and their representatives explaining Foxhoven would not admit "any testimony or evidence of the prior sexual conduct or mental health issues of either" Jane Doe or Plaintiff. ECF No. 137 at APP. 230. Plaintiff's personal representative, Matt Kaiser, filed a motion seeking to admit Witness I's statement that Jane Doe performed oral sex on him, arguing the ban on prior sexual conduct did not apply and that Jane Doe's actions were "highly probative of her state of mind on that night and her capacity to consent mere hours earlier." ECF No. 103-1 at APP. 299. Foxhoven permitted Plaintiff to introduce evidence regarding Jane Doe's subsequent actions with Witness I to show Jane Doe's level of intoxication and thus her ability to consent. ECF No. 137 at APP 231.

Additionally, Foxhoven considered how much time each party (Jane Doe, Parker, and Plaintiff) should have to present their arguments during the hearing. *See* ECF No. 103-1 at APP. 294. Foxhoven first gave each party equal time to make closing and opening arguments. *Id.* After considering Plaintiff's pre-hearing motion, Foxhoven determined

both Jane Doe and Parker would each have five minutes for an opening statement and ten minutes for a closing, while Plaintiff was given ten minutes for an opening statement and up to twenty minutes for a closing statement. *Id.* at APP. 234. After Parker argued Title IX requires all parties to be treated equally, however, Foxhoven amended his earlier decision. *Id.* at APP. 227. Under the amended order, Plaintiff and Jane Doe would both have five minutes for opening argument and ten minutes for closing argument. *Id.* Parker was given five minutes for both his closing and opening statements, although his argument was limited to "any position that is inconsistent with the position of [Jane Doe]." *Id.*

The disciplinary hearing was held on February 12, 2016. ECF No. 103-1 at APP. 236. After Jane Doe's personal representative gave her opening statement, Parker stated during his opening statement that, based on all the evidence available to the Dean of Students' Office, the Office "found [Jane Doe]'s account of this incident as being more credible" and thus recommended "the appropriate sanction be expulsion." Pl.'s Sealed App. Supp. Pl.'s Resp. Defs.' Mot. Summ. J. at APP. 570–71, ECF No. 118-6. During his opening statement, Plaintiff's personal representative explained "the two people who were involved were both blackout drunk." *Id.* at APP. 571. During a later portion of his opening statement, however, Plaintiff's personal representative argued, based on the timeline of the evening, "[w]e can know that [Jane Doe] was not incapacitated by looking at [the] window of 45 minutes . . . incapacitation doesn't turn on a dime." *Id.* at APP. 575–76. Based on Plaintiff's personal representative's statement that both Plaintiff and Jane Doe were "blackout drunk" during the events of the evening, Foxhoven amended his previous order regarding the admissibility of Jane Doe's actions after she left Plaintiff's room. *See id.* at APP. 596–98. Foxhoven explained because his order permitting the evidence was premised on the issue of whether Jane Doe was incapacitated and Plaintiff's personal representative's concession that Jane Doe was "blackout drunk" made her incapacitation no longer

a contested issue, Jane Doe's subsequent actions were irrelevant. *Id.* at APP. 596, 597. Thus, Plaintiff was not permitted to inquire into Jane Doe's actions with Witness I or Student P after leaving his room.

Along with Jane Doe and Plaintiff, eleven witnesses testified at the disciplinary hearing. *See id.* at APP. 559–61. All parties engaged in cross-examination. *Id.* Per the Code and the Policy, Jane Doe and Plaintiff did not cross-examine each other directly; rather, Foxhoven read questions each party had submitted. *See id.* at APP. 559, 561; ECF No. 137 at APP. 122. Additionally, Plaintiff's personal representative questioned Plaintiff on direct examination. Pl.'s Sealed App. Supp. Pl.'s Resp. Defs.' Mot. Summ. J., ECF No. 118-8 at APP. 771; *see also* ECF No. 137 at APP. 121–22.

During her testimony, Jane Doe reiterated what she had previously told the investigators about the events of October 8 and 9, 2015. *See generally* ECF No. 118-6 at APP. 578–611. However, for the first time, Jane Doe also testified that because she often experiences pain when she has vaginal intercourse, she did not believe she would have consented to having vaginal intercourse with Plaintiff. ECF No. 118-6 at APP. 590. Plaintiff's personal representative did not submit a question about the pain Jane Doe experiences during vaginal intercourse for Foxhoven to ask during Jane Doe's cross examination. *See id.* at APP. 611–22 (transcript showing Foxhoven asked Jane Doe various questions submitted by Plaintiff's personal representative but not about the pain Jane Doe experiences during vaginal intercourse).

Plaintiff called two individuals who had not been interviewed by Sirna: Student S and Student T. *Id.* at APP. 560. No party called Plaintiff's roommate, Witness J, who had been present in Plaintiff's room that evening. *Id.* at APP. 559–61. Additionally, no party called Witness K, who had previously reported to investigators that Plaintiff had told Witness K that Plaintiff had wasted a condom on Jane Doe. *Id.*; *see also* ECF No. 103-1 at APP. 217. However, Plaintiff did call

Student T, who was also present during that conversation. ECF No. 118-6 at APP. 560. Student T testified that, although Plaintiff confirmed he had "hooked up" with Jane Doe the previous night, he did not remember Plaintiff ever saying he had "wasted a condom" on Jane Doe. ECF No. 118-8 at APP. 751. Plaintiff's personal representative also did not call Student P, the individual Jane Doe jumped on after leaving Plaintiff's room, although Plaintiff's personal representative argued to Foxhoven that investigators should have interviewed Student P in order to establish a timeline for the evening. *Id.* at APP. 619, 620.

On February 17, 2016, Foxhoven filed his order regarding the case. ECF No. 103-1 at APP. 236–46. Foxhoven determined first "that a preponderance of evidence supports the fact that vaginal intercourse between [Jane Doe] and [Plaintiff] was either attempted or completed on the evening in question . . . . In any event, it is clear that [Plaintiff] touched the genitals of [Jane Doe] on the evening in question." *Id.* at APP. 237. Foxhoven also noted no one else appeared to be present in the room during their interaction and "[n]o sexual exam of [Jane Doe] was completed, resulting in a lack of definitive evidence of a sexual assault." *Id.* Instead, Foxhoven based his determination on the fact that although Jane Doe was "not conscious during the assault," she awoke to Plaintiff "violating" her, "[h]er pants were off," Plaintiff stated he had "whiskey dick," and that when Jane Doe left the fraternity house, "walking was painful in a way that indicated to her that she had been subjected to vaginal sex." *Id.*

Foxhoven also determined "a preponderance of evidence supports the fact that [Jane Doe] did not give her consent to the sexual contact in question," as she was incapacitated. *Id.* Foxhoven considered the following facts in making his decision: 1) Jane Doe's testimony that she experiences pain when having vaginal intercourse and thus does not have vaginal intercourse unless she is comfortable and trusts her partner, "[n]one of [which] apply to the relationship between [Jane Doe] and [Plaintiff]"; 2) testimony from Witnesses C, F, A, E, L, H, B, and G as to

Jane Doe's level of intoxication; and 3) the argument of "[Plaintiff] and his counsel . . . that both [Plaintiff] and [Jane Doe] were 'black out drunk' on the night in question." *Id.* at 237–40. Foxhoven also noted although Witness H stated upon initial contact with Jane Doe, he was not aware of anything that would have led him to believe Jane Doe was intoxicated, "he further testified that he believed that the complainant was extremely intoxicated by the fact that she was vomiting." *Id.* at APP. 240.

Foxhoven next discussed Plaintiff's position that he was also incapacitated in a section entitled "[Plaintiff]'s Argument of Mitigation." *Id.* at APP. 241. As to Plaintiff's argument "that he was basically 'blacked-out' and that, therefore, he should not be held responsible for his conduct," Foxhoven determined Plaintiff's account lacked credibility. *Id.* Rather, Foxhoven concluded although Plaintiff had been drinking that evening, the evidence showed he was "clearly more in control of himself than [Jane Doe]" and was aware of her level of intoxication. *Id.* Foxhoven based this determination on: 1) statements from Witnesses C and L and Student S regarding Plaintiff's level of intoxication at Drake Bakery and when entering the fraternity house; 2) Witness B's statement that, although Plaintiff was intoxicated that evening, Jane Doe was more intoxicated during the sober cab ride; 3) Witness E's testimony regarding Plaintiff's actions and ability to "pack[ ] a bowl" in the bathroom at Theta Chi while Jane Doe vomited; 4) Witness H's comment that Plaintiff did not seem intoxicated; 5) Witness G's testimony that Plaintiff told him he "had the situation handled" in reference to Jane Doe's vomiting; and 6) Plaintiff's testimony indicating "that he was able to call the 'sober cab'" and had likely punched in the security code to enter the fraternity house, although he stated he did not remember doing so. *Id.* at APP. 241–43. Foxhoven's findings did not address Plaintiff's complaint that he did not consent to Jane Doe giving him oral sex in the car before his alleged assault of Jane Doe.

Based on his findings, Foxhoven recommended Plaintiff be expelled. *Id.* at APP. 245. Acknowledging Plaintiff's personal representative's request Plaintiff be permitted to complete his degree, Foxhoven noted, due to Jane Doe's level of intoxication, Plaintiff's knowledge of Jane Doe's intoxication, and the "particularly aggravating factor" that the assault occurred after Jane Doe vomited, Foxhoven recommended expulsion. *Id.* at APP. 244. Plaintiff was informed about his right to appeal. *Id.* at APP. 245.

### 3. Appeals Panel Decision & Expulsion

On February 29, 2016, Plaintiff's personal representative filed a timely notice of appeal. *Id.* at APP. 248–63. Prior to the appeals hearing, the panel sent all parties a notice explaining the procedure it would follow at the hearing. ECF No. 137 at APP. 266–68. The panel concluded each party would be given twenty minutes to present their argument. *Id.* at APP. 267. All parties were permitted to reserve five minutes for rebuttal. *Id.* The panel also noted "each member of the three person appeals panel has no relationship or connection with either [Plaintiff] or [Jane Doe]." *Id.* at APP. 268.

On March 24, 2016, the hearing was held as scheduled and according to the procedure set forth in the panel's notice. ECF No. 137 at APP. 266–268. After the hearing, the panel affirmed Foxhoven's findings and his recommendation of expulsion. ECF No. 103-1 at APP. 269–70. The panel noted it had reviewed written responses from the parties regarding Plaintiff's appeal, in addition to "all of the exhibits and documents from the hearing as well as the audio recording of the hearing." *Id.* at APP. 269; *see also* Peters Dep. 37:5–40:18, ECF No. 103-1 at APP. 310. The panel determined Foxhoven's decision was supported by substantial evidence, explaining: 1) witnesses testified as to Plaintiff's and Jane Doe's differing level of intoxication; and 2) Plaintiff corroborated Jane Doe's testimony that Plaintiff had been using a condom during a conversation with his friends the next day. ECF No. 103-1 at APP. 270. The panel affirmed Foxhoven's

24

recommendation of expulsion, noting having sexual intercourse while someone was incapacitated and unable to give consent "is the worst kind of sexual assault." *Id.*

On April 8, 2016, Parker emailed Plaintiff confirming the panel's decision and explaining that the President of the University, Earl Martin, concurred in the decision. ECF No. 103-1 at APP. 271. Consequently, Plaintiff was officially "expelled from Drake University effective immediately." *Id.*

### C. Procedural Background

On December 1, 2016, Plaintiff filed suit against Defendants, as well as other individually named defendants. Compl., ECF No. 1. Plaintiff's complaint alleged eight counts, asserting Defendants violated: Title IX of the Education Amendments of 1972 (Count I); the Fourteenth Amendment of the United States Constitution (Count II); and Title II of the Americans with Disabilities Act (Count VI). He also brought state law claims based on breach of contract (Count III), breach of the covenant of good faith and fair dealing (Count IV), negligent infliction of emotional distress (Count V), and estoppel and reliance (Count VII). Finally, Plaintiff sought declaratory relief (Count VIII). On August 2, 2017, Plaintiff filed an Amended Complaint, in which he brought the same substantive claims but no longer filed under a pseudonym. *Compare* Am. Compl., ECF No. 46, *with* ECF No. 1. On August 11, 2017, the Court dismissed Plaintiff's constitutional claim, Count II, against all Defendants and dismissed all other Counts against the individually named defendants. Order Defs.' Partial Mot. Dismiss 10, ECF No. 48.

On May 17, 2018, Defendants filed the current motion for summary judgment on all counts. ECF No. 99. Plaintiff resists. ECF No. 111; ECF No. 121. Defendants have replied. ECF No. 135. The matter came before the Court for a hearing on July 20, 2018. Hr'g Mins. Defs.' Mot. Summ. J., ECF No. 143. Attorneys Philip Byler and David Goldman represented Plaintiff. *Id.* Attorneys Frances Haas and Mary Funk represented Defendants. *Id.*

## III.   LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), the Court must grant a party's motion for summary judgment if there are no genuine issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322−23 (1986) (describing material considered in a Rule 56 analysis). Partial summary judgment is also permissible. *See* Fed. R. Civ. P. 56(a) (allowing summary judgment for "the part of each claim or defense"). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine if "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). The Court must give the non-moving party all reasonable inferences from the facts presented. *Munz*, 28 F.3d at 798. The Court does not "weigh the evidence or attempt to determine the credibility of the witnesses," *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004), and instead must only "determine whether a dispute about a material fact is genuine," *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1377 (8th Cir. 1996).

To defeat a motion for summary judgment, the non-moving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248 (omission in original); *see also Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) ("In order to establish the existence of a genuine issue of material fact, '[a] plaintiff may not merely point to unsupported self-serving allegations'" (alteration in original) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 873 (8th Cir. 2005), *abrogated on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1058 (8th Cir. 2011))).

26

## IV.  DISCUSSION

The Court first considers Plaintiff's negligent infliction of emotional distress claim (Count V). ECF No. 46 ¶¶ 225–34. Because Plaintiff does not resist Defendants' motion for summary judgment on this claim, *see* ECF No. 111 ¶ 6, the Court dismisses it. The Court next considers Plaintiff's claim for declaratory judgment (Count VIII). ECF No. 46 ¶¶ 248–52. The Court finds Count VIII does not state an independent basis for relief, but that the remedy of declaratory judgment may be applied to the other claims if applicable.

The Court then turns to Plaintiff's Title IX claim (Count I). *Id.* ¶¶ 169–88. The Court grants Defendants' motion for summary judgment for Count I under Plaintiff's Title IX erroneous outcome and deliberate indifference theories, but denies Defendants' motion for summary on Plaintiff's Title IX claim under his selective enforcement theory. The Court then analyzes Plaintiff's ADA claim (Count VI), *id.* ¶¶ 235–40, and grants Defendants' motion summary judgment on that claim. Finally, the Court turns to Plaintiff's state law contract claims (Counts III, IV, and VII). *Id.* ¶¶ 203–24, 241–47. The Court finds Plaintiff's estoppel and covenant of good faith and fair dealing claims are subsumed by his breach of contract claim. The Court grants summary judgment to Defendants on some, but not all, of Plaintiff's breach of contract claims.

### A.  Negligent Infliction of Emotional Distress (Count V)

Defendants request summary judgment as to Plaintiff's negligent infliction of emotional distress claim. ECF No. 99 ¶¶ 14–16. Plaintiff does not resist Defendants' motion as to this claim. ECF No. 111 ¶ 6 ("Plaintiff states that he will not proceed further with the claim for negligent infliction of emotional distress."). Consequently, the Court dismisses Count V.

### B.  Declaratory Judgment (Count VIII)

In Count VIII, Plaintiff asserts an independent count for declaratory judgment.

ECF No. 46 ¶¶ 248–52.[5] Defendants move for summary judgment on Plaintiff's claim, asserting the Declaratory Judgment Act, 28 U.S.C. § 2201, "does not create any new substantive right but rather creates a procedure for adjudicating existing rights." ECF No. 104 at 40 (quoting *W. Cas. & Sur. Co. v. Herman*, 405 F.2d 121, 124 (8th Cir. 1968)). At the hearing on Defendants' motion, Plaintiff's counsel conceded the declaratory judgment he seeks cannot form the basis of a separate count. Mot. Summ. J. Hr'g Tr. 22:23–23:2, ECF No. 146. Consequently, to the extent Count VIII asserts an independent claim for relief, the Court grants Defendants' motion.

The Court notes the relief Plaintiff requests in Count VIII references Plaintiff's other substantive claims. *See* ECF No. 46 ¶¶ 248–49 (referencing Plaintiff's previous counts and requesting declaratory judgment based on his assertion that "Drake has committed numerous violations of the Parties' contracts and of federal and state law"). Furthermore, Plaintiff reiterates these requests in his Prayer for Relief. *Id.* at 59–60. Consequently, although Count VIII fails to state an independent claim for relief, both Count VIII and Plaintiff's Prayer for Relief identify some permissible remedies for Plaintiff's other substantive counts. Specifically, all of Plaintiff's requested relief, except a declaration that "Drake's Code is unconstitutional as applied" may, if appropriate, be applied to the applicable counts discussed below.

### C.      Title IX Claims (Count I)

In Count I, Plaintiff brings a claim under Title IX based on his disciplinary proceeding and resulting expulsion as well as Defendants' failure to investigate Plaintiff's complaint of alleged sexual assault by Jane Doe. *See* ECF No. 46 ¶¶ 180–81, 185.

Title IX claims based on alleged gender discrimination in disciplinary proceedings may be

---

[5] Plaintiff also requests a declaration that "Drake's Code is unconstitutional as applied." ECF No. 46 ¶ 252. Because the Court previously determined Plaintiff may not assert constitutional claims against Defendants, *see* ECF No. 48 at 4–7, the Court need not address Count VIII as it relates to this request.

analyzed under the erroneous outcome, deliberate indifference, or selective enforcement theories. *See Roe v. St. Louis Univ.*, 746 F.3d 874, 882 (8th Cir. 2014) (describing deliberate indifference); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994) (describing erroneous outcome and selective enforcement). For the reasons set forth below, the Court determines Plaintiff has not identified a genuine dispute of material fact as to whether gender bias caused an erroneous outcome in his disciplinary proceeding. Plaintiff also has not identified a genuine dispute of material fact as to whether Defendants were deliberately indifferent toward Plaintiff by failing to investigate his claim that Jane Doe sexually assaulted him. Plaintiff has identified a genuine dispute of material fact as to whether gender affected Defendants' decision to selectively enforce a disciplinary process. The Court thus grants Defendants' motion for summary judgment as to Plaintiff's Title IX claims under the erroneous outcome and deliberate indifference standards but denies Defendants' motion for summary judgment for Plaintiff's Title IX claims under the selective enforcement standard.

### 1. Erroneous outcome

In order to establish a violation of Title IX under the erroneous outcome theory, a plaintiff must show: 1) evidence illustrating an "articulable doubt" as to the accuracy of the outcome of the proceeding; and 2) particular circumstances showing gender bias was a motivating factor in the erroneous outcome. *Doe v. Miami Univ.*, 882 F.3d 579, 592 (6th Cir. 2018); *see Yusuf*, 35 F.3d at 715; *see also Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 990 (D. Minn. 2017). To show an articulable doubt, a plaintiff may point to "particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or . . . particular procedural flaws affecting the proof." *Yusuf*, 35 F.3d at 715. A plaintiff may illustrate gender bias by identifying "statements

by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*

"As a general rule, Title IX is not an invitation for courts to second-guess disciplinary decisions of colleges or universities." *Univ. of St. Thomas*, 240 F. Supp. 3d at 989. Rather, "Title IX should be construed to give '[s]chool administrators . . . the flexibility they require' to initiate a reasonable disciplinary response." *Id.* at 990 (alteration and omission in original) (quoting *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648–49 (1999)); *see also Haidak v. Univ. of Mass. at Amherst*, 299 F. Supp. 3d 242, 269 (D. Mass. 2018) (granting summary judgment to the defendant and holding the university disciplinary panel's "conclusion was supported by substantial evidence and involved a credibility determination it was in the best position to make").

In his Response to Defendants' Motion for Summary Judgment, Plaintiff identifies various procedural and substantive flaws in the investigation, disciplinary hearing, and appeals process he believes led to an erroneous outcome. ECF No. 46 ¶¶ 101–09, 142–47, 182. Specifically, Plaintiff contends Foxhoven erred by allowing Jane Doe to testify about her medical condition that made it painful for her to engage in vaginal intercourse, information that was not previously disclosed during the investigation, and which Foxhoven then relied on in determining whether Jane Doe had consented to sexual intercourse with Plaintiff. *Id.* ¶¶ 144–45. Plaintiff likewise asserts there was insufficient medical or physical evidence supporting Jane Doe's claim that sexual intercourse occurred, noting Jane Doe did not get a sexual assault exam and did not provide the underwear she was wearing at the time of the alleged assault as evidence in the investigation. *Id.* ¶¶ 146–48. Plaintiff also contends Foxhoven erred by allowing Parker to present evidence and argument,

arguing Parker was not an "independent actor," as Foxhoven concluded, but instead presented evidence against Plaintiff and sought his expulsion. *Id.* ¶ 152.

As to the appeals process, Plaintiff first contends Defendants refused to allow Plaintiff's father to present Plaintiff's appeal. ECF No. 46 ¶ 153. Plaintiff additionally asserts the panel never heard the audio recording of the disciplinary hearing "before rendering their short and vague affirmation of guilty against Plaintiff." *Id.* ¶ 154. Rather, Plaintiff contends the panel was a "rubber stamp" for Foxhoven's findings. ECF No. 121 at 24.

To show the alleged erroneous outcome was motivated by gender bias, Plaintiff asserts Defendants' actions, in general, during the investigation, the disciplinary hearing, and in making the ultimate decision to expel him reveal gender bias because they were taken against the weight of the evidence. ECF No. 121 at 15–24. Plaintiff also specifically contends the investigators, Foxhoven, Parker, and the appeals panel were all biased by the gender-based "trauma trope," which allowed them to explain away Jane Doe's inconsistencies and "counterintuitive" behavior that would otherwise discredit her. *Id.* at 24–25. Plaintiff also argues the "trauma trope" led Parker to testify that he would consider it "slut shaming" to imply Jane Doe's sexual activity after leaving Plaintiff's room was inconsistent with having been assaulted earlier. *Id.* at 25.

In addition, Plaintiff contends Drake was "victim centered" against male respondents. *Id.* at 26. To show that being victim-centered means being gender-biased, Plaintiff points to evidence that most claims of sexual misconduct at Drake were brought by a female complainant against a male respondent. *Id.* at 26. Plaintiff also asserts the Policy is gender-biased against respondents, who are "disproportionately" male, because it provides resources to complainants and labels them as "survivors." ECF No. 46 ¶ 185; ECF No. 121 at 27. Plaintiff further asserts the general purpose of the "female protectionist nature of campus sex tribunals" is a "misconceived political effort to undercut fairness for respondents." ECF No. 121 at 27. This political pressure,

Plaintiff argues, stems from a April 2011 "Dear Colleague Letter" issued by the U.S. Department of Education's Office of Civil Rights which called on universities to improve their sexual assault review process or risk losing federal funding. ECF No. 121 at 26–27.

Plaintiff's Title IX claim cannot survive Defendants' motion for summary judgment under an erroneous outcome theory. Plaintiff fails on the second prong of his erroneous outcome claim as a matter of law. Viewing the evidence in the light most favorable to the Plaintiff, no reasonable jury could find the undisputed facts show Defendants' actions were motivated by gender bias. Because Plaintiff fails on the second prong of the erroneous outcome test, the Court need not address the first prong—whether there is articulable doubt as to the accuracy of the proceedings.

First, no reasonable jury could find Defendants' choices regarding the investigative report and the disciplinary hearing were inherently gender-biased because Defendants found a male respondent responsible for sexual assault. Plaintiff asserts Defendants' "[r]eliance on hearsay and crediting the female complainant despite the accumulated evidence reflected a gender biased reaching for a conclusion that objective evidence did not permit." ECF No. 121 at 16. Plaintiff points to, among other things, Sirna's decisions to interview some witnesses and not others, ECF No. 46 ¶¶ 102–104, Sirna's finding that Plaintiff's roommate's testimony was not credible, *id.* ¶ 101, and Foxhoven's characterization that Plaintiff argued he was intoxicated to avoid responsibility, ECF No. 121 at 22. Plaintiff also cites other evidence he claims is objective, such as his erectile dysfunction and Jane Doe's decision not to be medically examined after the alleged assault, that he claims call for an opposite conclusion than the one made by Defendants. ECF No. 121 at 16. In sum, Plaintiff argues that Defendants viewed the evidence through a gender-biased lens in a way that disfavored Plaintiff and favored the female complainant.

When ruling on a motion to dismiss under Rule 12(b)(6), some courts have found that an action by a university official during the disciplinary process can raise a plausible

inference of gender bias. *Prasad v. Cornell Univ.*, No. 5:15-cv-322, 2016 WL 3212079, at *17 (N.D.N.Y. Feb. 24, 2016). These accepted inferences have been based on specific actions and decisions by university officials responsible for investigating or adjudicating complaints. *See Cornell*, 2016 WL 3212079, at *17 ("Given the totality of the circumstances, including that Jane Doe was treated more favorably than Plaintiff, that the investigators seemingly slanted the Investigative Report against Plaintiff, . . . Plaintiff plausibly establishes a causal connection between gender bias and the outcome of his disciplinary proceeding."); *Doe v. Washington & Lee Univ.*, No. 6:14-CV-00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015) (determining it was plausible that gender bias determined the outcome of university disciplinary proceedings where a university official depended on an article that posited "sexual assault occurs whenever a woman has consensual sex with a man and regrets it because she had internal reservations that she did not outwardly express"). However, conclusory allegations of gender bias based on the procedures of the disciplinary proceedings or decisions about the weight of the evidence are insufficient to defeat a motion for summary judgment under Rule 56. *See Pacheco v. St. Mary's Univ.*, No. 15-cv-1131 (RCL), 2017 WL 2670758, at *15–18 (W.D. Tex. June 20, 2017) (holding that the plaintiff's allegations of evidentiary and procedural shortcomings of the disciplinary process did not amount to evidence of gender-biased decision-making sufficient to defeat defendant's motion for summary judgment); *see also Mallory v. Ohio Univ.*, 76 F. App'x 634, 640 (6th Cir. Sept. 11, 2003) (unpublished) (holding plaintiff's allegations of procedural problems in the disciplinary process did not amount to gender bias and granting defendant's motion for summary judgment).

Plaintiff depends on the United States Court of Appeals for the Second Circuit's decision in *Doe v. Columbia University*, 831 F.3d 46 (2d Cir. 2016), to support his general argument about gender bias in the procedure and outcome of the disciplinary process. ECF No. 121 at 25. In

*Columbia University*, the Second Circuit reasoned "[w]hen the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer . . . that the evaluator had been influenced by bias." 831 F.3d at 57. *Columbia University* is distinguishable from the facts at hand. First, the Second Circuit in *Columbia University* was considering a ruling on a motion to dismiss under Rule 12(b)(6). *Id.* at 48. In that procedural context, the plaintiffs only had to show "plausible minimal inference of bias" for their claim to move forward. *Id.* Second, the climate on Columbia's campus at the time was tense ("there was substantial criticism of the University, both in the student body and in the public media") and the university official who wrote the report had herself "suffered personal criticism in the student body for her role in prior cases." *Id.* at 57, 58. Considering those circumstances, the Second Circuit held "[i]t is plausible that [the official] was motivated to refute those criticisms by siding with the accusing female and against the accused male." *Id.* at 58.

Although Plaintiff argues Defendants here viewed the evidence through the same kind of gender-biased lens as the defendant in *Columbia University*, the different factual context at Columbia as well as the different legal standard applied at this later pleading stage make the comparison inapt. *Columbia University* does not support Plaintiff's argument that a disciplinary hearing that results in an outcome—which, according to Plaintiff, is in opposition to the objective evidence—automatically reveals gender bias. To the contrary, the Court will not step into the shoes of the university's decision-makers and evaluate the weight and credibility of the evidence Defendants found demonstrated Plaintiff was responsible for misconduct. *See Univ. of St. Thomas*, 240 F. Supp. 3d at 989–90 (citing *Davis*, 526 U.S. at 648–49).

Second, no reasonable jury could find that Defendants' application of the concept of trauma in their decision-making or Defendants' overall victim-centered procedure reveal they were

motivated by gender bias. Plaintiff asserts "Sirna's misuse of 'trauma' to rationalize away Jane Doe's behavior plainly inconsistent with a sexual assault having occurred is gender biased bad science." ECF No. 121 at 17. Plaintiff also asserts Parker's testimony that he would consider it "slut-shaming" to imply sexual activity after being assaulted was inconsistent behavior for a victim was a gender-biased comment. ECF No. 121 at 25. Plaintiff retained an expert witness who opined Sirna and other officials justified Jane Doe's "inconsistent behaviors" and memories and thought Jane Doe could reasonably "behave in any way whatsoever post-assault." Pl.'s Sealed App. Supp. Pl.'s Resp. Defs.' Mot. Summ. J. at APP. 1148–49, ECF No. 118-12. Based on Plaintiff's expert's conclusion, Plaintiff asserts that Drake's decision-makers relied on "gender biased junk science." ECF No. 121 at 17–18.

Even if a reasonable jury found Plaintiff's expert's theories[6] demonstrated the system was slanted toward Jane Doe because of the trauma-based approach, a trauma-based approach does not mean a gender-biased one. Courts have found a victim-centered approach does not raise an inference of gender bias. *See Doe v. Univ. of Colo., Boulder ex rel. Bd. of Regents of Univ. of Colo.*, 255 F. Supp. 3d 1064, 1075, 1076, 1079 (D. Colo. 2017) (granting the defendant's motion to dismiss, and acknowledging "the possibility of gender-specific stereotypes influencing [an] investigation" when the majority of accusers are women and the accused are men but agreeing with other courts that "if anything, the inference of pro-victim bias is an obvious alternative explanation that overwhelms any potential of gender bias"); *Univ. of St. Thomas*, 240 F. Supp. 3d at 991 (citing *Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778 (S.D. Ohio 2015) (granting the defendant's motion to dismiss and noting a university official showing bias in favor of alleged victims is not equivalent to demonstrating bias against male students).

---

[6] The Court does not rule on the admissibility of the expert's report.

The Court similarly concludes a victim-centered approach does not create an inference of gender bias without evidence of gender bias in its formulation or application. Plaintiff cannot show the trauma-based theories used by Defendants were used because Plaintiff is a man. The statements Plaintiff suggests demonstrate Sirna's victim-centric approach were gender-neutral. For instance, McKinney stated in her deposition that "people behave differently" after a traumatic event. McKinney Dep. 50:6–51:22, ECF No. 118-3 at APP. 285. When Sirna was asked if she thought Jane Doe's behavior directly after the traumatic event was relevant to her credibility, Sirna stated: "victims often engage in counterintuitive behavior after a sexual assault. It's very common for them to want to regain control, and so they go and they have sex that's consensual with somebody else." Sirna Dep. 172:9–15, ECF No. 118-5 at APP. 457; *see also* Pl.'s Sealed App. Supp. Pl.'s Resp. Defs.' Mot. Summ. J. at APP. 430, Sirna Dep. 64:10–12, ECF No. 118-4 (noting "[v]ictims often engage in counterintuitive behavior."). Plaintiff argues a system focused on victims, even if stated in gender-neutral terms, is gender-biased because victims are women. ECF No. 121 at 26. Plaintiff asserts "females being both victims and accused" is a "theoretical but non-existent possibility." *Id.* Plaintiff does not cite any evidence for this proposition.

In addition, Plaintiff argues the Policy is gender-biased because it provides resources for victims and lists ways to prevent sexual assault but does not provide any resources for accused students. *Id.* at 27. But these sections also use gender-neutral language. *See* Pl.'s Sealed App. Supp. Pl.'s Resp. Defs.' Mot. Summ. J. at APP. 087–117, ECF No. 118-1. Moreover, the Policy itself states it "applies regardless of sexual orientation or gender identity." ECF No. 118-1 at APP. 099. Plaintiff asserts the gender-neutral language is "a pretext for Drake's anti-male discrimination." ECF No. 46 ¶ 50. Notwithstanding his conclusory allegations discussed here, Plaintiff does not show how victim-centric or trauma-informed language reveals a gender-

36

biased approach.

Here, at the summary judgment stage when Plaintiff has had the opportunity to review discovery to demonstrate gender bias, the Court finds Plaintiff is unable to do so. Without more, a jury could find the statements and decisions by Defendants and the Policy itself reveal a victim-centered, trauma-informed approach, but could not find they reveal a bias toward one gender.

Third, no reasonable jury could find the data about the gender of those accused of sexual misconduct at Drake reveal Defendants operated their nonacademic disciplinary procedure with gender-biased motives. Plaintiff asserts that because all 51 respondents in sexual misconduct disciplinary proceedings at Drake during the 2015–2016 academic year were male, the disciplinary system is infected with gender bias. ECF No. 121 at 26. Defendants point out the tracking chart provided by the Drake University Title IX coordinator indicates that although no respondents for sexual misconduct are labeled as female, there is no information provided about the gender of the respondent in numerous cases. ECF No. 135 at 1 n.1; *see generally* ECF No. 118-13 at APP. 1195–1254. Even when viewing the statistics as Plaintiff presents them, this data is not enough to show gender bias.

Courts have declined to infer a gender-biased motive on the part of university officials from the disparity in gender among those who are accused of sexual assault, noting that schools are not responsible for which students choose to report sexual misconduct. *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 92 (1st Cir. 2018) ("It is unreasonable to draw such an inference from this information rather than recognize that other non-biased reasons may support the gender makeup of the sexual misconduct cases."); *Doe v. Cummins*, 662 F. App'x 437, 454 (6th Cir. Dec. 6, 2016) (unpublished) (reasoning there were "more innocent" causes for the gender disparity between male and female respondents in sexual-misconduct cases than

gender bias); *Tsuruta v. Augustana Univ.*, No. 4:15–CV–04150-KES, 2015 WL 5838602, at *4 (D.S.D. Oct. 7, 2015) ("The fact that males are more often the subject of disciplinary (or criminal) proceedings stemming from allegations of sexual assault does not suggest that those proceedings are tainted by an improper motive.").

The Sixth Circuit, on the other hand, has reasoned it is plausible to infer gender bias from data showing all men accused of sexual misconduct during an academic year were found responsible for the alleged violation and data showing nearly ninety percent of students accused of sexual assault over several years had male first names. *Miami Univ.*, 882 F.3d at 593. As with the Second Circuit's decision in *Columbia University*, discussed above, this reasoning is distinguishable from the procedural setting of this case. *Miami University* was decided on a motion to dismiss under Rule 12(b)(6). *Id.* at 584. In noting the allegations were sufficient to raise an inference of gender bias at the motion to dismiss stage, the Sixth Circuit noted "[d]iscovery may reveal that the alleged patterns of gender-based decision-making do not, in fact, exist." *Id.* at 594. Here, on a motion for summary judgment under Rule 56, the court finds the Court of Appeals for the First Circuit's decision in *Boston College* more persuasive. In *Boston College*, the First Circuit reasoned "after the parties have engaged in substantial discovery, a complete lack of evidence—whether direct or circumstantial—will not allow a party to survive a motion for summary judgment. Conclusory allegations are not enough." *Bos. Coll.*, 892 F.3d at 92. As in *Boston College*, the Court concludes no reasonable jury could find the statistics Plaintiff relies on are anything more than conclusory allegations of gender bias.

Finally, no reasonable jury could conclude Defendants were influenced by outside pressure to carry out sexual misconduct investigations and disciplinary hearings that impermissibly favored women and unfairly punished men. Plaintiff asserts the "Dear Colleague Letter" pressured universities to create tribunals with the purpose of finding men responsible for sexual assault or

risk losing federal funding. ECF No. 121 at 26–27; ECF No. 46 ¶¶ 20, 51. Again, courts have not found this argument persuasive—particularly at the summary judgment stage. *See Bos. Coll.*, 892 F.3d at 92–93; *Doe v. Purdue Univ.*, 281 F. Supp. 3d 754, 780 (N.D. Ind. 2017); *Univ. of Colo.,* 255 F. Supp. 3d at 1078 ("Moreover, pressure from the federal government to investigate sexual assault allegations more aggressively—either general pressure exerted by the Dear Colleague Letter or specific pressure exerted by an investigation directed at the University, or both—says nothing about the University's alleged desire to find men responsible because they are men."); *Univ. of St. Thomas*, 240 F. Supp. 3d at 992.

For the reasons discussed above, Plaintiff's claim for erroneous outcome cannot survive Defendants' motion for summary judgment. The Court therefore grants summary judgment in Defendants' favor on this theory.

### 2.      Deliberate indifference

As part of Plaintiff's Title IX claim, Plaintiff asserts Defendants "demonstrated deliberate indifference when they refused to investigate and dismissed the sexual assault claim by Plaintiff, a male complainant, as well as by Plaintiff's father, a trustee of the college." ECF No. 46 ¶ 135. Plaintiff contends Parker's statement that Drake would not investigate Plaintiff's claim of sexual assault because it was a form of retaliation indicates deliberate indifference. ECF No. 121 at 33–34. Defendants contend Plaintiff's claim fails because one assault does not constitute a "systematic" denial of an education program and Drake's conduct did not cause Plaintiff's alleged assault or make him vulnerable to it. ECF No. 104 at 23–24. As explained below, the Court grants Defendants' motion for summary judgment as to this theory because Plaintiff has not shown how Defendants' alleged inaction subjected him to harassment.

For a school to incur liability under a Title IX deliberate indifference claim, "it must be (1) deliberately indifferent (2) to known acts of discrimination (3) which occur under its control."

39

*Shrum ex rel. Kelly v. Kluck*, 249 F.3d 773, 782 (8th Cir. 2001). Because Plaintiff's claim is premised on Defendants' failure to investigate peer-on-peer sexual harassment (specifically Jane Doe's alleged sexual assault of him), Plaintiff must also establish the discrimination was "so severe, pervasive, and objectively offensive that it can be said to deprive [him] access to the educational opportunities or benefits provided by the school." *K.T. v. Culver-Stockton Coll.*, 865 F.3d 1054, 1057 (8th Cir. 2017) (quoting *Davis*, 526 U.S. at 650). Finally, the "deliberate indifference must either directly cause the abuse to occur or make students vulnerable to such abuse." *Shrum*, 249 F.3d at 782; *see also K.T.*, 865 F.3d at 1058 (noting "while [the plaintiff] was dissatisfied with [the school]'s response," because the plaintiff only reported emotional distress following the alleged assault, "the response cannot be characterized as deliberate indifference *that caused the assault*").

Plaintiff's deliberate indifference claim cannot survive Defendants' motion for summary judgment. Specifically, Plaintiff does not claim Defendants' alleged failure to investigate his sexual assault caused him to experience any separate harassment following his assault. The Eighth Circuit requires such a showing. *See K.T.*, 865 F.3d at 1058 (dismissing the plaintiff's deliberate indifference claim because "at most, [the plaintiff's complaint] link the [the defendant's] inaction with emotional trauma [the plaintiff] claims she experienced following the assault"); *see also Davis*, 526 U.S. at 644 (explaining a plaintiff reporting student-on-student harassment must show the school's deliberate indifference caused the student to be "subject[ed] to harassment"). Furthermore, as the Eighth Circuit and other courts have noted, failure to follow Title IX regulations is not a sufficiently severe form of discrimination to give rise to a deliberate indifference claim. *See, e.g., St. Louis Univ.*, 746 F.3d at 883–84; *Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 169 (5th Cir. 2011) (noting that although a school district's Title IX policy required the principal to contact the district's Title

IX coordinator in the event of a sexual misconduct allegation, "just because [the principal] failed to follow district policy does not mean that her actions were clearly unreasonable" and thus deliberately indifferent); *Klocke v. Univ. of Tex. at Arlington*, No. 4:17-CV-285-A, 2018 WL 2744972, at *6 (W.D. Tex. June 7, 2018) (determining the plaintiff had failed to state a claim for relief for deliberate indifference based on the school's violations of Title IX regulations); *Doe ex rel. Doe v. Saint Paul Conservatory for the Performing Arts*, No. 17–5032 (DWF/FLN), 2018 WL 2431849, at *3 (D. Minn. May 30, 2018) (same); *Haidak*, 299 F. Supp. 3d at 270 (determining on summary judgment that because the plaintiff only asserted one instance of sexual assault, "[e]ven with the court accepting [p]laintiff's claim that he declined to pursue a charge against [the complainant] because Defendants indirectly discouraged him from doing so, this evidentiary insufficiency is fatal to any claim of a pervasive environment of harassment").

Moreover, to the extent Plaintiff asserts part of the harassment he faced was also due to Defendants' decision to investigate and ultimately expel him for sexual assault, Plaintiff's claim fails. *See* ECF No. 46 ¶¶ 135–36; ECF No. 121 at 32–34. Plaintiff does not explain how the adjudication of Jane Doe's complaint and his expulsion are connected to Plaintiff's alleged assault and Defendants' alleged failure to investigate. Both the disciplinary proceedings against Plaintiff and his ultimate expulsion were triggered by Jane Doe's complaint, rather than by Plaintiff's own assertions regarding the sexual assault he allegedly experienced. Significantly, Plaintiff concedes Defendants were required to investigate Jane Doe's complaint against him. *See* ECF No. 121 at 30. Consequently, Defendants' decision to investigate Plaintiff and expel him cannot form the basis of his deliberate indifference claim.

For the reasons discussed above, even if Defendants failed to investigate Plaintiff's report of sexual harassment, because Plaintiff cannot show how such a failure subjected him to "severe

and pervasive" harassment, his claim is insufficient as a matter of law. The Court thus grants Defendants' motion for summary judgment as to this theory.

### 3.     Selective enforcement

Plaintiff also asserts Defendants subjected him to selective enforcement. ECF No. 121 at 28. A Title IX selective enforcement claim is premised on the allegation that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715. To support a claim of selective enforcement, Plaintiff "must demonstrate that a female was in circumstances sufficiently similar to his own and was treated more favorably by the University." *Mallory*, 76 F. App'x at 641.

There are factual questions as to whether Defendants' decision to initiate disciplinary proceedings against Plaintiff but not Jane Doe—even though they were both accused of sexual misconduct—was motivated by gender. These factual questions make it impossible for the Court to grant Defendants' motion for summary judgment on Plaintiff's selective enforcement claim. In considering Defendants' motion as to this claim, the Court addresses two factual questions. First, were Plaintiff and Jane Doe treated equally when they brought their respective complaints of sexual misconduct? In considering this question, the Court must also consider whether Plaintiff and Jane Doe were similarly situated. Second, if Plaintiff and Jane Doe were treated differently, was the disparate treatment motivated by gender?

Plaintiff contends comparison to "similarly situated" individuals is not required for a selective enforcement claim. ECF No. 121 at 29. Plaintiff asserts *Yusuf*, 35 F. 3d 709, which first articulated this theory, does not establish such a requirement. ECF No. 121 at 29. However, the *Yusuf* court implied the gender of the plaintiff and other accused students must be taken into account in order to bring a selective enforcement claim. *Yusuf*, 35 F.3d at 716. Specifically, while

the court determined the plaintiff had sufficiently alleged an erroneous outcome claim, it dismissed the plaintiff's selective enforcement allegation based primarily on the fact that both the plaintiff and his comparator were male. *Id.* Plaintiff also argues the cases cited by Defendants requiring opposite-gender complaints were called into question by the Second Circuit's decision in *Doe v. Columbia University*, 831 F.3d 46. ECF No. 121 at 28–30. Although the court in *Columbia University* overturned the district court's decision that had inquired into whether the plaintiff and comparator were "similarly situated," nothing in *Columbia University* touched on the actual elements for such a claim or called into doubt the district court's formulation of the theory. *See generally Columbia Univ.*, 831 F.3d 46. Rather, the Second Circuit focused on whether outside pressure could indicate gender bias under Title IX in general. *Id.* at 57–58.

Furthermore, following the decision in *Columbia University*, courts have continued to require a plaintiff asserting a selective enforcement claim to point to a similarly situated individual of the opposite gender who was treated more favorably. *See, e.g.*, *Plummer v. Univ. of Houston*, 860 F.3d 767, 778 (5th Cir. 2017) (determining plaintiffs had failed to assert a selective enforcement claim because, in part, "during the discipline process they—a male and a female—were treated equally"); *Cummins*, 662 F. App'x at 452 n.10 (finding plaintiffs' selective enforcement claim inapplicable because plaintiffs did not allege a similarly accused female was treated differently); *Stenzel v. Peterson*, No. 17-580 (JRT/LIB), 2017 WL 4081897, at *4–5 (D. Minn. Sept. 13, 2017) (finding the male plaintiff's selective enforcement claim failed because plaintiff could not show he and the female complainant were similarly situated); *St. Mary's Univ.*, 2017 WL 2670758, at *18 (examining whether the plaintiff and the female accuser were similarly situated). These cases do not provide a detailed analysis of how the test for a selective enforcement claim should be applied. Nonetheless, the Court concludes, consistent with the reasoning in these cases, a plaintiff asserting a selective enforcement Title IX claim must

demonstrate a similarly situated individual of the opposite sex was treated more favorably than the plaintiff.

There is a genuine issue of material fact as to whether Jane Doe and Plaintiff are similarly situated. Although Jane Doe and Plaintiff both alleged sexual misconduct by the other, they reported their allegations in different manners. *See* ECF No. 103-1 at APP. 155, APP. 182–83. Jane Doe reported she had been assaulted to the Department of Public Safety. *Id.* at APP. 155. As required by the Policy, the Department of Public Safety reported her complaint to the Dean of Students. ECF No. 103 at APP. 139; ECF No. 103-1 at APP. 155. The Dean of Students then investigated the complaint, a process required by the Code. ECF No. 137 at APP. 116. Plaintiff first alleged he was also a victim of sexual assault during a meeting with Overberg and Parker after the initial interviews regarding Jane Doe's assault had taken place. Overberg Dep. 63:6–12, ECF No. 103 at APP. 027. In response, Overberg set up a time for Plaintiff to meet with investigators Sirna and McKinney to talk about his allegations. Overberg Dep. 87:5–10, ECF No. 103 at APP. 031. Overberg also instructed Sirna and McKinney to ask Plaintiff if he wanted to initiate a conduct charge against Jane Doe and to get all the relevant information from him about it. ECF No. 103-1 at APP. 308. When investigators asked Plaintiff how he wanted to proceed, he told them he did not want to file a conduct charge against Jane Doe "right now" and he was just "verbalizing the issue." *Id.* at APP. 182–83.

An accused student and his or her accuser can be compared to show selective enforcement if the parties allege misconduct against each other. *See Stenzel*, 2017 WL 4081897, at *5–6. But if the accused student did not similarly initiate or attempt to initiate a complaint against his or her accuser, the two cannot be compared. In *Stenzel v. Peterson*, the court held the plaintiff's selective enforcement claim failed as a matter of law because the plaintiff had not filed a formal complaint even though the plaintiff who was accused of sexual assault told a university employee

44

that his accuser engaged in nonconsensual sexual contact with him and the university failed to follow up on his complaint. 2017 WL 4081897, at *6. The court found without an "allegation that [the plaintiff] was not encouraged to file a report or was dissuaded from filing a report," "there are not specific facts to indicate [the plaintiff] was treated differently during the process because of his gender." *Id.* [7] In *Doe v. Amherst College*, however, school officials encouraged the female student to file a complaint against the male plaintiff but did not do the same for the male plaintiff even though he also made allegations of sexual misconduct against the female student. 238 F. Supp. 3d 195, 223 (D. Mass. 2017). The court found these factual allegations of active encouragement by the school of the female student's complaint were sufficient to survive a motion for judgment on the pleadings. *Id.*

Here, there is a genuine issue of material fact as to whether Defendants dissuaded Plaintiff from initiating his complaint. If Plaintiff was discouraged from filing his complaint, then Jane Doe and Plaintiff would be similarly situated—they both were in the position to initiate complaints of sexual misconduct. Jane Doe was successful in initiating formal disciplinary proceedings. Plaintiff was not. Plaintiff claims he chose not to initiate his complaint because he was told it would be retaliatory. Pl.'s Dep. 151:13–152:25, 153:14–154:5, ECF No. 118 at APP. 38–39. Defendants respond that all accused students, male or female, receive the same general warning that they may

---

[7] Plaintiff argues the United States District Court for the Southern District of Ohio's ruling in *Gischel v. University of Cincinnati* indicates whether an accused student filed a formal complaint is irrelevant if the university had actual knowledge of the alleged conduct. Notice ¶ 1, ECF No. 140. The *Gischel* court relied on *Doe v. Miami University*, 882 F.3d 579 (6th Cir. 2018) for this holding. Order 2–4, *Gischel v. Univ. of Cincinnati*, No. 1:17-cv-00475-SJD, (S.D. Ohio June 26, 2018), ECF No. 27. In *Miami University*, however, the Sixth Circuit found the filing of a formal complaint is not necessary to show the school had actual knowledge of misconduct for the plaintiff to bring a deliberate indifference claim. 882 F.3d at 590–91. *Miami University* did not consider the plaintiff's selective enforcement claim and did not discuss whether a formal complaint versus informal notification impacts whether two students can be compared. *Id.* at 594–95. Hence, the Court does not find *Gischel* persuasive.

not retaliate against their accuser. Parker Decl. ¶¶ 4–5, ECF No. 103-1 at APP. 306. The Code includes a general prohibition of retaliation. The Code states: "[r]etaliation occurs when action is taken against another because they have sought guidance, filed [a] complaint or participated in an investigation." ECF No. 137 at APP. 115. "Examples of retaliation include, but are not limited to, any action that has an adverse impact on the complainant's employment, compensation or work assignments, or, in the case of students, grades, class selection or any other matter pertaining to [the] student." *Id.* at APP. 115–16. This same language was included in the email that Plaintiff received initially informing him he was the subject of a complaint. ECF No. 103-1 at APP. 152–53. These general warnings against retaliatory actions, although not an exhaustive list, do not specifically mention counter-complaints of sexual misconduct against a student's accuser.

Plaintiff alleges he was told a counter-complaint would be retaliatory, Pl.'s Dep. 153:14–154:5, ECF No. 118 at APP. 39, and the general warning against retaliation in the Code does not list counter-complaints as an example of retaliatory action. ECF No. 137 at APP. 115–16. Viewing the evidence in the light most favorable to Plaintiff, a reasonable jury could find Plaintiff was dissuaded from filing a complaint.

There is also a genuine issue of material fact as to whether the allegations of Plaintiff and Jane Doe were treated differently and whether this disparate treatment was motivated by gender. It is undisputed Plaintiff told the Dean of Students he might be a victim of sexual assault. Overberg Dep. 62:15–63:12, ECF No. 103 at APP. 27. It is disputed, however, if the Dean of Students investigated or dismissed his complaint. According to the Code, the Dean of Students can initiate an investigation of sexual misconduct. ECF No. 137 at APP. 116. Plaintiff contends Parker told his father on a phone call before the disciplinary hearing that "Drake would not be investigating [Plaintiff's] claim because they believed [Plaintiff's] claim to be retaliatory."

Rossley Sr. Decl. ¶ 10, ECF No. 118-13 at APP. 1180. Defendants, however, contend Plaintiff's complaint was "effectively investigated and adjudicated and found to be without merit." ECF No. 104 at 20. As evidence of the investigation of Plaintiff's allegations, Defendants rely on Sirna's findings from the investigation and Foxhoven's ruling after the disciplinary hearing that indicated Plaintiff lacked credibility. ECF No. 103-1 at APP. 220–25, 241. Sirna and Foxhoven, however, made this credibility determination about Plaintiff regarding Jane Doe's allegations of sexual assault by Plaintiff—not specifically about Plaintiff's allegations of sexual assault by Jane Doe. Thus, there is a dispute of material fact as to how Plaintiff's allegations of sexual misconduct by Jane Doe—and subsequent decision not to initiate disciplinary proceedings against Jane Doe—were treated by Defendants.

Although Defendants claim Plaintiff cannot allege facts to show any possible disparate treatment was motivated by gender, the disputed facts themselves—whether an arguably similarly situated man and woman were treated differently—raise the specter of gender bias. Defendants have provided different explanations for their approach to Plaintiff's allegations. Parker is reported to have told Plaintiff's father that Plaintiff's complaint would not be investigated, while Defendants have argued that the allegations were investigated and found to be without merit. ECF No. 118-13 at APP. 1180; ECF No. 104 at 20. These differing explanations can be evidence of pretext. *Cf. Fitzgerald v. Action, Inc.*, 521 F.3d 867, 873 (8th Cir. 2008) (finding that defendant employer's varying explanations for its decision to terminate plaintiff employee "raise a question [as to] the true reason for its decision"). This inquiry of gender-based motivations is distinct from the inquiry of gender bias in Plaintiff's erroneous outcome claim. Plaintiff cannot show evidence that gender bias influenced the disciplinary process followed to determine if sexual misconduct against an alleged victim, Jane Doe, had occurred. Victim-centric disciplinary proceedings do not equate to gender-biased, female-centric disciplinary proceedings.

47

*See Univ. of Colo.*, 255 F. Supp. 3d at 1075, 1079; *Univ. of St. Thomas*, 240 F. Supp. 3d at 991. But when contrasting the experiences of two alleged victims—one a woman and the other a man—and noting the possible disparate treatment, it is reasonable for a jury to consider gender-biased motivations based on these facts.

Defendants' motion for summary judgment is therefore denied as to Plaintiff's Title IX claim under a selective enforcement theory.

### D.     ADA Claim (Count VI)

In Count VI, Plaintiff asserts Defendants violated Title III of the American with Disabilities Act by failing to provide Plaintiff with reasonable accommodations during the investigation, disciplinary hearing, and appeals hearing. ECF No. 46 ¶ 239.[8] Specifically, Plaintiff claims due to his ADHD, dyslexia, and word-retrieval issues, Defendants should have provided the following accommodations during the disciplinary process:

> (i) having someone else with him in the room [during] the meeting with the investigator; (ii) having questions by the investigators written down before [the Plaintiff] would be expected to answer them; and (iii) time and a half, or at least more time at the hearing in a situation where it was two 'parties' . . . versus one 'party.'

ECF No. 121 at 39; *see also* Pl.'s Dep. 125:12–128:23, 133:7–136:24, ECF No. 103 at APP. 008, APP. 010. Defendants assert they are entitled to summary judgment on this count as 1) Plaintiff never requested a reasonable accommodation; and 2) the accommodations Plaintiff now identifies were either offered to him, are speculative, or would have amounted to an undue burden. ECF No. 104 at 26–30.[9] Because the Court determines no reasonable jury could

---

[8] Although Plaintiff's Amended Complaint was brought under Title II of the ADA, both parties agree Plaintiff's claim is only actionable under Title III, as the former applies to public institutions and the latter applies to private institutions. *See* ECF No. 104 at 26; ECF No. 121 at 35. Because both parties treat Plaintiff's claim as if it were brought under Title III, the Court does as well.

[9] Defendants also assert Plaintiff's claim "fails because [Plaintiff] failed to generate any evidence that his expulsion was based upon his disability." ECF No. 104 at 30 (citations and internal

find Plaintiff requested an accommodation, the Court grants Defendants' motion for summary judgment as to Count VI.

### 1.   Applicable Law

Under Title III of the ADA, it is unlawful for "any place of public accommodation" to "fail[ ] to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities." 42 U.S.C. § 12182(b)(2)(A)(ii); *see also Mershon v. St. Louis Univ.*, 442 F.3d 1069, 1076 (8th Cir. 2006) ("Discrimination under Title III specifically includes the failure to make reasonable modifications."). However, an entity need not accommodate an individual if "the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. 12182(b)(2)(A)(ii). Because the "discrimination" in a failure to accommodate claim "is framed in terms of the failure to fulfill an affirmative duty," a plaintiff is not required to separately show the defendant's actions were motivated by intentional discriminatory animus. *Pebbles v. Potter*, 354 F.3d 761, 767 (8th Cir. 2004) ("The concern is compelling behavior, not policing an employer's actions that, when accompanied by an invidious discriminatory intent, are unlawful."); *see also Mershon*, 442 F.3d at 1076–77 (listing the elements for a failure to accommodate claim under Title III without reference to intentional discrimination).

Thus, in the context of higher education, an individual bringing a failure to accommodate claim under Title III of the ADA must show:

(1) that the plaintiff is disabled and otherwise qualified academically,

---

quotation marks omitted). As explained below, in cases asserting failure to accommodate under the ADA, a plaintiff is not required to separately establish a defendant's actions were based on discriminatory animus.

(2) that the defendant is a private entity that owns, leases or operates a place of public accommodation (for ADA purposes) . . . , and

(3) 'that the defendant failed to make reasonable modifications that would accommodate the plaintiff's disability without fundamentally altering the nature of the public accommodation.'

*Id.* at 1076 (quoting *Amir v. St. Louis Univ.*, 184 F.3d 1017, 1027 (8th Cir. 1999)). "As to the third requirement, [the plaintiff] bears the initial burden of demonstrating that he requested reasonable accommodations." *Id.* at 1077. Such requests must specifically identify the particular accommodations and "explain how each requested accommodation was necessary to enable [the plaintiff] to participate in light of his disabilities." *Id.*

## 2. **Analysis**

Defendants do not contest that Plaintiff can establish the first two elements of his ADA claim. *See Mershon*, 442 F.3d at 1076–77. *See generally* ECF No. 104 at 26–28. As to the third element, the parties dispute whether Plaintiff sufficiently requested a reasonable accommodation under the ADA. *Id.*; ECF No. 104 at 27; ECF No. 121 at 36–39. Based on the parties' arguments, the Court first considers if Plaintiff specifically requested an accommodation during the disciplinary process. The Court then examines whether Defendants were nonetheless on constructive notice and if Plaintiff's father sufficiently requested accommodations for the disciplinary hearing.

### a. Specific request

The Court determines there are no genuine issues of material fact indicating Plaintiff or his attorney ever specifically requested an accommodation during the investigation, disciplinary hearing, or appeals hearing. It is undisputed Plaintiff suffers from a mild form of dyslexia, ADHD, and word-retrieval issues. ECF No. 133 ¶ 1; Pl.'s Dep. 129:1–9, 172:20–173:4, ECF No. 103 at APP. 009, APP. 014–15; Pl.'s Sealed App. Supp. Pl.'s Resp. Defs.' Mot. Summ. J. at APP. 775–76, Hr'g Tr. 218:17–219:12, ECF No. 118-8. Due to his disabilities,

Plaintiff regularly requested, and received, academic accommodations from Defendants. *See* Pl.'s Dep. 169:16–170:24, ECF No. 103 at APP. 14; ECF No. 104 at 27. As Plaintiff explained in his deposition, although he was generally awarded "time and a half" for exams, the accommodations he requested and utilized "varie[d] class to class." Pl.'s Dep. 170:6–14, ECF No. 103 at APP. 014; Pl.'s Dep. 130:8–131:8, ECF No. 118 at APP. 033. Furthermore, Plaintiff stated in order to secure accommodations, Plaintiff met with each professor individually to determine what accommodations were necessary. Pl.'s Dep. 169:23–170:5, ECF No. 103 at APP. 014. Because he initiated these requests, Plaintiff had not discussed whether the disability coordinator was authorized to speak to professors independently about Plaintiff's disabilities. Pl.'s Dep. 171:16–172:16, ECF No. 103 at APP. 014.

The evidence also indicates during the disciplinary process, Plaintiff did make Parker, the investigators, and Foxhoven aware of his disabilities, and some of the associated symptoms. *See, e.g.*, Parker Dep. 232:2–233:7, ECF No. 103 at APP. 050 (mentioning Plaintiff's parents statements to Parker about Plaintiff's disabilities); ECF No. 103-1 at APP. 192 (noting Plaintiff's statements about his disabilities to the investigators); Pl.'s Sealed App. Supp. Pl.'s Resp. Defs.' Mot. Summ. J. at APP. 775–76, Hr'g Tr. 218:17–219:12, ECF No. 118-8 (noting Plaintiff's statements about his disabilities during the disciplinary hearing with Foxhoven). However, both Plaintiff and Plaintiff's personal representative stated they never requested Plaintiff be provided accommodations. Pl.'s Dep. 120:19–121:10, 129:10–130:10, ECF No. 103 at APP. 006–07, 009; Defs.' Second Suppl. App. at APP. 314, Kaiser Dep. 25:18–26:13, ECF No. 132. Plaintiff also did not request accommodations during the investigation. Sirna Decl. ¶ 4, ECF No. 103-1 at APP. 301. Rather, Plaintiff stated he assumed Defendants would follow up about any necessary accommodations once he revealed he had taken Adderall on

October 8, 2015, due to his ADHD. *See* Pl.'s Dep. 120:23–123:13, ECF No. 103 at APP. 006–07. Furthermore, although Plaintiff's personal representative requested Plaintiff be given extra time during the disciplinary hearing, these requests were consistently raised as an issue of procedural fairness, rather than Plaintiff's disabilities. *See* Hr'g Tr. 6:14–19, ECF No. 118-6 at APP. 563 (arguing "having ten minutes arguing that [the Plaintiff] is responsible and we get five minutes to rebut that is not fair"); ECF No. 137 at APP. 233; *see also* Foxhoven Dep. 23:15–24:6, ECF No. 103 at APP. 076; Pl.'s Dep. 133:7–19, ECF No. 103 at APP. 010 ("[E]ven my accommodations aside, we should have gotten double anything anyway. But on top of my accommodations, I already deserved time and a half for anything and everything."). The Court determines no reasonable jury could find Plaintiff or his attorney affirmatively requested any accommodations during the investigation, disciplinary hearing, or appeals hearing.

      b.     Constructive notice

Absent an affirmative request for an accommodation, Plaintiff contends Defendants were constructively on notice of Plaintiff's disabilities due to his academic accommodations and statements regarding his ADHD, dyslexia, and word-retrieval issues. ECF No. 121 at 37–38. Consequently, Plaintiff asserts Defendants were required to affirmatively engage with Plaintiff regarding possible accommodations. *Id.* Plaintiff relies on two cases, both outside the Eighth Circuit, to support his argument. *Id.* at 38 (citing *Nathanson v. Med. Coll. of Pa.*, 926 F.2d 1368 (3d Cir. 1991) and *Redding v. Nova Southeastern Univ., Inc.*, 165 F. Supp. 3d 1274 (S.D. Fla. 2016)). Both cases are distinguishable. First, in *Redding*, the United States District Court for the Southern District of Florida considered claims brought by a dismissed medical student under the ADA and § 504(a) of the Rehabilitation Act of 1973. 165 F. Supp. 3d at 1279. The plaintiff claimed she had been dismissed from medical school because of her disability and

had also been denied reasonable accommodations. *Id.* at 1289, 1295 (noting the plaintiff's failure to accommodate claim was premised on her academic training, while her dismissal claim only focused on her subsequent clinical rotations). As to the plaintiff's failure to accommodate claim, the court noted although it was unclear whether a student's failure to follow a formal procedure nullified an informal request for an accommodation, the plaintiff's argument was ultimately moot as the plaintiff testified she had attempted to comply with the formal procedure and had previously received accommodations outside the school's formal process. *Id.* at 1296 & n.25. Additionally, in examining the defendant's decision to dismiss the plaintiff, the court ultimately determined the plaintiff was not a "qualified individual" during her clinical rotation as she had not identified or requested the reasonable accommodations that would permit her to satisfy the program's essential requirements. *Id.* at 1293–94. While *Redding* thus stands for the proposition that formal requests may not be required, particularly when informal requests have previously been granted, *Redding* does not support Plaintiff's position.

First, unlike Plaintiff, the *Redding* plaintiff's informal requests actually identified the accommodations she was requesting. *Id.* at 1296. Plaintiff has not identified any informal requests he made during the disciplinary process that specified the accommodations he now contends were necessary. Second, as noted above, the *Redding* court ultimately determined the plaintiff had not requested a reasonable accommodation during her clinical rotation, and was thus not a "qualified individual." *Id.* at 1293–94. The court specifically distinguished the plaintiff's earlier approved accommodations, which were given during her academic training, with any accommodations she may have requested during her clinical rotation. *Id.* ("[The plaintiff] requested accommodations only in relation to the make-up exam policy, and it was incumbent on her to request additional accommodations if she sought accommodations related to the clinical rotation attendance policy."). Similarly, Plaintiff only points to his past requests for academic accommodations to

support his claim that Defendants were on constructive notice as to his requests for accommodations during the investigation and subsequent hearings. Although Plaintiff asserts his academic accommodations put Defendants on notice of his need for the disciplinary accommodations he now identifies, the academic accommodations addressed different contexts than the disciplinary procedures set out in the Code and the Policy. For instance, "time and a half" during an exam is not procedurally or substantively comparable to "time and a half" during a disciplinary procedure involving credibility and factual determinations. Furthermore, while there was no formal process to request accommodations during the disciplinary procedure, to receive academic accommodations Plaintiff had previously, he had to, at the very least, affirmatively approach a professor regarding his request and identify the particular accommodations he needed. He stated the disability coordinator had told him he needed to be more "accountable" regarding this affirmative responsibility. Pl.'s Dep. 230:2–24, ECF No. 118 at APP. 058. Thus, although he may not have been required to follow a formal procedure to request an accommodation, Plaintiff understood he must, at a minimum, ask that his disabilities be accommodated. As discussed above, he failed to do so during the disciplinary procedure.

*Nathanson* is similarly distinguishable. In *Nathanson*, the Court of Appeals for the Third Circuit considered the plaintiff's failure to accommodate claim under § 504 of the Rehabilitation Act. 926 F.2d at 1370. Noting the school "must know or be reasonably expected to know of [the plaintiff]'s handicap" to be liable under the Act, the court ultimately concluded there were genuine issues of material fact as to whether the school was on notice of the accommodations the plaintiff sought. *Id.* at 1381, 1385. Specifically, the court noted either the school was on constructive notice due to the plaintiff's repeated statements that she was unable to attend the school without an accommodation, or the school was on direct notice due to the plaintiff's "direct requests for accommodations." *Id.* at 1382–83, 1387. Although *Nathanson* provides a closer fit to

the facts at issue here than *Redding*, *Nathanson* is also ultimately distinguishable. First, unlike Plaintiff, the student in *Nathanson* repeatedly requested a particular accommodation (a type of desk) as it applied to her general ability to attend school. *Id.* at 1381–82. In contrast, while Plaintiff requested and received academic accommodations, he did not request such accommodations for his disciplinary procedures. Rather, his requests were specifically directed to his academic pursuits. Plaintiff did not indicate that, due to his disabilities, he would be unable to participate in the investigation or subsequent hearings.[10] Second, to the extent the court determined constructive notice triggers some duty to accommodate absent a request for an accommodation, the Court is bound by Eighth Circuit precedent to the contrary. *See Mershon*, 442 F.3d at 1077 (noting under both Title III of the ADA and the Rehabilitation Act, a party bringing a failure to accommodate claim "bears the initial burden of demonstrating that he requested reasonable accommodations, and that those accommodations would render him otherwise qualified for admission"); *see also Pierre v. Univ. of Dayton*, No. 3:15-cv-362, 2017 WL 1134510, at *10 (S.D. Ohio Mar. 27, 2017) (holding a student in a disciplinary proceeding failed to state a claim for failure to accommodate "because he did not mention a need for any accommodation until after his disciplinary hearing" and noting "[t]hat the University's Office of Learning Resources department knew that [the plaintiff] had a disability does not trigger an obligation on every department of the University to offer him accommodations when dealing with him"). Thus, the Court concludes Plaintiff's argument that Defendants were on constructive notice of his need for accommodations fails as a matter of law.

---

[10] The Court notes during his disciplinary hearing, Plaintiff explained: "I also have a . . . word-based learning disability where I'm very bad at retrieving words and—like literally what is happening now—I guess like a word-retrieval issue and a mild form of dyslexia as well." Hr'g Tr. 219:8–12, ECF No. 118-8 at APP. 776. However, as detailed above, Plaintiff did not explain he was unable to participate in the hearing due to this issue, nor did he—nor his personal representative—request an accommodation during the hearing following Plaintiff's statement.

c. Third-party request

Finally, Plaintiff contends even if he did not request an accommodation during the disciplinary procedure, his father, Thomas Rossley, Sr. requested an accommodation on his behalf. ECF No. 121 at 38–39. In his declaration, Plaintiff's father stated during a "contentious" phone call with Parker in December 2015, he "demanded" that Parker "accommodate [Plaintiff]'s disabilities in the upcoming hearing" and that "Parker never addressed this request for disability accommodations." Rossley, Sr. Decl. ¶10, ECF No. 118-13 at APP. 1179–80. Further, he explained he "was infuriated that [Plaintiff] had to defend himself against Dean Parker's call for [Plaintiff]'s expulsion with no accommodations that [Plaintiff's father] had requested for [Plaintiff]'s ADHD, anxiety, and language-based learning disabilities." Rossley, Sr. Decl. ¶14, ECF No. 118-13 at APP. 1182.

Plaintiff does not cite to any case law to support his claim that a third party may request an accommodation on behalf of an adult student during a disciplinary procedure. *See* ECF No. 121 at 38–39.[11] Although the Court has identified cases from other Circuits in which the courts, in dicta, determined a third party could sufficiently request an accommodation on behalf of a disabled individual, these cases are inapposite. First, they involve discrimination in employment (Title I of the ADA), rather than private education (Title III of the ADA). *See, e.g., E.E.O.C. v. C.R. England, Inc.*, 644 F.3d 1028, 1049 (10th Cir. 2011); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 303, 313–14 (3d Cir. 1999) (determining the plaintiff sufficiently requested an accommodation through her son after being admitted to a

---

[11]At the hearing on this motion, Plaintiff pointed the Court to both *Nathanson* and *Redding* to support this contention. Mot. Summ. J. Hr'g Tr. 51:8–52:5, ECF No. 146. However, neither case involves a third-party request for an accommodation; rather, both plaintiffs requested their own accommodations during their respective academic programs. *Nathanson*, 926 F.2d at 1370; *Redding*, 165 F. Supp. 3d at 1293–94.

psychiatric hospital); *Corbett v. Nat'l Prods. Co.,* No. 94–2652, 1995 WL 133614, at *4 (E.D. Pa. Mar. 27, 1995) (finding the plaintiff had requested an accommodation "in essence when his wife called to inform [his employer] of his entry into the treatment program"). In determining the plaintiffs in those cases sufficiently requested accommodations, the courts relied on the employer's duty to engage in an interactive process. *See Taylor*, 184 F.3d at 314 (noting once the school had notice of the plaintiff's disability, it was required to engage in an interactive process to accommodate any requested accommodation, and thus "it would be especially inappropriate to insist that [the plaintiff]'s son must have specifically invoked the ADA" to begin that process); *see also C.R. England*, 644 F.3d at 1049 (noting the interactive process was envisioned to facilitate reasonable accommodations and that in the employment context, the request does not need to "be made by the employee" (quoting *Taylor*, 184 F.3d at 313)). Meanwhile, the Eighth Circuit has noted its skepticism as to whether institutions are required to engage in an interactive process under the ADA generally and in the academic setting specifically, thus further limiting the applicability of the above cases. *See Koester v. Young Men's Christian Ass'n of Greater St. Louis*, 855 F.3d 908, 912 & n.2 (8th Cir. 2017) (noting it was "assuming with a hefty dose of skepticism that these concepts [of the interactive process] are applicable in this Title III case"); *Mershon*, 442 F.3d 1069 (explaining "even if such an interactive process is required in an academic setting," the plaintiff would bear the burden of showing he needed accommodations to gain entry to graduate school (citing *Stern v. Univ. of Osteopathic Med. & Health Scis.*, 220 F.3d 906, 909 (8th Cir. 2000))).

Moreover, unlike the current case, the plaintiffs in *Taylor* and *Corbett* were both incapable of requesting the accommodations themselves, as they were in treatment facilities. *See Taylor*, 184 F.3d at 302; *Corbett*, 1995 WL 133614, at *1. Plaintiff was capable of requesting accommodations for himself, as evidenced by the fact that he consistently did so in the academic

setting and understood he was required to raise the issue of individual accommodations with his professors.

During the hearing on this motion, Plaintiff's counsel also asserted, because Plaintiff had waived his rights under the Family Educational Rights and Privacy Act (FERPA), his father was serving as his representative when he requested accommodations from Parker. Mot. Summ. J. Hr'g Tr. 52:5–14, ECF No. 146. However, FERPA only protects a student's privacy as applied to his academic and medical records; it does not provide a parent with representative authority once the FERPA rights are waived. *See generally* 20 U.S.C. § 1232g. This is particularly true when, as here, the adult student is capable of requesting accommodations for himself and is represented by independent counsel. *See* Pl.'s Dep. 194:7–14, ECF No. 103 at APP. 019 (stating that at the time Plaintiff had the second meeting with the investigators, he had an attorney); ECF No. 103-1 at APP. 219 (noting the second interview occurred on November 10, 2015); Rossley, Sr. Decl. ¶ 12, ECF No. 118-13 at APP. 1180–81 (stating Rossley, Sr. spoke with Parker regarding Plaintiff's disabilities in December 2015). Plaintiff stated he understood his attorney was responsible for discussing any accommodations he might need with Defendants and that he "delegated [that duty] to [his] lawyer." Pl.'s Dep. 126:8–22, ECF No. 103 at APP. 008. For the reasons set forth above, Rossley, Sr. could not request an accommodation for his adult son and Defendants were not required to engage with Plaintiff in response to his father's statements.

Finally, even if Plaintiff's father could request an accommodation for his adult son, the record does not provide any indication of what accommodations Rossley, Sr. specifically requested. Rossley, Sr.'s declaration states he "demanded" that Defendants "accommodate [Plaintiff]'s disabilities in the upcoming hearing" and that he was "infuriated" that Defendants had not provided the "accommodations that [he] had requested for [Plaintiff]'s ADHD, anxiety, and language-based learning disabilities." Rossley, Sr. Decl. ¶¶ 12, 14,

ECF No. 118-13 at APP. 1179, 1182. This declaration does not indicate what accommodations were necessary in the hearing, which accommodations Rossley, Sr. believed should have been provided during the investigation, and how Defendants should accommodate Plaintiff's disabilities. Although Plaintiff received academic accommodations, as noted above, those accommodations were provided in a separate process and involved accommodations for different requirements under the Code. As the Eighth Circuit has explained, plaintiffs seeking accommodations must "request[ ] reasonable specific accommodations." *Mershon*, 442 F.3d at 1077. Looking at the facts in the light most favorable to Plaintiff, the Court thus determines there is no genuine dispute of material fact that Plaintiff, his attorney, or his father, requested any reasonable accommodations. Because Plaintiff is required to show he requested such an accommodation as a basis for his ADA claim, the Court thus grants Defendants' motion for summary judgment as to Count VI.

## E.   Contract Claims (Counts III, IV, and VII)

Plaintiff brings three state law contract claims: breach of contract (Count III), breach of the covenant of good faith and fair dealing (Count IV), and estoppel and reliance (Count VII). ECF No. 46 ¶¶ 203–19, 220–24, 241–47. All of Plaintiff's claims are premised on, and encompassed by, the contractual language contained in the Code and the Policy. For purposes of summary judgment, Defendants concede the Code and the Policy constitute contracts under Iowa state law. *See* ECF No. 104 at 34. Defendants argue Plaintiff's contractual claims fail because: 1) Plaintiff cannot show Defendants violated any contractual rights due to him under the Code or the Policy, including the requirement to conduct a fair hearing; 2) Plaintiff's covenant of good faith and fair dealing claim would alter the terms of the contract; and 3) the Code and the Policy explained all of the promises made to Plaintiff, and by conducting a fair and equitable hearing, Defendants kept their promise. *Id.* at 34–40.

59

The Court first considers whether Plaintiff's claims asserting estoppel and breach of the covenant of good faith and fair dealing are subsumed by his claim alleging breach of contract. Determining they are, the Court next examines whether Plaintiff has identified genuine issues of material fact as to whether Defendants breached their contractual duties to Plaintiff under the Code or Policy. The Court finds Plaintiff has shown that some, but not all, of the alleged breaches include genuine issues of material fact.

### 1. Estoppel & covenant of good faith and fair dealing (Counts IV and VII)

In Count VII, Plaintiff asserts a claim for estoppel and reliance. Plaintiff alleges "Drake's various policies constitute representations and promises that Drake should have reasonably expected to induce action or forbearance by Plaintiff," including the "express and implied promises that Drake would not tolerate, and Plaintiff would not suffer, harassment by fellow students" and that Drake "would not deny Plaintiff his procedural rights should he be accused of a violation of Drake's policies." ECF No. 46 ¶¶ 242–43. Because Plaintiff asserts he suffered harm after reasonably relying on "representations and promises" by Defendants, the Court understands Plaintiff to be making a promissory estoppel, rather than equitable estoppel, claim.[12]

Under Iowa law, "[t]he theory of promissory estoppel allows individuals to be held liable for their promises despite an absence of the consideration typically found in a contract." *Schoff v. Combined Ins. Co. of Am.*, 604 N.W.2d 43, 48 (Iowa 1999). Consequently, in order to establish a claim for promissory estoppel, a plaintiff must show:

> (1) [A] clear and definite promise; (2) the promise was made with the promisor's clear understanding that the promisee was seeking an assurance upon which the promisee could rely and without which he would not act; (3) the promisee acted to his substantial detriment in reasonable reliance on the promise; and (4) injustice can be avoided only be enforcement of the promise.

---

[12] Equitable estoppel is based on a misstatement of fact; promissory estoppel requires a plaintiff show he detrimentally relied upon a promise. *See Merrifield v. Troutner*, 269 N.W.2d 136, 137 (Iowa 1978) (discussing these distinctions).

*Id.* at 49. Because promissory estoppel is a form of equitable relief and applies only where a contract otherwise does not exist, a plaintiff may not assert a claim of promissory estoppel if the promise at issue is encompassed by a written and formal contract. *See, e.g.*, *PFS Distrib. Co. v. Raduechel*, 574 F.3d 580, 599 (8th Cir. 2009) (affirming dismissal of the employee's promissory estoppel claim and explaining "[the employee]'s allegations do not sufficiently show the statements of [the employer's] officers created oral contracts or warrant promissory estoppel because the alleged statements, at most, restated the terms of [the employee]'s written compensation agreement"); *John T. Jones Constr. Co. v. Hoot Gen. Constr.*, 543 F. Supp. 2d 982, 1021 (S.D. Iowa 2008) ("Because [the plaintiff] has a complete remedy at law for breach of contract there is no reason to resort to equity."); *Blackledge v. Puncture Proof Retread Co.*, 181 N.W. 662, 664 (Iowa 1921) (reasoning an "oral contract must be independent in fact, and must not be a contradiction, modification, or qualification of the written contract, either as to its enforcement, its consideration, or its executory obligation"); 28 Am. Jur. 2d, *Estoppel & Waiver* § 54 (1964 & Aug. 2018 Update) ("A promissory estoppel claim is precluded by the existence of an enforceable contract, and in fact, promissory estoppel does not apply when the dispute arises out of a valid contract between the parties.").

As applied to this case, Plaintiff claims he reasonably relied upon Defendants' promises "that Drake would not tolerate, and Plaintiff would not suffer, harassment by fellow students" and that Drake "would not deny Plaintiff his procedural rights should he be accused of a violation of Drake's policies." ECF No. 46 ¶¶ 242–43. Apart from the plain language contained in the Code and the Policy, Plaintiff does not point to any "clear and definite" statements by Defendants relating to these alleged promises. *See Schoff*, 604 N.W.2d at 48. Plaintiff asserts Parker, Martin (President of Drake), and Vanessa Macro, the Chief Administrative Officer for Drake, stated

respondents in sexual misconduct investigations must be treated fairly during the disciplinary process and are entitled to due process. *See* ECF No. 121 at 42–43. However, these statements by Parker, Martin, or Macro were made during depositions after Plaintiff was expelled and thus cannot form the basis of a promissory estoppel claim. Plaintiff does not identify any statements Defendants made to him before he matriculated at Drake which were intended to provide "an assurance upon which [Plaintiff] could rely and without which he would not [have] act[ed]." *Schoff*, 604 N.W.2d at 49.

Furthermore, even if Plaintiff could point to affirmative statements by Defendants regarding due process or equitable proceedings made by Defendants before the disciplinary proceedings, such statements are encompassed by the Code and the Policy. *See* ECF No. 137 at APP. 111–12, 134 (defining "sexual assault" as a form of non-academic misconduct); *id.* at APP. 138 (explaining, per the Policy, "[t]he University disciplinary process will include a prompt, fair, and impartial investigation and resolution process"); *see also id.* (noting when a complaint of sexual misconduct is filed against a student, the Policy and the Code follow the same disciplinary procedure). Thus, to the extent Defendants promised Plaintiff a fair and equitable disciplinary procedure and assured him he would not be subjected to sexual harassment, any alleged breach of such promises is encompassed by the Code and the Policy and it thus limited to a remedy at law for breach of contract. *See PFS Distrib. Co.*, 574 F.3d at 599 (dismissing the employee's promissory estoppel claim when "the alleged statements, at most, restated the terms of [the employee]'s written [contract]"); *John T. Jones Constr.*, 543 F. Supp. 2d at 1021 (determining there is no reason "to resort to equity" when the plaintiff's remedy is encompassed by his breach of contract claim).

For similar reasons, the Court determines Plaintiff's claim for breach of the covenant of good faith and fair dealing is subsumed by his breach of contract claim. In Count IV, Plaintiff

asserts Defendants "breached and violated the covenant of good faith and fair dealing implied in the agreement(s) with Plaintiff by meting out the disproportionately severe sanction of expulsion where there was a lack of credible evidence concerning the claims against him." ECF No. 46 ¶ 222. Plaintiff identifies two examples of Defendants' alleged breach: 1) Foxhoven's decision to "allow[ ] Jane Doe to admit to her own sexual assault of Plaintiff," "lie in her testimony without consequences," and "doctor her text message evidence to try to prove the plaintiff was stalking her"; and 2) Defendants' refusal to take action against Jane Doe for these violations of the Code. *Id.* ¶ 221. Defendants contend Iowa law does not recognize Plaintiff's claim as Plaintiff is seeking to alter the terms of the Code and the Policy. ECF No. 104 at 38. Defendants also assert Plaintiff was only expelled after he was found responsible for sexual misconduct in accordance with the Code; the Code does not give Plaintiff "a contractual right to have Drake initiate disciplinary action against other students"; and Defendants followed the terms of the contracts by providing all the evidence they had to Plaintiff before the disciplinary hearing. *Id.* at 38–39.

Iowa law recognizes an implied covenant of good faith and fair dealing in all contracts. *See Alta Vista Props., LLC v. Mauer Vision Ctr., PC*, 855 N.W.2d 722, 730 (Iowa 2014); *Bagelmann v. First Nat'l Bank*, 823 N.W.2d 18, 34 (Iowa 2012). "The underlying principle is that there is an implied covenant that neither party will do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Am. Tower, L.P. v. Local TV Iowa, LLC*, 809 N.W.2d 546, 550 (Iowa Ct. App. 2011) (quoting 13 Richard A. Lord, *Williston on Contracts* § 38.15, at 435 (4th ed. 2000). The covenant thus "prevents one party from using technical compliance with a contract as a shield from liability when that party is acting for a purpose contrary to that for which the contract was made." *Mid-America Real Estate Co. v. Iowa Realty Co.*, 406 F.3d 969, 974 (8th Cir. 2005). Importantly, however, the covenant "does not give rise to new substantive terms that do not otherwise exist in

the contract." *Bagelmann*, 823 N.W.2d at 34 (quoting *Mid-America Real Estate*, 406 F.3d at 974). Thus, an implied covenant of good faith and fair dealing is contained in the Code and the Policy. Plaintiff's alleged violations of the covenant of good faith and fair dealing are subsumed by his breach of contract claims. Because Counts IV and VII are more appropriately considered as part of Plaintiff's breach of contract claims, the Court grants summary judgment in Defendants' favor on Counts IV and VII.

### 2.      Breach of Contract (Count III)

Plaintiff alleges Defendants breached its express and implied agreements with Plaintiff. ECF No. 46 ¶ 205. Under Iowa law, to prevail on a contract claim, a plaintiff must prove: 1) the existence of a contract; 2) the terms and conditions of the contract; 3) that the plaintiff has performed all the terms and conditions required under the contract; 4) the defendant's breach of the contract in some particular way; and 5) that the plaintiff has suffered damages as a result of the breach. *Molo Oil Co. v River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998). Contracts between a university and a student have been construed narrowly. *See Jackson v. Drake Univ.*, 778 F. Supp. 1490, 1493 (S.D. Iowa 1991) (holding financial aid documents included express terms of an agreement but did not contain an implicit agreement for the student to play basketball). The Court relies on Plaintiff's Amended Complaint—which identifies specific contract terms he alleges were breached by Defendants—and not on Plaintiff's Response in which Plaintiff argues generally that Defendants treated him unfairly in violation of their agreement. *Compare* ECF No. 46 ¶¶ 203–19, *with* ECF No. 121 at 42.

The first breach Plaintiff alleges is that Defendants failed to conduct an equitable investigation of Jane Doe's claims. ECF No. 46 ¶¶ 207–08. Plaintiff contends this breach violates the Policy term which states: "[t]he University disciplinary process will include a prompt, fair, and impartial investigation and resolution process." ECF No. 137 at APP. 138. Plaintiff next alleges

Defendants failed to conduct an equitable investigation of Plaintiff's claim of sexual misconduct by Jane Doe. ECF No. 46 ¶¶ 209–213. Plaintiff claims Defendants' failure to do so violates the term of the Code stating the Dean of Students will investigate student complaints. ECF No. 137 at APP. 116. Third, Plaintiff alleges Defendants breached the Code by discriminating against Plaintiff on the basis of sex. ECF No. 46 ¶¶ 214–15. Plaintiff alleges this discrimination violates the term of the Code stating Drake prohibits discrimination on the basis of sex. ECF No. 137 at APP. 099. Fourth, Plaintiff alleges Defendants breached the contract by failing to apply the proper burden of proof during the disciplinary proceedings. ECF No. 46 ¶¶ 216–17. Plaintiff claims that this breach corresponds with the term in the Code that provides "[a] violation of this Code is established upon proof of a charge by a preponderance of the evidence; a preponderance of the evidence exists when it is more likely than not, or the greater weight of the evidence suggests, a violation occurred." ECF No. 137 at APP. 122.

Plaintiff's first and last identified breaches—that Drake failed to conduct an equitable investigation and failed to apply the correct burden of proof—do not present a genuine issue of material fact. Although Plaintiff challenges various procedural characteristics of the disciplinary process, Plaintiff provides nothing more than conclusory allegations that the process was biased and partial. Plaintiff claims Defendants failed to provide "procedural equity" and argues, among other things, that "[t]he investigation report was positioned to support Jane Doe's accusation of lack of consent and incapacitation" and the "[s]anction was unwarranted and disproportionate in light of the circumstances." ECF No. 46 ¶ 208. Similarly, Plaintiff argues the wrong burden of proof was applied because "[a] fair reading of the evidence" calls for a different outcome. *Id.* at ¶ 217.

Plaintiff expresses disagreement with the procedure and the outcome, but does not demonstrate a genuine issue of material fact that shows the proceeding was not prompt, fair, and

impartial. Plaintiff agreed to accept the Code's "rules, regulations and policies" through "voluntary entrance into Drake University." ECF No. 137 at APP. 103. A Drake student also "acknowledges the right of the University to initiate disciplinary procedures when an allegation or a complaint of non-academic misconduct is made and to impose disciplinary sanctions when it has been determined that non-academic misconduct has occurred." *Id.* Because Plaintiff has not pointed to any genuine issue of material fact beyond his opinions about partiality and unfairness, Defendants' motion for summary judgment is granted as to these alleged breaches of contract.

However, there is a genuine issue of material fact as to Plaintiff's claim that Defendants breached the contract by failing to conduct an equitable investigation of Plaintiff's allegations against Jane Doe. There is also a genuine issue of material fact as to whether this failure was motivated by sex discrimination. The Code requires the Dean of Students conduct investigations into student complaints of sexual misconduct. ECF No. 137 at APP. 116. There are genuine issues of material fact as to whether Plaintiff filed a complaint, what Defendants decided to do with Plaintiff's complaint if it was initiated, and, finally, if any of these decisions were the result of sex discrimination. A jury must weigh the evidence to answer these questions and determine if Defendants breached their contract with Plaintiff. *See Amherst Coll.*, 238 F. Supp. 3d at 218 (holding the specific factual allegations that "the [defendant] responded differently to similar reports when the genders of the potential victims and aggressors were different" sufficient to show a breach of an agreement to hold a fair hearing to survive a motion for a judgment on the pleadings). Thus, Defendants' motion for summary judgment is denied as to the alleged breaches of contract that Defendants failed to conduct an equitable investigation of Plaintiff's claim and Defendants discriminated against Plaintiff on the basis of sex.

## V.  CONCLUSION

The Court grants in part and denies in part Defendants' Motion for Summary Judgment. Plaintiff did not contend dismissal of his negligent infliction of emotional distress claim. Plaintiff did not request a reasonable accommodation and thus cannot maintain his ADA claim. Plaintiff has not identified genuine issues of material fact to support his deliberate indifference and erroneous outcome claims under Title IX. The Court thus grants summary judgment in favor of Defendants on Plaintiff's negligent infliction of emotional distress claim, his ADA claim, and his Title IX claim under his erroneous outcome and deliberate indifference theories.

However, there are genuine issues of material fact as to whether Defendants selectively enforced their Code and Policy against Plaintiff in violation of Title IX. The Court thus denies Defendants' motion for summary judgment on Plaintiff's Title IX claim under a selective enforcement theory.

Plaintiff may not maintain an independent claim for declaratory judgment, so the Court grants Defendants' motion for summary judgment as to that claim. Plaintiff's estoppel and covenant of good faith and fair dealing claims are subsumed by his other contractual claims. Consequently, Defendants' motion for summary judgment on Plaintiff's estoppel and covenant of good faith and fair dealing claims is granted.

However, there are genuine issues of material fact as to whether Defendants breached their contract with Plaintiff by failing to investigate his claim of sexual misconduct. The Court denies Defendants' motion for summary judgment on Plaintiff's contract claims as to these two breaches. Summary judgment is granted in favor of Defendants on all of Plaintiff's other breach of contract claims.

**IT IS SO ORDERED** that Defendants' Motion for a Summary Judgment, ECF No. 99, is **GRANTED IN PART** and **DENIED IN PART**. The Court **GRANTS** Defendants'

Motion for Summary Judgment on Plaintiff's Title IX claim (Count I) under Plaintiff's erroneous outcome and deliberate indifference theories. The Court **DENIES** Defendants' Motion for Summary Judgment on Plaintiff's Title IX claim (Count I) under Plaintiff's selective enforcement theory. The Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's breach of contract claim (Count III) regarding Defendants' failure to conduct an equitable investigation and to apply a proper burden of proof. The Court **DENIES** Defendants' Motion for Summary Judgment on Plaintiff's breach of contract claim (Count III) regarding the Defendants' failure to investigate Plaintiff's allegations of sexual misconduct and its discrimination against Plaintiff on the basis of sex. The Court finds Plaintiff's estoppel and covenant of good faith and fair dealing claims (Counts IV and VII) are subsumed by Plaintiff's breach of contract claim and thus **GRANTS** Defendants' Motion for Summary Judgment on Counts IV and VII. Defendants' Motion for Summary Judgment on Plaintiff's claim of negligent infliction of emotional distress (Count V) is not resisted by Plaintiff and is thus **DISMISSED**. The Court **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's ADA claim (Count VI). Plaintiff's claim for a declaratory judgment (Count VIII) does not constitute an independent claim of relief. The Court thus **GRANTS** Defendants' Motion for Summary Judgment on Plaintiff's Count VIII for declaratory judgment.

The parties are responsible for their own costs.

Dated this 12th day of October, 2018.

REBECCA GOODGAME EBINGER
UNITED STATES DISTRICT JUDGE